UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROBERT REED,

                                        Plaintiff,

v.

                                                      9:19-CV-1203
                                                      (GTS/TWD)

R. MCGRATH, et al.,

                                        Defendants.
_____

APPEARANCES:                            OF COUNSEL:

ROBERT REED
  *Plaintiff, pro se*
93-B-1119
Bare Hill Correctional Facility
Caller Box 20
Malone, NY 12953

LETITIA JAMES                           LAUREN ROSE EVERSLEY, ESQ.
Attorney General of the State of New York    Assistant Attorney General
  *Counsel for Defendants*
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

Robert Reed ("Plaintiff"), an inmate in the custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), commenced this *pro se* action pursuant to

42 U.S.C. § 1983, asserting his constitutional rights were violated at Franklin Correctional

Facility ("Franklin").  (Dkt. No. 1.)  The claims remaining are Eighth Amendment excessive

force, Eighth Amendment failure to protect, and Fourteenth Amendment equal protect claims

against R. McGrath, G. Dupra,[1] D. Healey, D. Yelle, G. Smythe, Titus, Sr., K. Compo, and K. Bedore (collectively, "Defendants").  (Dkt. No. 8.)

Plaintiff now moves for summary judgment.  (Dkt. No. 49.)  Defendants filed a response and cross-moved for partial summary judgment.  (Dkt. No. 53.)  Plaintiff responded to Defendants' motion.  (Dkt. No. 54.)

The parties' cross-motions have been referred for a Report-Recommendation by the Honorable Glenn T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  For the reasons that follow, the Court recommends Plaintiff's motion for summary judgment be denied and Defendants' cross-motion for partial summary judgment be granted in part and denied in part.

## II.    RELEVANT BACKGROUND

The verified complaint alleges that on October 24, 2016, at 1:16 p.m. in the E-2 dormitory entryway of Franklin, Plaintiff was "repeatedly kicked and punched" by corrections officers McGrath, Dupra, Healey, Yelle, Smythe, Titus, Sr., and corrections sergeants Compo and Bedore.  (Dkt. No. 1 at 4.[2])  Plaintiff was also called a racial slur during the assault.  *Id*.  "Some of the officers attempted to break [Plaintiff's] legs and one attempted to pull [his] eye out of the socket."  *Id*.  As a result of the assault, Plaintiff suffered abrasions to his knee, wrist, and lip, redness and bruising on his left shoulder, two black eyes, a "large lump near [his] testicles[,]"

---

[1]  This defendant's name is spelled "Dupro" in the caption.  Defendant spells his surname "Dupra" according to the declaration he filed with the Court.  (Dkt. No. 53-8.) The Clerk is directed to amend the caption to reflect the correct spelling of Dupra.

[2]  Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

a "lasting back injury[,]" chest pains, "convulsions[,] and severe headaches." *Id*. Plaintiff also lost a tooth. *Id*.

Plaintiff seeks summary judgment because "there is not enough evidence to dispute [his] claim that Sergeant Compo used force on [him] and there is not enough evidence to dispute [his] claim that Sergeant Compo used excessive force." (Dkt. No. 49 at 1.) Defendants oppose Plaintiff's motion and Titus, Sr. and Bedore cross-move for summary judgment for lack of personal involvement. (Dkt. Nos. 53, 53-1.)

It is undisputed that a documented use of force incident occurred on October 24, 2016. (Dkt. No. 53-2 at ¶ 5.) According to Defendants, Compo, McGrath, Dupra, Healey, Smythe, and Yelle reported to the E-2 dormitory in response to a "red dot" alarm wherein a non-party officer alleged that Plaintiff had become "very irate and caused a scene in front of approximately 55 other inmates." *Id*. at ¶ 4. Compo avers that he ordered Plaintiff to "assume the pat-frisk position," but Plaintiff "came of the wall" and punched Compo. (Dkt. No. 53-3 at ¶¶ 5, 6.) At approximately 1:10 p.m., a documented use of force occurred. (Dkt . No. 53-2 at ¶ 5.)

Titus, Sr. and Bedore seek summary judgment because they were not personally involved in the incident at issue. (Dkt. No. 53-1 at 5-11.) To that end, Defendants submit evidence that Titus, Sr. was not present at the facility on October 24, 2016, as it was his regularly scheduled day off. (Dkt. No. 51-2 at ¶¶ 6, 7.) Defendants submit evidence that Bedore arrived at the E-2 dormitory *after* the use of force had ceased and "[h]is only involvement—if it could be described as such—was that, at the request of [Compo], he documented the use of force in the necessary logbook." (Dkt. No. 53-1 at 9-11, Dkt. No. 53-2 at ¶¶ 8-10.) Neither Titus, Sr. nor Bedore are listed on the Use of Force Report. *Id*. at ¶ 11.

In response to Defendants' cross-motion, Plaintiff requests that "Officer Titus be removed from this matter[.]"  (Dkt. No. 54 at 1.)  However, Plaintiff argues "there is legally sufficient evidence to conclude that Sergeant Bedore was present" and participated in the alleged constitutional violations and, therefore, Bedore should be denied summary judgment.  *Id*. at 3.

## III.    MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up). "In undertaking this analysis, it

bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id*.; *see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co.*, 884 F. Supp. 2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.").

"Moreover, the district court considering a summary judgment motion must be mindful of the underlying standards and burden of proof." *Larkins v. Cayuga Cty.*, No. 9:13-CV-219 (NAM/ATB), 2014 WL 4760064, at *4 (N.D.N.Y. Sept. 24, 2014) (quotation marks and alternations omitted). Accordingly, with respect to Plaintiff's motion, "he bears a much greater initial burden; he must show that the evidence supporting his claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id*.

## B.    Deficiencies in Plaintiff's Motion

Local Rule 56.1(a) requires a party moving for summary judgment to file and serve a Statement of Material Facts. *See* L.R. 56.1(a) ("Any motion for summary judgment <u>shall</u> contain a separate Statement of Material Facts." (emphasis added)). "The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." *Id*. "Each fact listed shall set forth a specific citation to the record where the fact is established." *Id*. "<u>Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.</u>" *Id*. (emphasis in the original).

The Local Rules are not "empty formalities," and courts within this District have denied a *pro se* party's motion for summary judgment based on their failure to file a Statement of Material Facts. *See, e.g., A'Gard v. Locke*, No. 9:14-CV-0613 (GTS/DEP), 2016 WL 8735653, at *4

(N.D.N.Y. June 24, 2016) (denying summary judgment motion because the *pro se* plaintiff did not comply with the applicable local rules governing motion practice by including a Statement of Material Facts) (citing *Riley v. Town of Bethlehem*, 5 F. Supp. 2d 92, 93 (N.D.N.Y. 1998) (dismissing summary judgment motion based on moving party's failure to file a properly supported Statement of Material Facts as required under the Local Rules)), *report-recommendation adopted*, 2016 WL 5137273 (N.D.N.Y. Sept. 21, 2016); *Diaz v. Smith*, No. 9:19-CV-1438 (LEK), ECF No. 73 (same); *see also Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426-27 & n.4 (N.D.N.Y. 2009) (Suddaby, J.) ("As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.") (collecting cases).

Here, Plaintiff filed a single document entitled "Summary Judgment Motion FRCP Rule 56" that blends a notice of motion with a memorandum of law.  (Dkt. No. 49.)  Plaintiff did not include a separate Statement of Material Facts as required under Local Rule 56(1)(a).  Because Plaintiff has not complied with the Local Rules governing motion practice by including the required Statement of Material Facts, the Court recommends denying Plaintiff's motion for summary judgment.

Additionally, even were the Court to overlook Plaintiff's failure to comply with the Local Rules, the undersigned agrees with Defendants that Plaintiff's motion demonstrates there are genuine disputes of material facts in this case.  (*See* Dkt. No. 53-1 at 11-14.)

As stated above, the crux of Plaintiff's motion for summary judgment is that "there is not enough evidence to dispute [his] claim that Sergeant Compo used forced on [him] and there is not enough evidence to dispute [his] claim that Sergeant Compo used excessive force on [him]." (Dkt. No. 49 at 1.)  Plaintiff seems to suggest that because a documented use of force occurred

on October 24, 2016, the evidence establishes that Defendants, and especially Compo, subjected him to excessive force. *Id*. at 2-4. Plaintiff is incorrect.

To establish an excessive force claim, the inmate must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotation marks omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

In his declaration, Compo avers that he responded to a "red dot" alarm to interview Plaintiff regarding the alleged disturbance he caused in in the E-2 dormitory. (Dkt. No. 53-7 at ¶ 5.) After Plaintiff was escorted to the foyer area of the dormitory, Compo instructed Plaintiff to "assume the pat-frisk position." *Id*. at ¶ 6. However, Plaintiff "turned off of the wall" and punched Compo in the face. *Id*. Compo's account of the incident is corroborated by the Use of Force Report. (Dkt. No. 53-3 at 85-87.) Additionally, Dupra, Healey, McGrath, Smythe, and Yelle each declare that they responded to the "red dot" alarm and although they were present for the documented use of force on October 24, 2016, they did not assault Plaintiff or witness any other officer, including Compo, assault Plaintiff. (Dkt. Nos. 53-8 at ¶ 8, 53-9 at ¶ 8, 53-10 at ¶ 8, 53-11 at ¶ 8, 53-12 at ¶ 8.)

Conversely, Plaintiff testified that, while his hands were against the wall, "as soon as Sergeant Compo came out of the door -- came through the door, he punched me. And that's -- that's how this – this all started." (Dkt. No. 53-3 at 23.) Plaintiff further testified that Bedore,

Dupra, Healey, McGrath, Smythe, and Yelle proceeded to assault him by beating, punching, and kicking him. *Id*. Plaintiff was forced to the ground; they tried to break his leg and used a racial slur. *Id*.

Here, the competing evidence rests on the credibility of Plaintiff on one hand and Defendants on the other. In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the nonmoving party requires the Court to credit Defendants' version of the events for purposes of Plaintiff's motion for summary judgment. *Coleman v. Racette*, No. 9:18-CV-0390 (MAD/CFH), 2021 WL 4312392, at *8 (N.D.N.Y. May 27, 2021), *report-recommendation adopted*, 2021 WL 3508342 (N.D.N.Y. Aug. 10, 2021); *In re Dana Corp.*, 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence, functions which are reserved to a jury and not a judge) (citing cases). As such, Defendants have raised a material issue of fact as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

In sum, even if the Court were to overlook Plaintiff's failure to submit a Statement of Material Facts as required by Local Rule 56(1)(a), such conflicting allegations represent a genuine dispute of a material fact in this case that also precludes granting summary judgment to Plaintiff.[3] Accordingly, the Court recommends that Plaintiff's motion for summary judgment be denied.

---

[3] The Court agrees with Defendants that any concerns or allegations regarding the falsification of documents or party testimony are issues for trial as it would require the "type of credibility assessment that had been explicitly reserved for the finder of fact, be it the trial judge or a jury." (Dkt. No. 53-1 at 13 (quoting *Wilson v. Deluca*, No. 9:11-CV-00030 (MAD), 2014 WL 991862, at *9 (N.D.N.Y. Mar. 12, 2014)).)

### C.    Deficiencies in Plaintiff's Opposition

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' cross-motion for partial summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under Local Rule 56.1(b).[4] (Dkt. No. 54.) "This requirement is not a mere formality; rather 'this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties.'" *Cao-Bossa v. New York State Dep't of Lab.*, No. 1:18-CV-0509 (GTS/TWD), 2021 WL 3674745, at *1 (N.D.N.Y. Aug. 19, 2021).

Where, as in this case, a party has failed to respond to the movant's Statement of Material Facts in the manner required under Local Rule 56.1(b), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[5] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[4] Local Rule 56.1(b) requires the opposing party to file a Response to the movant's Statement of Material Facts. Under the rule, the Response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 56.1(b).

[5] Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 53 at 3.)

Accordingly, the facts set forth in Defendants' Statement of Material Facts (Dkt. No. 53-2) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's verified complaint and opposition submission will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts . . . supplemented by Plaintiff's verified complaint . . . as true."). As to any facts not contained in Defendants' Statement of Material Facts, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

### D. Personal Involvement

Titus, Sr. and Bedore cross-move for summary judgment arguing they were not personally involved in the alleged constitutional violations. (Dkt. No. 53-1 at 5-11.)

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who

knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Recently, the Second Circuit concluded that "there is no special rule for supervisory liability" and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). To avoid summary judgment, a plaintiff must establish that the defendant violated the constitution by his or her "own conduct, not by reason of [the defendant's] supervision of others who committed the violation" and cannot "rely on a separate test of liability specific to supervisors." *Id*. The "factors" necessary to plead and establish a Section 1983 violation "'will vary with the constitutional provision at issue' because the elements of different constitutional violations vary." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

As set forth above, to establish a prima facie Eighth Amendment excessive force claim, a plaintiff must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden*, 186 F.3d at 262-63. Further, in order to establish an Eighth Amendment failure to protect claim, a plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. With respect to a Fourteenth Amendment equal protection claim, "[c]ourts in this circuit and elsewhere have held

that officers' use of racial epithets may be regarded as direct evidence of racial animus and, when combined with physical abuse or other unlawful actions, may establish an equal protection violation." *Ali v. Connick*, 136 F. Supp. 3d 270, 280 (E.D.N.Y. 2015).

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016) (quotation omitted), *report-recommendation adopted*, 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016), *rev'd on other grounds sub nom. Brandon v. Kinter,* 938 F.3d 21 (2d Cir. 2019). A plaintiff's verified complaint and deposition testimony constitutes such evidence and "[a]ny discrepancies or inconsistencies in [the] plaintiff's testimony are for a jury to assess." *Latouche v. Tompkins*, No. 9:09-CV-308 (NAM/RFT), 2011 WL 1103045, at *5 (N.D.N.Y. Mar. 23, 2011).

"Personal involvement is generally a question of fact and summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law." *Guarneri v. Hazzard*, No. 9:06-CV-985 (NAM/DRH), 2010 WL 1064330, at *23 (N.D.N.Y. Mar. 22, 2010) (quoting *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (citing Fed. R. Civ. P. 56(c) and cases)).

### 1.    Titus, Sr.

The undisputed record evidence demonstrates Titus, Sr. was not present at Franklin on October 24, 2016. (Dkt. No. 53-2 at ¶ 7.) At his deposition, Plaintiff testified that Titus, Sr. "wasn't the guy that I was thinking he was" and that "another guy identified [Titus, Sr.]" as one of the officers involved in the use of force. (Dkt. No. 53-3 at 29-30.) Moreover, in his response

to Defendants' motion, Plaintiff "request[s] that Officer Titus be removed from this matter[.]" (Dkt. No. 54 at 1.)

Accordingly, the Court recommends granting Defendants' cross-motion for summary judgment as to Titus, Sr. on this ground.

### 2.    Bedore

The Court reaches a different result, however, as to Bedore.  To be sure, Defendants have marshalled evidence indicating Bedore was not personally involved in the alleged constitutional violations.  (Dkt. No. 53-2 at ¶¶ 8, 12.)  For one, Bedore flatly denies being present during the documented use of force and further declares that he never used excessive force on Plaintiff on the date at issue or at any other time.  (Dkt. No. 53-4 at ¶¶ 5, 10.)  Bedore declares that when he arrived in the E-2 dormitory on October 24, 2016, the use of force had ceased, and Plaintiff had been placed in mechanical restraints and was being transported to the infirmary.  *Id*. at ¶ 6.  For his part, Bedore states he only documented the use of force in the logbook.  *Id*. at ¶ 7.

As pointed out by Defendants, these facts are consistent with the memorandum Bedore authored on November 9, 2016, as part of the investigation into Plaintiff's grievance concerning the October 24, 2016 use of force, as well as the declarations of Compo, Dupra, Yelle, Healey, McGrath, and Smythe and the Use of Force Report, all of which state that Bedore was not present at or involved in the use of force.  (Dkt. No. 51-1 at 9; Dkt. Nos. 53-4 at ¶ 9, 54-7 at ¶¶ 4, 9; 54-8 at ¶¶ 4, 7; 54-9 at ¶¶ 4, 7; 54-10 at ¶¶ 4, 7; 54-11 at ¶¶ 4, 7; 54-12 at ¶¶ 4, 7; 54-3 at 85-87.)

Conversely, according to Plaintiff's verified amended complaint and deposition testimony, Bedore was not only present during the October 24, 2016, assault, but Bedore was

one of the officers that subjected Plaintiff to the excessive force.  (Dkt. No. 1 at 4, Dkt. No. 53-3

at 29, 44-47.)  To that end, Plaintiff testified:

> Q:  Now you mention Sergeant -- Sergeant Bedore, where was he
> during this?
>
> A:  He was -- he was on the left side of me, close to the door, he
> was closest to the door.
>
> Q:  And what are your basis for your claims against him, what was
> he doing during this incident?
>
> A:  He was hitting me.  He was punching me, kicking me.

(Dkt. No. 53-3 at 29.)  Defendants have acknowledged as much in their memorandum of law:

> With respect to defendant Bedore, contrary to plaintiff's testimony
> at his deposition, *see* Eversley Decl. ¶ 3, Exhibit "A" at p. 26,
> defendant Bedore did not witness nor did he participate in the use
> of force.  *See* Bedore Decl. ¶ 5.

(Dkt. No. 53-1 at 9.)  Nevertheless, Defendants contend summary judgment is warranted because

Bedore proffers "persuasive documentary evidence to corroborate [his] sworn affidavit that" he

did not participate or witness the alleged constitutional violation.  (Dkt. No. 53-1 at 9-10.)

But as this Court has held, "the weighing of such competing evidence, no matter how

weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier

of fact."  *Cirio v. Lamora*, No. 08-CV-431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb.

24, 2010), *report-recommendation adopted*, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010).

"And while it is true that the only piece of evidence [Plaintiff] offers on this score is his own

self-serving testimony, that 'can establish a genuine dispute of fact so long as [it] does not

contradict the witness's prior testimony.'"  *Waters v. Prack*, No. 9:13-CV-1437 (LEK/DEP),

2017 WL 1187871, at *1 (N.D.N.Y. Mar. 30, 2017) (quoting *Dye v. Kopiec*, No. 16-CV-2952,

2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (collecting cases)).

In sum, while Plaintiff and Defendants provide different accounts of the events that transpired on October 24, 2016, there are genuine material issues of fact concerning Bedore's personal involvement in the alleged constitutional violations.[6]

Accordingly, the Court recommends denying Defendants' cross-motion for summary judgment as to Bedore on this ground.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 49) be **DENIED**; and it is further

**RECOMMENDED** that Defendants' cross-motion for partial summary judgment (Dkt. No. 53) be **GRANTED** insofar as it seeks dismissal of Plaintiff's claims against Titus, Sr., and **DENIED** insofar as it seeks dismissal of Plaintiff's claims against Bedore, and it is further

**RECOMMENDED** that Titus, Sr. be **DISMISSED** from this action with prejudice; and it further

**ORDERED** that the Clerk amend the docket to reflect the correct spelling of Dupra; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

---

[6] The Court has carefully considered the cases relied upon by Defendants in their memorandum of law wherein this Court has granted summary judgment for lack of personal involvement where the defendant proffers "persuasive documentary evidence to corroborate [his or her] sworn affidavit that" he or she did not participate in the alleged constitutional violation and finds them factually and procedurally distinguishable. (Dkt. No. 53-1 at 9-10.)

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[7]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: December 22, 2021
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[7]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 18 of 174
Larkins v. Cayuga County, Not Reported in F.Supp.3d (2014)
2014 WL 4760064

KeyCite Overruling Risk - Negative Treatment

Overruling Risk    Darnell v. Pineiro,    2nd Cir.,    February 21, 2017

2014 WL 4760064
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald LARKINS, Plaintiff,
v.
CAYUGA COUNTY and David Gould,
Sheriff in Official Capacity, Defendants.

No. 9:13–CV–219 (NAM/ATB).
|
Signed Sept. 24, 2014.

**Attorneys and Law Firms**

Ronald Larkins, Auburn, NY, pro se.

Bryan Georgiady, Esq., The Law Firm of Frank W. Miller,
East Syracuse, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**INTRODUCTION**

*1 Plaintiff Ronald Larkins, an inmate in the custody of the
New York State Department of Corrections and Community
Supervision, brought this action for declaratory and monetary
relief under 42 U.S.C. § 1983, alleging that defendants
Cayuga County and Sheriff David Gould denied him adequate
medical care by failing to provide him with eye glasses
while he was confined at the Cayuga County Jail ("CCJ").
Plaintiff's motion (Dkt. No. 25) and defendants' cross-motion
(Dkt. No. 26) for summary judgment were referred to United
States Magistrate Judge Andrew T. Baxter for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

Magistrate Judge Baxter issued a Report and
Recommendation (Dkt. No. 34) in which he recommends
that the Court deny plaintiff's motion for summary judgment,
grant defendants' cross-motion for summary judgment and
dismiss the complaint in its entirety. Magistrate Judge

Baxter's recommendation is based on his conclusion that there
is no evidence that Cayuga County had a "policy or custom"
that caused plaintiff any constitutional violation. Magistrate
Judge Baxter further concluded that no reasonable fact finder
could conclude that defendant Sheriff Gould, or anyone else at
CCJ, acted with deliberate indifference to plaintiff's medical
needs.

Plaintiff objects to Magistrate Judge Baxter's conclusion and
asserts that Cayuga County's policy of prohibiting prisoners
from covering their eyes and keeping the lights on "24/7" is
sufficient to establish municipal liability. Dkt. No. 37, p. 2.
Plaintiff also objects to dismissal of Sheriff Gould for lack
of personal involvement asserting that there is evidence that
Sheriff Gould, and others at CCJ, were aware he was suffering
from headaches and that his vision was deteriorating. Dkt. No.
37, pp. 2, 5. Defendants oppose plaintiff's objections. Dkt. No.
38.

**DISCUSSION**

The Court adopts Magistrate Judge Baxter's summary of the
facts and applicable law. The Court does not repeat them here.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de
novo* those parts of a report and recommendation to which a
party specifically objects. Where a party interposes only
general objections to a report and recommendation, the Court
reviews for clear error or manifest injustice. *See Davis v.
Chapple,* 2010 WL 145298, *2 (N.D.N.Y. Jan. 8, 2010),
*Brown v. Peters,* 1997 WL 599355,*2–* 3 (N.D.N.Y.), *aff'd
without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to
any portion of a report and recommendation waives further
judicial review of the matters therein. *See Roldan v. Racette,*
984 F.2d 85, 89 (2d Cir.1993).

Viewing the facts in the light most favorable to plaintiff,
the Court concludes, as did Magistrate Judge Baxter, that
there is sufficient evidence from which to assume that
plaintiff has raised an issue of fact as to whether his medical
need for prescription eyeglasses was sufficiently serious, in
satisfaction of the first prong of the deliberate indifference
analysis. *See e.g., Thomas v. Toperok,* No. 6:13–CV–6371,
2014 WL 897097, at*5 (W.D.N.Y. Mar. 6, 2014) (assuming
that plaintiff's assertion "that he suffered eye strain and
migraines from not having the proper strength prescription
glasses for a period of time, and that he allegedly almost went
'legally blind' " was sufficient to allege a serious medical

condition). The Court, however, further concludes, as did Magistrate Judge Baxter, that there is:

> **\*2** no evidence from which a reasonable factfinder could conclude that any of plaintiff's medical providers were aware that he was suffering from severe headaches, that his vision was deteriorating to any great extent, or aware of any other information that would indicate that plaintiff was suffering from a condition requiring urgent medical care.

Dkt. No. 34, p. 13. To establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The grievances plaintiff submitted contained complaints regarding his vision, but they only stated that his vision had "gotten worse". Plaintiff did not request stronger pain medication and did not request a visit with the doctor. Moreover, following plaintiff's June 2011 grievance, Nurse Wallace made a number of attempts to and eventually succeeded in finding an eye care provider to see plaintiff and scheduled an appointment. Even viewing the evidence in the light most favorable to plaintiff, there is no basis on which a factfinder could concluded that Nurse Wallace or any other prison official could infer that a substantial risk of serious harm existed if plaintiff was not seen promptly by an eye care provider. Thus, plaintiff has failed to raise a genuine issue of material fact as to whether defendants were deliberately indifferent to plaintiff's serious medical need.

## CONCLUSION

Upon *de novo* review, the Court accepts and adopts the Report–Recommendation and Order in its entirety.

It is therefore

**ORDERED** that the Report–Recommendation (Dkt. No. 34) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that plaintiff's motion for summary judgment (Dkt. No. 25) is **DENIED** and it is further

**ORDERED** that defendants' motion (Dkt. No. 26) for summary judgment is **GRANTED** and the case dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c). Presently before the court are plaintiff's motion and defendants' cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. Nos. 25 and 26). Plaintiff has filed a reply. (Dkt. No. 31). For the following reasons, this court will recommend that plaintiff's motion for summary judgment be denied, that defendants' cross-motion for summary judgment be granted, and that the complaint be dismissed in its entirety.

### I. *Facts*

Plaintiff brings this pro se civil rights complaint under § 1983 based on events arising out of his confinement at the Cayuga County Jail ("CCJ"). Plaintiff, who first began wearing prescription glasses in 2006, arrived at CCJ without these glasses on or about August 24, 2010. During the intake interview conducted by Nurse Wallace, plaintiff noted that he wore glasses, but did not have them with him, and did not discuss any other significant concerns during the interview. (Dkt. No. 26–3 ("Wallace Aff.") at ¶¶ 8, 11, 14). In October 2010, plaintiff submitted an Inmate Request Form for an eye exam, explaining that he was "constantly squinting because of nearsightedness" and that he had two pair of glasses at home but lost them. (*Id.* at Ex. B). Nurse Wallace responded that the Jail did not have an optometrist for routine vision care and would not be able to provide glasses. (*Id.* at ¶¶ 15, 17, and Ex. B).

2014 WL 4760064

**\*3** In November 2010, plaintiff woke up with blurry vision in his left eye. (Dkt. No. 26–1 ("Def. Rule 7.1 Statement") at ¶ 16). Though this problem did resolve on its own, (Def. Rule 7.1 Statement at ¶¶ 18–19), plaintiff saw Dr. Kooi regarding his left eye and his deteriorating vision on December 30, 2010. (Dkt. No. 26–4 ("Kooi Aff.") at ¶ 3–4). During this visit, plaintiff complained of nearsightedness, explaining that his vision had been getting worse for two weeks. (Wallace Aff. at ¶ 22; Kooi Aff. at ¶ 4). He did not, however, mention any problems with headaches. (Wallace Aff. at ¶ 22). Dr. Kooi examined plaintiff and found the pupils of plaintiff's eyes to be equal, round, and reactive to light and accommodation, the fundus of each eye in good condition and noted that plaintiff was not in any distress. (Kooi Aff. at ¶¶ 6, 7). Dr. Kooi recommended that plaintiff see an outside ophthalmologist, if possible, but did not believe he was in need of emergency medical care. (Kooi Aff. at ¶¶ 9, 11).

In light of Dr. Kooi's recommendation, Nurse Wallace contacted Dr. Speck, the doctor who CCJ generally used for inmates' optometry issues. When Nurse Wallace spoke with someone in Dr. Speck's office, Nurse Wallace was told that the doctor declined to see plaintiff, but would reconsider if "something further" developed. Based on Dr. Kooi's findings, Nurse Wallace states that she did not recognize any indications of an urgent need for medical care. (Wallace Aff. at ¶ 27). When Nurse Wallace relayed the message from Dr. Speck's office to Dr. Kooi he did not specifically tell the nurse to attempt to schedule an appointment with another provider. Plaintiff never contacted the infirmary again regarding problems with his vision. (Wallace Aff. at ¶ 34).

A few months later, plaintiff filed a grievance regarding the fact that he had not yet been scheduled to see an outside optometrist. In this grievance, plaintiff asserted that his vision was "no better." (Dkt. No. 26–5 ("Gleason Aff."), Ex. A). Following this grievance, Nurse Wallace contacted additional providers in the area, even though as far as she knew nothing about plaintiff's vision had changed. However, she was unable to locate a provider who was willing to see plaintiff. (Wallace Aff. ¶¶ 36–37). Plaintiff filed a second grievance in June 2011, stating that his vision had "gotten worse." (Gleason Aff., Ex. B). After making additional attempts to locate an optometrist, Nurse Wallace found a provider, but was unable to schedule an appointment until February 6, 2012. (Wallace Aff. at ¶¶ 40, 41). Plaintiff was transferred out of the Jail on December 29, 2011. During his vision screening at Elmira Correctional Facility, his vision was found to be 20/70. (Wallace Aff, Ex.

D). In February 2012, it was found to be 20/200. (Wallace Aff. Ex. E).

Plaintiff brings this action against Sheriff Gould and the County of Cayuga alleging that he was denied adequate medical care while at CCJ.

## II. *Summary Judgment*

**\*4** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

Where, as here, cross motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." *Natural Res. Def. Council v. Evans,* 254 F.Supp.2d 434, 438 (S.D.N.Y.2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* (citation omitted). Moreover, "[t]he district court considering a summary judgment motion ... must ... be 'mindful of the underlying standards and burdens of proof ...' " *U.S. S.E.C. v. Meltzer,* 440 F.Supp.2d 179, 187 (E.D.N.Y.2006) (citations omitted). Accordingly, with respect to plaintiff's motion, he

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 21 of 174
Larkins v. Cayuga County, Not Reported in F.Supp.3d (2014)
2014 WL 4760064

bears a much greater initial burden; he "must show that the evidence supporting [his] claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id.* Accord, *McCarthy v. Wachovia Bank, N.A.,* 759 F.Supp.2d 265, 273 (E.D.N.Y.2011).

## III. *Defendants*

### A. Applicable Law

#### 1. Municipal Liability

In *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights, and it must be the moving force behind the violation. *Id.; Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir.1979). The plaintiff must allege facts demonstrating: "(1) the existence of an officially adopted policy, custom, or practice and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally protected rights." *Best v. City of New York,* No. 11 Civ. 4475, 2012 WL 5458054, at *3 (S.D.N.Y. Nov. 8, 2012) (quoting *Bd. of Cnty. Commis of Bryan Cnty. v. Brown,* 520 U.S. 397, 403–404 (1997)).

**\*5** A municipality may not be held liable on a "respondeat superior" theory. *Monell,* 436 U.S. at 691. However, a policy, custom or practice of an entity may be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir.2004) (quoting *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996)). However, a single incident of illegality does not ordinarily rise to the level of a custom or policy. *Vaher v. Town of Orangetown,* 916 F.Supp.2d 404, 440 (S.D.N.Y.2013) (citations omitted).

#### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second

Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007).

### B. Application

Plaintiff names the County of Cayuga as a defendant. However, plaintiff fails to state a claim for municipal liability against Cayuga County. There is no evidence of a "policy or custom" of Cayuga County that caused plaintiff any constitutional violation. The County cannot be liable simply because plaintiff was housed in its jail. Consequently, Cayuga County may be dismissed on this basis alone.

Sheriff Gould is named as a defendant in the caption of the complaint, but plaintiff's only factual allegations regarding defendant Gould are that he was aware of plaintiff's medical needs through two grievances and that he is "statutorily responsible for inmates medical care."[1] (Compl. at 5). Despite the sparse allegations and evidence regarding defendant Gould, the court has considered the merits of plaintiff's claim against him and has also considered whether to allow plaintiff an opportunity to amend the complaint to name another individual who was personally involved in the alleged violations.[2] Defendants have already submitted affidavits from Dr. Kooi and Nurse Wallace-the individuals involved in plaintiff's medical care, and the court finds that plaintiff's claim fails on the merits. For the reasons described herein, the court has determined that no reasonable fact finder could conclude that anyone at CCJ acted with deliberate indifference.

[1]    However, the grievances do not appear to have been directed to Sheriff Gould. The only indication that Sheriff Gould was even aware of plaintiff's situation is a September 6, 2011 letter from the Chairman of the Citizens Policy and Complaint Review Council to Sheriff Gould explaining that

the Council accepted plaintiff's grievance and that facility officials shall ensure that inmates[ ] are afforded the medical treatment prescribed by the responsible licensed medical professional. (Dkt. No. 31–3 at 8).

2    Plaintiff attempted to amend his complaint on October 31, 3013. (Dkt. No. 22). It appeared that plaintiff sought to add a medical malpractice claim against Dr. Kooi. (Dkt. No. 22 at 1). This court denied the motion without prejudice on November 8, 2013 and gave plaintiff thirty days to submit a new motion to amend, explaining that plaintiff would need to include a complete proposed amended complaint and could not name Dr. Kooi as a defendant and include only a state law negligence claim against him. (Dkt. No. 24 at 4). On November 14, 2013, plaintiff submitted his motion for summary judgment. (Dkt. No. 25). Plaintiff did not submit a new motion to amend.

## IV. *Denial of Medical Care*

### A. Applicable Law

**\*6** In order to state a claim based on constitutionally inadequate medical treatment,[3] the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

3    Plaintiff's claim arose while he was a pretrial detainee at the Cayuga County Jail, and is, therefore, properly analyzed under the Fourteenth Amendment. *See, e.g., Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). However, regardless of whether a deliberate indifference claim is brought pursuant to the Eighth or Fourteenth Amendment, the standard is the same. *Id.* at 72.

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' "

*Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*7** Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Therefore, any claims of medical malpractice, or disagreements with treatment are not actionable under section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.1992), *aff'd* 970 F.2d 896 (2d Cir.1992) (table).

### B. Application

2014 WL 4760064

Plaintiff accuses defendants of deliberate indifference to plaintiff's serious medical needs when they failed to ensure that he be scheduled for an optometry appointment so that he could obtain prescription eye glasses in a reasonably timely fashion. Defendants argue that plaintiff cannot meet either the subjective or the objective prong of the standard.

With respect to the objective prong, defendants contend that plaintiff's medical needs were not "serious." Among the relevant factors for determining whether a serious medical need exists are "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (citation omitted). Diminished eyesight can, under certain circumstances, be sufficiently serious to provide the basis for a claim for the denial of medical care. *See Koehl v. Dahlsheim,* 85 F.3d 86, 88 (2d Cir.1996) (holding that a prisoner who was denied prescription eyeglasses necessary to correct double vision and a loss of depth perception, resulting in headaches and injuries from walking into objects as a result, had a serious medical condition).

Plaintiff alleges that he suffered severe headaches or migraines during the time that he did not have prescription glasses. *See Johns v. Goord,* No. 9:09–CV–1016 (NAM/ RFT), 2010 WL 3907826, at *4 (N.D.N.Y. Sept. 30, 2010) (explaining that plaintiff's allegations of "extreme eye pain, excruciating headaches, a loss of vision and loss of balance" were sufficient to withstand defendants' motion to dismiss). Defendants contend that plaintiff failed to complain about headaches while at CCJ, but have presented no evidence to show that he did not suffer from the severe headaches alleged. It appears that plaintiff had a standing order for ibuprofen and tylenol and could receive up to 3 tables 4 times per day without contacting medical staff. (Dkt. No. 31 at 14). Plaintiff alleges that he would take 3 ibuprofen at a time for the pain. (Dkt. No. 26–6 at 46). Additionally, plaintiff's medical records from Auburn Correctional Facility confirm that he has consistently complained that he experienced severe headaches during his time at CCJ. (Dkt. No. 25–3 at 21).

Moreover, plaintiff asserts that his eyesight deteriorated significantly due to the fact that he did not have prescription glasses for over a year, resulting in permanent damage. *See Davidson v. Scully,* 155 F.Supp.2d 77, 87 (S.D.N.Y.2001) ("Where a prisoner's vision will degenerate in the absence

of corrective glasses, the need for vision correction can be a sufficiently serious need.") (citing *Koehl,* 85 F.3d at 87). Defendants have not produced any evidence that the delay did not cause the degeneration. [4]

[4]      Defendants argue that this deterioration occurred after his time at CCJ, and therefore, defendants are not responsible for the deterioration. It does appear that after he left the Jail in December 2011, plaintiff's vision was 20/70, and two months later it was 20/200. However, it is not clear that the year that plaintiff spent at the Jail without glasses did not cause this deterioration. Based on the record now before this court, a reasonable juror could find that the delay in care caused plaintiff's vision to further deteriorate.

*8 Defendants argue that because plaintiff spent time in the law library and did legal research, his daily activities were not impacted. However, the court notes that plaintiff was having trouble with distance vision, not reading. Therefore, the fact that he could still read and write without incident did not mean that his long-distance vision was not deteriorating, or causing significant issues. Indeed, plaintiff asserts that he had difficulty identifying other inmates. (Dkt. No. 26–6 at 63–64 (explaining that he could only see people at the end of the hall if he squinted)). Under these circumstances, the court will assume that there is an issue of fact as to whether plaintiff's medical needs were serious.

However, turning to the subjective prong of the test, the court finds that plaintiff cannot show that anyone at CCJ acted with deliberate indifference, and therefore recommends dismissing plaintiff's medical indifference claim on the merits. In order to establish "deliberate indifference," plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839– 40).

Here, the record is devoid of evidence from which a reasonable factfinder could conclude that any of plaintiff's medical providers were aware that he was suffering from severe headaches, that his vision was deteriorating to any great extent, or aware of any other information that would indicate that plaintiff was suffering from a condition requiring urgent medical care. To the extent plaintiff asserts that

2014 WL 4760064

CCJ employees should have been aware of his worsening condition based on his grievances, the information provided in these grievances is insufficient to alert the staff that plaintiff suffered from a serious medical need. In his first grievance, plaintiff simply stated that his vision was "no better." (Gleason Aff., Ex. A). Even the second grievance only stated that his vision "has gotten worse" with no additional details about problems that the vision was causing, the extent to which it deteriorated, or that he was suffering in any other way. (Gleason Aff., Ex. B). After his visit on December 30, 2011, plaintiff never contacted the infirmary again regarding his vision. [5] (Wallace Aff. at ¶ 34). Plaintiff also never requested a visit with the doctor to request stronger pain medication for his headaches. [6]

[5]    Plaintiff explains that he assumed he "would be seen in a reasonable time frame." (Dkt. No. 31–3 at 3). However, this does not change the fact that officials at CCJ had no reason to believe that serious harm could occur.

[6]    Plaintiff himself does not assert that he informed anyone in the medical unit who would be able to assist with his vision issues that his vision was deteriorating, instead only claiming that he told Sergeant Gleason and other inmates that it was getting worse. (Dkt. No. 31 ("Pl. Response to Rule 7.1 Statement") at ¶ 39).

Plaintiff asserts that Nurse Wallace ignored Dr. Kooi's orders and that this demonstrates deliberate indifference. Although under certain circumstances, ignoring the orders of a doctor could demonstrate deliberate indifference, [7] the court finds that based on the undisputed facts, Nurse Wallace did not ignore Dr. Kooi's orders. As detailed above, she contacted CCJ's usual eye care provider who declined to see plaintiff at that time, and told Nurse Wallace to let his office know if plaintiff's condition became more urgent. She relayed this message to Dr. Kooi, who did not tell her to call other providers. (Wallace Aff. at ¶ 32). Nurse Wallace states that she believed Dr. Kooi would have told her to do so had plaintiff's condition been urgent. (Id. at ¶ 33). Dr. Kooi explains that he did not believe immediate eye care was required, and he was not aware of any other significant changes in plaintiff's vision prior to his transfer. (Kooi Aff. at ¶¶ 11, 12). Nurse Wallace's actions do not rise to the level of deliberate indifference. Indeed, Nurse Wallace explained that based on Dr. Kooi's examination of plaintiff she did not personally recognize an urgent need for medical care, and that she never received any

information that plaintiff's vision had a material impact on his ability to live or function in the jail or that his health or safety was in danger. (Wallace Aff. at ¶¶ 27, 45, 46). Plaintiff presents no evidence to suggest that Nurse Wallace knew that plaintiff suffered from a substantial risk of serious harm.

[7]    See *Paul v. Bailey*, 09 Civ 5784, 2013 WL 2896990, at * 16 (S.D.N.Y. June 13, 2013) ("Ignoring the express orders of a doctor is more than merely negligent and is sufficient to withstand a motion to dismiss.") (citing *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.1987)) (Report and Recommendation).

**\*9** No evidence suggests that any officials at CCJ were aware that serious harm could occur if an appointment with an ophthalmologist was not scheduled immediately. The court finds that no reasonable juror could conclude that personnel at CCJ were deliberately indifferent to plaintiff's condition, meaning that they "kn[ew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety" and that they were "both ... aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and ... also dr[e]w the inference. *Farmer*, 511 U .S. at 837. The court will, therefore, recommend denying plaintiff's motion and will recommend granting defendants' cross-motion for summary judgment.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 25) be **DENIED,** and it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED** and that the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

File June 27, 2014.

**Larkins v. Cayuga County, Not Reported in F.Supp.3d (2014)**

2014 WL 4760064

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4760064

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

KeyCite Yellow Flag - Negative Treatment
Supplemented by  A'Gard v. Locke,  N.D.N.Y.,  August 17, 2016

2016 WL 8735653
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenith M. A'GARD, Plaintiff,

v.

N. LOCKE,[1] et al., Defendants.

[1]    Defendant Locke was sued by plaintiff as N.
       Lock. *See* Dkt. No. 1 at 7. The clerk of the
       court will respectfully be directed to revise
       the docket in this matter to reflect the correct
       spelling of defendant Locke's name.

Civil Action No. 9:14-CV-0613 (GTS/DEP)
|
Signed 06/24/2016

**Attorneys and Law Firms**

KENITH M. A'GARD, 10-A-3008, Shawangunk
Correctional Facility, P.O. Box 700, Wallkill, NY 12589, Pro
Se.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ. Assistant Attorney
General, The Capitol, Albany, NY 12224.

REPORT, RECOMMENDATION AND ORDER

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  *Pro se* plaintiff Kenith M. A'Gard, a New York State
prison inmate, has commenced this action against several
defendants, both named and unidentified "Doe" defendants,
all of whom are corrections employees stationed at the prison
facility in which plaintiff was confined at the relevant times,
pursuant to 42 U.S.C. § 1983, alleging the deprivation of
his civil rights. Liberally construed, plaintiff's complaint
asserts claims under the Eighth Amendment for (1) failure to
protect, against defendant Nathan Locke and four unnamed
individuals, based on allegations that they failed to take
reasonable steps to prevent plaintiff from being assaulted by a
fellow inmate, and (2) deliberate medical indifference, against

an unidentified nurse, based on allegations that she provided
inadequate medical care following the assault on plaintiff.

Currently pending before the court are cross-motions brought
by defendant Locke and the plaintiff, each seeking the entry
of summary judgment in their favor. For the reasons set
forth below, I recommend that plaintiff's motion be denied and
defendant Locke's motion be granted. In addition, based on
the record evidence adduced by defendant Locke in support
of his motion, which demonstrates his knowledge as to the
identities of the Sergeant John Doe and Lieutenant John
Doe named as defendants in the complaint, the previous
efforts of plaintiff to identify these defendants, and my
recommendation with respect to the claim asserted against
defendant Locke, defense counsel will be directed to provide
plaintiff with the names of these individuals.[2] Finally, in light
of plaintiff's failure to take reasonable steps to identify and
join the other unnamed defendants in this action during the
pendency of discovery and the absence of any record evidence
that would appear to support a claim against any of those
defendants, I recommend that the claims asserted against the
remaining three unnamed defendants be dismissed without
prejudice for failure to prosecute.

[2]    After plaintiff has been provided with the true
       names of Sergeant John Doe and Lieutenant John
       Doe, plaintiff will be granted leave to amend
       his complaint, after which point the court will
       issue a new scheduling order allowing for limited
       discovery relative to the Eighth Amendment claim
       asserted against these defendants.

I. BACKGROUND[3]

[3]    In light of the procedural posture of the case,
       the following recitation is derived from the
       record now before the court. Ordinarily, when
       a motion for summary judgment is made, the
       record evidence is construed with all inferences
       drawn and ambiguities resolved in the non-moving
       party's favor. *Terry v. Ashcroft*, 336 F.3d 128,
       137 (2d Cir. 2003). In this case, in light of the
       parties' cross-motions, the court draws "all factual
       inferences ... against the party whose motion is
       under consideration." *Tindall v. Poultney High
       Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005)
       (quotation marks omitted). It is worth noting that,
       generally, the material facts underlying plaintiff's

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)
Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 27 of 174
2016 WL 8735653

claim against defendant Locke in this matter are not in dispute.

**\*2** Plaintiff is a New York State prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 1. While he is now incarcerated at the Shawangunk Correctional Facility, at the times relevant to his claims in this action, plaintiff was confined in the Upstate Correctional Facility ("Upstate"), located in Malone, New York. [4] *Id.* at 6.

[4]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined for twenty-three hours each day, primarily for disciplinary reasons. *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL 31040370, at \*4 n.11 (S.D.N.Y. Sept. 12, 2002).

Plaintiff arrived at Upstate on April 19, 2013. Dkt. No. 63 at 4. Upon his arrival, he was assigned to a double-occupancy cell with inmate James Heath following an assessment of his suitability and compatibility for double-cell housing. [5] *Id.*; Dkt. No. 53-3 at 3, 16. Accompanied by defendants Corrections Officers Doe 1 and Doe 2, defendant Locke escorted plaintiff to his cell as instructed by his area supervisor, a sergeant. Dkt. No. 53-2 at 2. Upon the group's arrival at the cell, Inmate Heath refused to allow plaintiff to enter, told defendant Locke and the other officers that he did not want plaintiff in the cell with him, and became "hostile." Dkt. No. 1 at 15; Dkt. No. 63 at 4; Dkt. No. 53-1 at 11-12; Dkt. No. 53-2 at 2. Defendant Locke then informed his sergeant by radio communication of Inmate Heath's behavior. Dkt. No. 63 at 4; Dkt. No. 53-1 at 11; Dkt. No. 53-2 at 2. Plaintiff was escorted back to a holding pen, and defendant Locke met with the Sergeant and Lieutenant Watch Commander to discuss the situation. Dkt. No. 63 at 4; Dkt. No. 53-1 at 13-14; Dkt. No. 53-2 at 2. According to defendant Locke, defendant Sergeant Doe "then ordered [him], along with [his] fellow officers, to escort plaintiff ... into the cell." Dkt. No. 53-2 at 2; *see also* Dkt. No. 63 at 4-5. Defendant Locke, in the company of Sergeant John Doe and two other officers, then escorted plaintiff back to the cell. Dkt. No. 53-2, at 3.

[5]    Although plaintiff refers to this individual as "Scott Heath" in his complaint, *see, e.g.,* Dkt. No. 1 at 1, 8, it appears the inmate who plaintiff intends to reference is "James Heath," DIN 03-B-2618. *See* Dkt. No. 63 at 4.

Prior to plaintiff's entry into the cell, defendant Lieutenant Doe allegedly told plaintiff in the presence of defendant Locke that he wanted plaintiff to "kick [Inmate] Heath's ass." Dkt. No. 53-1 at 14-15; *see also* Dkt. No. 1 at 15. Once plaintiff was locked in his new cell, defendant Locke returned to his post. Dkt. No. 53-2 at 3.

Shortly after plaintiff was locked into the cell, he was assaulted by Inmate Heath. Dkt. No. 1 at 15; Dkt. No. 63 at 5-6. Defendant Locke responded to the cell and issued plaintiff a misbehavior report based on the incident. Dkt. No. 1 at 17; Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 3, 6. Although the misbehavior report issued to plaintiff suggests that defendant Locke witnessed Inmate Heath and plaintiff "exchanging striking blows," [6] plaintiff disputes this, [7] and a declaration submitted by defendant Locke in support of his motion for summary judgment is vague regarding this point. *See* Dkt. No. 53-2 at 3. In any event, defendant Locke wrote in a misbehavior report issued concerning the incident that "Inmate Agard, K Din #10A3008 did not appear to be the aggressor but was attempting to defend himself." Dkt. No. 1-1 at 1; Dkt. No. 53-2 at 6.

[6]    *See, e.g.,* Dkt. No. 1-1 at 1.

[7]    *See* Dkt. No. 1 at 25; Dkt. No. 63 at 5.

**\*3** Following plaintiff's altercation with Inmate Heath, he was taken out of the cell and seen by medical staff. Dkt. No. 53-2 at 3. Plaintiff claims that Nurse Jane Doe, a defendant in this action, acted with deliberate indifference to his serious medical needs by failing to provide adequate medical care to address his injuries, which allegedly included "a concussion, a split-lip, a stab wound to the left side of the nose, chipped and cracked teeth, and a swelling to [his] face and skull." Dkt. No. 1, at 44.

Plaintiff contends that his "Institutional History" records reflect that he "was not suppose[d] to be in 'double-occupancy-housing' at Upstate" and that he is " 'victim prone.' " Dkt. No. 1 at 19, 21. Plaintiff testified at his deposition in this matter that he informed defendant Locke, prior to being escorted into Inmate Heath's cell, that he "couldn't double bunk." Dkt. No. 53-1 at 16. In addition, plaintiff contends, and there is no evidence disputing, that defendant Locke was aware that Inmate Heath had a history of violence against other prisoners while incarcerated at Upstate. Dkt. No. 1 at 24; Dkt. No. 63 at 5 & n.2. Defendant Locke maintains that he "had no authority to change the approval of plaintiff to be housed with Inmate Heath." Dkt. No. 53-2 at 3.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 28 of 174

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on May 27, 2014, with the filing of a complaint and accompanying applications to proceed *in forma pauperis* ("IFP") and for permission to proceed in the action anonymously, utilizing a pseudonym, for safety reasons.[8] Dkt. Nos. 1-3. Named as defendants in plaintiff's complaint were Corrections Officer N. Locke, Inmate James Heath, Deputy Superintendent Rock, Inspector General Vern Fonda, Administrative Assistant Chad Powell, Nurse Doe, Corrections Officers Doe 1 and Doe 2, Corrections Sergeant Doe, and Corrections Lieutenant Doe. Dkt. No. 1 at 1, 6-10. On December 23, 2014, Chief District Judge Glenn T. Suddaby issued a decision and order pursuant to 28 U.S.C. §§ 1915(e)(2)B(ii), 1915A(b) in which he (1) granted plaintiff's IFP application; (2) denied plaintiff's request to proceed under a pseudonym in this action; and (3) dismissed all of plaintiff's claims, except plaintiff's Eighth Amendment failure to protect claim asserted against defendants Locke, Corrections Officers Doe 1 and 2, Corrections Lieutenant Doe, and Corrections Sergeant Doe, and plaintiff's Eighth Amendment deliberate medical indifference claim against Nurse Doe. *See generally* Dkt. No. 14.

8    Plaintiff's original IFP application was denied as incomplete on June 3, 2014. Dkt. No. 6. Plaintiff thereafter filed a renewed and complete request on June 10, 2014. Dkt. No. 7.

Following the close of discovery, defendant Locke filed a motion seeking the entry of summary judgment in his favor on December 24, 2015. Dkt. No. 53. In his motion, defendant Locke argues that no reasonable factfinder could conclude he is liable for failing to protect plaintiff from Inmate Heath's attack, and, in any event, he is entitled to qualified immunity from suit. *See generally* Dkt. No. 53-5. Plaintiff filed a response to defendant Locke's motion on February 4, 2016, which he has characterized as a cross-motion for summary judgment. Dkt. No. 63. Defendant Locke subsequently filed an opposition to plaintiff's cross-motion on March 15, 2016. Dkt. No. 67.

The pending motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Plaintiff's Cross-Motion for Summary Judgment and Failure to Respond to Defendant Locke's Statement of Material Facts

**\*4**    Although plaintiff characterizes his response to defendant Locke's motion as a " 'cross-motion' for summary judgment," and "submits that plaintiff's complaint and the relief requested be granted in its entirety," Dkt. No. 63 at 1, 3, his submission fails to comply with the local rules of this court governing motion practice. In particular, Local Rule 7.1 requires a moving party to submit a "supporting affidavit," as well as a statement of material facts. N.D.N.Y. L.R. 7.1(a)(2)-(3). In this case, plaintiff has submitted only a memorandum of law in support of his cross-motion. Dkt. No. 63. Because plaintiff has not complied with the applicable local rules governing motion practice by including an affidavit and statement of material facts, I recommend that his motion be denied. *See, e.g., Riley v. Town of Bethlehem*, 5 F.Supp.2d 92, 93 (N.D.N.Y. 1998) (dismissing summary judgment motion based on moving party's failure to file a properly supported Local Rule 7.1 Statement of Material Facts).

Plaintiff's failure to respond to the Local Rule 7.1(a)(3) Statement submitted by defendants in support of their motion is also significant. By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced a non-movant's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).[9] Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F.Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

9        Copies of all unreported decisions cited in this
         document have been appended for the convenience
         of the *pro se* plaintiff.

Here, because plaintiff was warned of the consequences of
failing to properly respond to defendant Locke's statement of
material facts, *see* Dkt. No. 53 at 2; Dkt. No. 54 at 2, but
nonetheless has failed to do so, I recommend that the court
deem the facts contained in defendant's statement as having
been admitted, to the extent they are supported by accurate
record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1;
*see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996).
As to any facts not contained in defendant Locke's statement
of material facts, in light of the procedural posture of this case,
the court is "required to resolve all ambiguities and draw all
permissible factual inferences" in favor of plaintiff. *Terry,* 336
F.3d 1 at 137.

B. Defendant Locke's Motion

1. Legal Standard Governing
Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of
the Federal Rules of Civil Procedure. Under that provision,
the entry of summary judgment is warranted "if the movant
shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S.
317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion
Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is
"material" for purposes of this inquiry if it "might affect the
outcome of the suit under the governing law." *Anderson,* 477
U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553
(2d Cir. 2005). A material fact is genuinely in dispute "if the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party." *Anderson,* 477 U.S. at 248.

*5 A party moving for summary judgment bears an initial
burden of demonstrating that there is no genuine dispute
of material fact to be decided with respect to any essential
element of the claim in issue; the failure to meet this burden
warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4;
*Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden
is met, the opposing party must show, through affidavits or
otherwise, that there is a material dispute of fact for trial. Fed.
R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S.
at 250.

When deciding a summary judgment motion, a court must
resolve any ambiguities, and draw all inferences, in a light
most favorable to the non-moving party. *Anderson,* 477 U.S.
at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d
133, 137-38 (2d Cir. 1998). The entry of summary judgment
is justified only in the event of a finding that no reasonable
trier of fact could rule in favor of the non-moving party. *Bldg.
Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501,
507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250
(finding summary judgment appropriate only when "there can
be but one reasonable conclusion as to the verdict").

2. Merits of Plaintiff's Claim
Asserted Against Defendant Locke

Plaintiff asserts an Eighth Amendment failure to protect
claim against Corrections Officer Locke based on allegations
that he was aware of the risk of harm plaintiff faced
from Inmate Heath prior to being escorted and housed in
his cell. *See generally* Dkt. Nos. 1, 63. Defendant Locke
contends that, even assuming plaintiff's allegations are true,
he had no authority to change plaintiff's housing assignment,
and, therefore, he is not responsible for violating plaintiff's
constitutional rights. [10] *See generally* Dkt. No. 53-5.

10       Defendant Locke also argues that he was unaware
         that plaintiff was a homosexual and victim-prone
         prior to directing plaintiff to bunk with Inmate
         Heath. Dkt. No. 53-5 at 8-9. Whether this is true
         is not relevant because plaintiff's claim is based on
         allegations that defendant Locke was aware that
         (1) plaintiff could not double-bunk, (2) defendant
         Sergeant Doe told plaintiff to fight Inmate Heath,
         (3) Inmate Heath refused to permit plaintiff to enter
         the cell, and (4) Inmate Heath had a history of
         assaulting other prisoners while at Upstate.

The Eighth Amendment prohibits punishment that is
"incompatible with 'the evolving standards of decency that
mark the progress of a maturing society[,]' or 'involve[s]
the unnecessary and wanton infliction of pain[.]' " *Estelle
v. Gamble,* 429 U.S. 97, 102-03 (1976) (quoting *Trop v.
Dulles,* 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia,*
428 U.S. 153, 169-73 (1976) (citations omitted)). While
the Eighth Amendment " 'does not mandate comfortable
prisons,' neither does it permit inhumane ones." *Farmer
v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v.*

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

*Chapman*, 452 U.S. 337, 349 (1981)); *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

Law enforcement officers have a duty to intervene and prevent a cruel and unusual punishment, prohibited by the Eighth Amendment, from occurring or continuing. *Farmer*, 511 U.S. at 836 (1994); *Hayes v. N.Y. City Dep't of Corrs*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985) ("The failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment."). A plaintiff asserting a claim that prison officials have failed to protect him from harm must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes*, 84 F.3d at 620. This "reckless disregard" to a plaintiff's health and safety can be proven by evidence establishing "a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs.*, 904 F. Supp. 217, 222 (S.D.N.Y. 1995) (quotation marks omitted); *see also Hayes*, 84 F.3d at 620 ("[A] prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm."). Said differently, to establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle*, No. 10-CV-0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)); *see also Farmer*, 511 U.S. at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no realistic opportunity to intervene where "three blows were struck in ... rapid succession"); *accord, Henry*, 2011 WL 5975027, at *4. From a constitutional perspective, "deliberate indifference ... requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

**\*6** In this case, plaintiff has submitted undisputed admissible record evidence establishing that defendant Locke was present when Inmate Heath told defendant Locke and the other corrections officers escorting plaintiff that he did not want plaintiff to be housed in his cell and refused to allow plaintiff entry into the cell. Dkt. No. 1 at 15; Dkt. No. 53-1 at 11; Dkt. No. 63 at 4. In addition, defendant Locke does not dispute that he learned plaintiff was not supposed to be housed in a double-bunk cell prior to placing plaintiff in Inmate Heath's cell. Dkt. No. 53-1 at 16. The undisputed record also reflects that defendant Locke was present when defendant Lieutenant Doe allegedly told plaintiff that he wanted plaintiff to "kick [Inmate Heath's] ass" once he was placed inside the cell. [11] Dkt. No. 1 at 15; Dkt. No. 53-1 at 14-15. Finally, plaintiff contends that, prior to placing plaintiff in Inmate Heath's cell, defendant Locke was aware of Inmate Heath's violent disciplinary history while at Upstate, including the issuance of three Tier III misbehavior reports involving assaults on Inmate Heath's former cellmates. Dkt. No. 63 at 4, 5 & n.2.

[11]         In my view, this evidence is not hearsay and is properly relied on when analyzing defendant Locke's pending motion. Plaintiff is not relying on the statement made by defendant Lieutenant Doe for the truth of the matter asserted. Instead, plaintiff offers the lieutenant's statement to show defendant Locke's state of mind and that defendant Locke was on notice that plaintiff may be at risk of harm. Accordingly, the statement is not hearsay. *See* Fed. R. Evid. 801(c), Advisory Committee Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."); *accord, United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013); *see also George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

Although it is not disputed that defendant Locke contacted his supervisors after Inmate Heath refused plaintiff access to his cell, Dkt. No. 53-1 at 12, the accumulation of all of the record evidence gives rise to a genuine dispute of material fact as to whether defendant Locke was aware of a serious risk to plaintiff's health and safety immediately prior to ordering plaintiff to bunk with Inmate Heath, and recklessly

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

disregarded that risk by failing to intervene and stop plaintiff from being housed with Inmate Heath. In my view, reasonable factfinders could disagree as to whether notifying his supervisor of Inmate Heath's conduct but otherwise failing to take any further action to protect plaintiff from impending harm was sufficiently reasonable on defendant Locke's part for purposes of an Eighth Amendment claim, or whether defendant Locke had a realistic opportunity to intervene and prevent the attack on the plaintiff. Accordingly, I recommend defendant Locke's request for summary judgment dismissing the claim asserted against him on the merits be denied.

### 3. Qualified Immunity

Defendant Locke also seeks dismissal of plaintiff's claim against him based on the doctrine of qualified immunity. Dkt. No. 53-5 at 11-12.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

*7 Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir. 1995).

In this case, even when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, it was objectively reasonable for defendant Locke to believe his acts were lawful. As was discussed above, the record establishes that defendant Locke had no authority to alter plaintiff's cell assignment, and plaintiff does not otherwise contend that defendant Locke should have acted beyond the scope of his authority. Dkt. No. 53-2 at 1. Upon being confronted with Inmate Heath's refusal to permit plaintiff to enter the cell, defendant Locke conferred with his supervisors, who then ordered that he direct plaintiff to enter the cell through the recreational pen door in order to effectuate the housing assignment. Dkt. No. 53-2 at 2; Dkt. No. 63 at 4. These actions, which are not disputed by plaintiff, were within the scope of defendant Locke's duties and approved by supervisors. Dkt. No. 53-2 at 1-3.

*8 It was certainly reasonable for defendant Locke to believe he was not violating plaintiff's constitutional rights by notifying his supervisor of a potential risk to plaintiff's safety.

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

It was likewise objectively reasonable for defendant Locke to rely on his superiors' instructions in returning plaintiff to the cell with Inmate Heath because, at a minimum, officers of reasonable competence could disagree as to the legality of defendant Locke's actions in light of this directive from his superiors. *See Anthony v City of New York, et al.*, 339 F.3d 129, 138 (2d Cir. 2003) (" 'Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists.... ' ") (quoting *Bilida v. McCleod*, 211 F.3d 166, 174–75 (1st Cir. 2000)); *Kraft v. City of N.Y.*, 696 F.Supp.2d 403, 420 (S.D.N.Y. 2010) (reliance on an "apparently valid" order supports finding of qualified immunity); *cf. Cuoco v. Moritsugu*, 222 F.3d 99, 111 (2d Cir. 2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate in not unreasonable because they lack the authority to intervene in medical decisions). For these reasons, I recommend a finding that defendant Locke is entitled to qualified immunity from suit, and that defendant Locke's motion be granted on this basis.

C. Status of Doe Defendants

On November 30, 2015, plaintiff moved to file an amended complaint to add the names of two defendants previously identified as Sergeant John Doe and Lieutenant John Doe. Dkt. No. 47. In his motion, plaintiff provided the court with only the last name of Sergeant John Doe, and asked the court to order defense counsel to provide him with the name of the lieutenant listed on page 252 of a log book.[12] *Id.*

[12]     Although plaintiff stated in his letter motion that he had attached the relevant page of the log book, it was not received by the court with plaintiff's filing. *See* Dkt. No. 47.

On December 1, 2015, I denied plaintiff's motion because, pursuant to the court's mandatory pretrial discovery and scheduling order, the deadline for joinder of parties expired on August 2, 2015, and plaintiff failed to show good cause to amend. Dkt. No. 49. Thereafter, defendant Locke filed his motion for summary judgment. Dkt. No. 53. In support of that motion, defendant Locke submitted, *inter alia*, a declaration in which he acknowledges that his "area supervisor, a Sergeant," and the "Watch Commander, a Lieutenant," discussed the situation involving plaintiff and Inmate Heath, after which point the Sergeant "ordered" defendant Locke and two of his fellow officers to escort

plaintiff back to the cell occupied by Inmate Heath. Dkt. No. 53-2. Based on defendant Locke's sworn statement, there is no question that at least defendant Locke is aware of the identities of Sergeant John Doe and Lieutenant John Doe. As a result, in the interests of justice, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action.[13] *See Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997).

[13]     Plaintiff attempted to obtain the names of these defendants while discovery was ongoing. *See* Dkt. Nos. 31, 31-1, 47. Moreover, the undisputed record now shows that defense counsel knew, or could have known with relative ease, the names of Lieutenant Doe and Sergeant Doe. Under such circumstances, the court finds "good cause" to amend the scheduling order to allow plaintiff leave to amend the complaint. The court also does not find any bad faith or dilatory motive on the part of plaintiff in seeking to identify these defendants based on the efforts he made during discovery, nor does the court find any undue prejudice to defendants in granting plaintiff leave to amend. *See, e.g., Morales v. County of Suffolk, et al.*, 952 F. Supp.2d 433, 435-436 (E.D.N.Y. 2013) (finding the absence of undue prejudice under similar circumstances because the Doe defendant sought to be added "plainly knew" about his involvement in the actions that gave rise to the claim and the need to re-open discovery "is not, in itself, sufficient to constitute prejudice"). Because plaintiff remains within the three-year limitations period to assert claims against Lieutenant Doe and Sergeant Doe, the court need not decide whether an amendment properly naming these defendants would relate back to the original filing date of the complaint.

**\*9** As it relates to the other Doe Corrections Officers and Nurse Doe, plaintiff has not taken the same steps to identify these unnamed defendants that he took with respect to naming Lieutenant Doe and Sergeant Doe. Indeed, in his motion for leave to amend, he only sought to properly name Lieutenant Doe and Sergeant Doe. *See* Dkt. No. 47.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*,

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 8735653

No. 12-CV-0447, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.,* 07-cv-2027, 2010 WL 882990, at * 5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward v. Town & Vill. of Harrison,* 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.").

The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against defendants Corrections Officers Doe 1 and Doe 2, Lieutenant Doe, Sergeant Doe, and Nurse Doe, provided that plaintiff take "reasonable steps through discovery to ascertain the name of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them." Dkt. No. 14 at 12, 14. That order warned plaintiff, however, as follows: "If plaintiff fails to learn their identities, this action will be dismissed as against the Doe defendants." *Id.* at 12 n.9. The deadline for joining parties to this lawsuit passed on August 2, 2015. Dkt. No. 24 at 5. Discovery in this matter was originally scheduled to close on October 2, 2015. Dkt. No. 24 at 5. That deadline was subsequently extended until December 2, 2015, at defendant Locke's request. Dkt. Nos. 39-40.

It is now more than five months past the extended deadline for joinder of parties, yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed Corrections Officers or Nurse. As such, I recommend that the claims brought against these three unnamed defendants be *sua sponte* dismissed without prejudice for failure to prosecute.

## IV. SUMMARY AND RECOMMENDATION

Notwithstanding the existence of a genuine dispute of material fact with respect to whether defendant Locke acted reasonably in ordering plaintiff to bunk with Inmate Heath I find, based upon the record now before the court, that it was objectively reasonable for defendant Locke to believe

he was not violating plaintiff's rights when he contacted his supervisor after learning of Inmate Heath's refusal to allow plaintiff in the cell and thereafter followed orders from his supervisors in pursuing plaintiff's housing assignment. Accordingly, I recommend that the court find defendant Locke is entitled to qualified immunity.

**\*10** With respect to Sergeant John Doe and Lieutenant John Doe identified in plaintiff's complaint, I find that the identities of these individuals is known, or can be determined with relative ease, by defense counsel, and that good cause now exists for amending the scheduling order to name these individuals as defendants in this action. As a result, defense counsel is directed to provide plaintiff with the names of these individuals, after which point plaintiff will be granted leave to amend his complaint to add these individuals as defendants in this action.

With respect to the other three Doe defendants identified in plaintiff's complaint, because discovery is now closed and plaintiff has failed to take reasonable steps to identify those individuals and join them in the action, I recommend that the claims asserted against those individuals is dismissed without prejudice for failure to prosecute.

Accordingly, it is hereby respectfully

ORDERED that, within forty-five (45) days of the filing date of this decision and order, defense counsel produce the information specified above regarding the identities of defendant Sergeant John Doe and defendant Lieutenant John Doe. Upon receipt of defense counsel's response, the clerk shall return this file to the court for further review; and it is hereby further

ORDERED, that the clerk adjust the court's records to reflect the correct spelling of defendant's name to N. Locke; and it is hereby respectfully

RECOMMENDED that defendant Locke's motion for summary judgment (Dkt. No. 53) be GRANTED and that plaintiff's claims against defendant N. Locke be DISMISSED, and plaintiff's cross-motion for summary judgment (Dkt. No. 63) be DENIED; and it is hereby further respectfully

RECOMMENDED that plaintiff's claims against defendant Corrections Officer John Doe 1, Corrections Officer John Doe 2, and Nurse Doe be *sua sponte* DISMISSED WITHOUT PREJUDICE.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 8735653

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5137273

2016 WL 5137273
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenith A'GARD, Plaintiff,

v.

N. LOCKE, Corr. Officer a/k/a N. Lock; John
Doe 1, Corr. Officer, Upstate Corr. Facility; John
Doe 2, Corr. Officer, Upstate Corr. Facility; John
Doe, Corr. Sergeant, Upstate Corr. Facility; John
Doe, Lieutenant, Upstate Corr. Facility; and Jane
Doe, Nurse, Upstate Corr. Facility, Defendants.

9:14-CV-0613 (GTS/DEP)
|
Signed 09/20/2016
|
Filed 09/21/2016

**Attorneys and Law Firms**

KENITH A'GARD, 10-A-3008, Sullivan Correctional
Facility, Box 116, Fallsburg, New York 12733, Plaintiff, Pro
Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for
the State of New York, The Capitol, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney
General, Albany, New York 12224, Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Kenith A'Gard ("Plaintiff")
against the six above-captioned employees of the New
York State Department of Corrections and Community
Supervision at Upstate Correctional Facility ("Defendants")
are the following: (1) Defendant Locke's motion for summary
judgment pursuant to Fed. R. Civ. P. 56; (2) Plaintiff's cross-
motion for summary judgment; (3) United States Magistrate
David E. Peebles' Report-Recommendation recommending
that Defendant Locke's motion be granted, that Plaintiff's
cross-motion be denied, and that Plaintiff's claims against
Defendants Corrections Officer John Doe 1, Corrections
Officer John Doe 2, and Nurse Jane Doe be *sua sponte*
dismissed without prejudice based on Plaintiff's failure to

prosecute those claims and/or failure to comply with a Court
Order to take reasonable steps to identify those Defendants
pursuant to Fed. R. Civ. P. 41(b); (4) Plaintiff's Objections to
the Report-Recommendation; (5) Magistrate Judge Peebles'
Supplemental Report-Recommendation recommending that
Plaintiff's claims against Defendants Sergeant John Doe
and Lieutenant John Doe also be *sua sponte* dismissed
without prejudice based on Plaintiff's failure to prosecute
those claims and/or failure to comply with a Court Order to
take reasonable steps to identify those Defendants pursuant
to Fed. R. Civ. P. 41(b); (6) Plaintiff's Objection to the
Supplemental Report-Recommendation; and (7) Plaintiff's
motion to amend his Complaint. (Dkt. Nos. 53, 63, 71,
73, 78, 81, 82.) For the reasons set forth below, the Court
accepts and adopts both the Report-Recommendation and the
Supplemental Report-Recommendation for the reasons stated
therein; Defendant's Locke's motion for summary judgment
is granted and Plaintiff's claims against Defendant Locke are
dismissed; Plaintiff's cross-motion for summary judgment is
denied; his motion to amend his Complaint is denied; and his
claims against Defendants Corrections Officer John Doe 1,
Corrections Officer John Doe 2, Nurse Jane Doe, Sergeant
John Doe and Lieutenant John Doe are dismissed without
prejudice.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Peebles' Report-
Recommendation**
Generally, in his Report-Recommendation, Magistrate Judge
Peebles rendered the following three recommendations: (1)
that Plaintiff's claims against Defendant Locke be dismissed
based on the doctrine of qualified immunity, especially in
light of Plaintiff's willful failure to submit a response to
Defendant Locke's Statement of Material Facts, as required
by Local Rule 7.1(a)(3) of the Local Rules of Practice for
this Court; (2) that Plaintiff's claims against Defendants
Corrections Officers John Doe 1, John Doe 2, and Nurse
Jane Doe be *sua sponte* dismissed due to Plaintiff's failure to
prosecute those claims and/or failure to comply with a Court
Order to take reasonable steps to identify those Defendants;
and (3) that Plaintiff's cross-motion for summary judgment be
denied due to his willful failure to comply with Local Rule
7.1(a)(2),(3) of the Local Rules of Practice for this Court.
(Dkt. No. 71, Part III.)

**B. Plaintiff's Objections to the Report-
Recommendation**

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

**\*2** Generally, in his Objections to the Report-Recommendation, Plaintiff argues that the Court should reject the Report-Recommendation for the following three reasons: (1) Magistrate Judge Peebles erred in recommending that the factual assertions contained in Defendant Locke's Statement of Material Facts be deemed admitted due to Plaintiff's failure to properly respond to them under Local Rule 7.1(a)(3), because Defendant Locke never met his threshold burden of citing admissible record evidence to establish the facts asserted; (2) Magistrate Judge Peebles erred in recommending that the Court penalize Plaintiff for failing to comply with Local Rule 7.1(a), because that failure was due to his lack of understanding of that rule as a *pro se* litigant, which was due to the Court's prior denial of Plaintiff's request for the appointment of counsel; and (3) Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because a finding that it was objectively reasonable for Locke to believe he was not violating Plaintiff's rights is inconsistent with (a) the record evidence that Locke spoke with his supervisor about placing Plaintiff into a cell with Inmate James Health (thus demonstrating that Locke knew that the placement violated Plaintiff's rights), (b) the point of law that Defendant Locke cannot escape liability based on the defense that he was "just following orders," and (c) Magistrate Judge Peebles' prior finding that a genuine dispute of material fact exists regarding the merits of Plaintiff's claims against Defendant Locke. (Dkt. No. 73.)

### C. Magistrate Judge Peebles' Supplemental Report-Recommendation

Generally, in his Supplemental Report-Recommendation, Magistrate Judge Peebles recommended that Plaintiff's claims against Defendants Sergeant John Doe and Lieutenant John Doe be *sua sponte* dismissed due to Plaintiff's failure to prosecute those claims and/or failure to comply with a Court Order to take reasonable steps to identify those Defendants. (Dkt. No. 78.) In doing so, Magistrate Judge Peebles found that, in response to having been ordered to produce to Plaintiff the true identities of the Defendants named in the Complaint as Sergeant John Doe and Lieutenant John Doe, defense counsel filed a letter on August 4, 2016, representing to the Court (as an officer of it) that, although defense counsel conferred with Defendant Locke regarding the identity of these two Defendants, Defendant Locke cannot recall the names of either Defendant, despite having reviewed the 11-Building console log book from the date of the incident. (*Id.*)

### D. Plaintiff's Objection to the Supplemental Report-Recommendation

Generally, in his Objection to the Supplemental Report-Recommendation, Plaintiff asserts two arguments: (1) while he does not know the name of Defendant Lieutenant John Doe, he does know the name of Defendant Sergeant John Doe, which is Sergeant "Smith"; and (2) because he can identify Defendant Sergeant John Doe, the Court should not dismiss his claims against that Defendant but permit him to amend his Complaint (so as to identify that Defendant as "Sergeant Smith" and voluntarily discontinue his claims against Defendant Lieutenant John Doe). (Dkt. No. 81.)

### E. Plaintiff's Motion to Amend His Complaint

Generally, in his motion to amend his Complaint, Plaintiff requests leave to do the following: (1) discontinue his claims against Defendant Lieutenant John Doe; (2) discontinuing his claims against Defendant Locke; and (3) identifying Defendant Sergeant John Doe as Defendant Sergeant "Smith"; and (3) adding claims against Defendant James C. Heath. (Dkt. No. 82.)

## II. STANDARD OF REVIEW

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [2] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in

A'Gard v. Lock`e, Not Reported in Fed. Supp. (2016)

Case 9:19-cv-01203-GTS-TWD   Document 57   Filed 12/22/21   Page 37 of 174

2016 WL 5137273

objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[1]    See also *Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[2]    See *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*3** When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P.

72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.* [4]

[3]    See *Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a) (3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at \*1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at \*3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at \*4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

[4]    See also *Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

A'Gard v. Lock'e, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Peebles' thorough Report-Recommendation and Supplemental Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation and Supplemental Report-Recommendation to which Plaintiff specifically objected, and no clear error in the remaining parts of the Report-Recommendation and Supplemental Report-Recommendation: Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, both the Report-Recommendation and Supplemental Report-Recommendation are accepted and adopted in their entirety for the reasons stated therein. To those reasons, the Court adds the following five points.

As to the first ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), Plaintiff is incorrect that Defendant Locke never met his threshold burden of citing admissible record evidence to establish the facts he asserted in his Statement of Material Facts; Locke did so. (*See* Dkt. No. 53, Attach 4 [Def. Locke's Rule 7.1 Statement, supporting factual assertions with accurate citations to admissible record evidence].) Indeed, the lack of merit of Plaintiff's claims against Defendant Locke is apparent from Plaintiff's attempt to abandon his claims against Locke in his proposed Amended Complaint. (Dkt. No. 82.)

 **\*4**  As to the second ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), Plaintiff is incorrect that imposing the consequences of violating Local Rule 7.1(a)(3) on a *pro se* litigant who has been specifically advised of those consequences and nonetheless violated that rule effectively "penaliz[es]" that litigant for his *pro se* status. As Magistrate Judge Peebles' correctly stated in his Report-Recommendation, even *pro se* litigants must obey a district court's procedural rules. (*See* Dkt. No. 71, at 9 [Report-Recommendation, citing cases].) *See also Cusamano v. Sobek*, 604 F. Supp.2d 416, 426-27 & n.4 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

The Court notes that Plaintiff was sufficiently and repeatedly advised of the consequences of failing to submit such a proper response through his receipt of, and/or access to, the following documents: (1) the courtesy copies of Local Rule 7.1(b)(3) of the District's Local Rules of Practice and pages 39 and 40 of the District's *Pro Se* Handbook, which were on file at his Correctional Facility during the time in question; and (2) the Notice of Consequences of Failing to Respond that was provided to Plaintiff by Defendants with their motion papers (Dkt. No. 53, page 2); and (3) a Notice from the Court advising Plaintiff of the motion response deadline, including a Notice of Consequences of Failing to Respond (Dkt. No. 54, at 1-2).

As to the third ground asserted in Plaintiff's Objections to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order), as an initial matter, this Objection gives rise to only a clear-error review, because it is simply a reiteration of an argument asserted in his opposition memorandum of law. (*Compare* Dkt. No. 73, at Paragraphs 3-5 [Obj.] *with* Dkt. No. 63, at Points 1-3 [Opp'n Memo. of Law].) In any event, Plaintiff is incorrect that Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because of the record evidence that Locke spoke with his supervisor about placing Plaintiff into a cell with Inmate James Health: that evidence does not demonstrate that Locke knew that the placement violated Plaintiff's rights. In addition, Plaintiff is incorrect that Magistrate Judge Peebles erred in recommending that Plaintiff's claims against Defendant Locke be dismissed based on the doctrine of qualified immunity, because Defendant Locke cannot escape liability based on the defense that he was "just following orders," and he had previously found a genuine dispute of material fact regarding the merits of Plaintiff's claims against Defendant Locke: as Magistrate Judge Peebles stated, qualified immunity is an immunity from suit rather than a mere defense to liability. (Dkt. No. 71, at 18 [Report-Recommendation].)

As to Plaintiff's Objection to the Supplemental Report-Recommendation (summarized above in Part I.D. of this Decision and Order), the Court rejects that Objection on each of two alternative grounds: (1) the Objection is untimely in that it is dated September 9, 2016, and the deadline for objections was September 6, 2016 (Dkt. No. 81); and (2) in any event, the Objection presents no specific challenge to any portion of the Supplemental Report-Recommendation, but merely an argument that Plaintiff "can amend [his] Complaint." (*compare* Dkt. No. 81 *with* Dkt. No. 78.) With regard to this second ground, the Court notes that a district court will ordinarily refuse to consider evidentiary material and arguments that could have been, but were not, presented

A'Gard v. Locke, Not Reported in Fed. Supp. (2016)

2016 WL 5137273

to the magistrate judge in the first instance. *See, supra,* Part II of this Decision and Order.

**\*5** As for Plaintiff's motion to amend his Complaint, that motion is in fact Plaintiff's second such motion, the first such motion having been filed on November 30, 2015, and denied on December 1, 2015. (Dkt. No. 47; Text Order filed Dec. 1, 2015.) Plaintiff's second motion is denied on each of six alternative grounds: (1) it is untimely (the motion filing deadline having expired on August 2, 2015) and Plaintiff has not shown good cause for an extension of the deadline (*compare* Dkt. No. 24, at 5 *with* Dkt. No. 82); [5]  (2) it is barred by the law of the case doctrine, given that it is based on the same unsuccessful ground that supported his first such motion (*compare* Dkt. No. 47 *with* Dkt. No. 82 *and* Text Order filed Dec. 1, 2015); (3) it does not identify the amendments in the proposed pleading through the redline/strikeout method or other equivalent means, as required by Local Rule 7.1(a)(4) of the Local Rules of Practice for this Court (Dkt. No. 82, Attach. 1); [6]  (4) it is unsupported by a memorandum of law, in violation of Local Rule 7.1(a)(1); (5) it is unsupported by an affidavit, in violation of Local Rule 7.1(a)(2); and (6) it is unsupported by a showing of cause (e.g., the lack of undue delay, the lack of bad faith or dilatory motive on the part of Plaintiff, the lack of undue prejudice to Defendants by virtue of allowance of the amendment, the lack of futility of the amendment). [7]

[5]  *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 340 (2d Cir. 2000) ("[D]espite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause."); Fed. R. Civ. P. 16(b)(4), (f)(C) ("A schedule may be modified only for good cause and with the judge's consent.... On motion or its own, the court may issue any just orders ... if a party or its attorney ... fails to obey a scheduling or other pretrial order.").

[6]  The Court notes that the underlined portions of Plaintiff's proposed Amended Complaint do not signify additions (or deletions) of language, but apparently merely portions of text that Plaintiff deems particularly relevant–a practice in which

he engaged while drafting his original Complaint. (Compare Dkt. No. 1 with Dkt. No. 82, Attach. 1.)

[7]  *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (explaining that permissible grounds upon which to base the denial of a motion for leave to file an amended complaint include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

**ACCORDINGLY**, it is

**ORDERED** that both Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 71) and his Supplemental Report-Recommendation (Dkt. No. 78) are **ACCEPTED** and **ADOPTED** in their entirety; and it is further

**ORDERED** that Defendant Locke's motion for summary judgment (Dkt. No. 53) is **GRANTED**, and Plaintiff's claims against Defendant Locke are **DISMISSED** from this action; and it is further

**ORDERED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 63) is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion to amend his Complaint (Dkt. No. 82) is **DENIED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants Corrections Officer John Doe 1, Corrections Officer John Doe 2, Nurse Jane Doe, Sergeant John Doe and Lieutenant John Doe are *sua sponte* **DISMISSED** without prejudice based on Plaintiff's failure to prosecute those claims and/or failure to comply with a Court Order to take reasonable steps to identify those Defendants pursuant to Fed. R. Civ. P. 41(b).

The Court certifies, for purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken from this Decision and Order would not be taken in good faith.

Dated: September 20, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5137273

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4312392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Steven RACETTE, et al., Defendants.

No. 9:18-CV-0390 (MAD/CFH)
|
Signed 05/27/2021

**Attorneys and Law Firms**

TOWAUN COLEMAN, Plaintiff pro se, 07-A-2215, Southport Correctional Facility, P.O. Box 2000, Pine City, New York 14871.

OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General, HON. LETITIA JAMES, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff pro se Towaun Coleman ("Coleman" or "Plaintiff"), who was, at all relevant times, in the custody of Clinton Correctional Facility ("Clinton C.F."), brings this action pursuant to 42 U.S.C. § 1983 against Defendants, former Superintendent of Clinton C.F. Steven Racette ("Racette"), Lieutenant Durkin ("Durkin"), Sergeant Hutti ("Hutti"), Sergeant King ("King"), Correctional Officer John Reyell ("Reyell"), Correctional Officer Wyatt ("Wyatt"), Correctional Officer S. Dubrey ("Dubrey"), Correctional Officer Spinner ("Spinner"), Correctional Officer J. Tyler ("Tyler"), Correctional Officer Coryea ("Coryea"), and Correctional Officer Demers ("Demers"), for violations of his constitutional rights under the First and Eighth Amendments. See Dkt. No. 85 ("Sec. Am. Compl.").

Presently before the Court is Defendants' motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 91. Coleman opposed Defendants' motion. [2] See Dkt. No. 98. For the following reasons, it is recommended that Defendants' motion for partial summary judgment be granted in part and denied in part.

[2] Defendants did not submit a reply.

**I. BACKGROUND**

In support of the motion, Defendants filed a Statement of Material Facts. [3] See Dkt. No. 91-6. The facts recited are for the relevant time period as referenced in the Second Amended Complaint and are related herein in the light most favorable to Coleman as the nonmoving party. See subsection II(A) infra.

[3] At the filing date of Defendants' motion, Local Rule 7.1(a)(3) provided:

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.

The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/ or denying each of the movant's assertions in a short and concise statement, in matching

numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert. The non-movant's response may also set forth a short and concise statement of any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs, followed by a specific citation to the record where the fact is established.

Effective January 1, 2021, the rule number was changed to Local Rule 56.1.

Defendants filed a Statement of Material Facts. Dkt. No. 91-6. Coleman provided a Statement of Material Facts, but did not respond to Defendants' Statement of Material Facts. See Dkt. No. 98. The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Prestopnik v. Whelan, 253 F.Supp. 2d 369, 371 (N.D.N.Y. 2003). Although the Local Rules provide that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); see subsection II.A. Supra.

## A. Facts [4]

[4]    The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents. Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/ documents in the context of the within motion. See Daniel v. Unum Provident Corp., 261 Fed. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party"). In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities

resolved in favor of the non-moving party. See Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

*2  On June 6, 2015, staff at Clinton C.F. discovered that two inmates, Richard Matt and David Sweat, had escaped from the facility. Dkt. No. 91-4 at ¶ 5. As a result, the entire facility was placed on lockdown immediately. Dkt. No. 91-3 at ¶ 4. At that time, Racette was the Superintendent at Clinton C.F. Dkt. No. 91-4 at ¶ 1.

On June 8, 2015, staff at Clinton C.F. conducted cell frisks throughout the facility, including Coleman's housing location, Upper H Block, 12 Company. [5]  Dkt. No. 91-5 at 35-36. [6]  At the relevant time, Coleman was housed in Cell 15. Dkt. No. 91-2 at ¶ 6. Between 8:00 A.M. and 9:00 A.M., Clinton C.F. staff began entering Upper H Block. Sec. Am. Compl. at ¶ 26. Durkin supervised the searches that were conducted in the Upper H Block on June 8, 2015. Dkt. No. 91-3 at ¶¶ 7, 10.

[5]    A cell frisk is a search of the inmate's cell. Dkt. No. 91-2 at ¶ 5.

[6]    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

On June 25, 2015, Coleman filed a grievance (CL-67063-15) related to an assault that allegedly occurred on June 8, 2015, in the Upper H Block, 12 Company. Dkt. No. 91-3 at ¶ 8. In his grievance, Coleman identified Defendants Durkin, Hutti, King, Reyell, Dubrey, Spinner, Tyler, and Wyatt as "individuals that assaulted [him] or [ ] witnessed the assault." Dkt. No. 91-3 at 9. In March 2016, Coleman was transferred out of Clinton C.F., but returned in October 2018. [7]  Dkt. No. 25; Dkt. No. 98-2 at 25.

[7]    In March 2016, Coleman was transferred from Clinton C.F. to Green Haven C.F. See Coleman v. Racette, No. 9:15-CV-0040, Dkt. No. 44 (N.D.N.Y. filed Mar. 31, 2016).

The remaining record contains few undisputed facts. Coleman and Defendants disagree on many of the events that transpired on June 8, 2015 and provide conflicting accounts of the circumstances surrounding the incidents.

## 1. Plaintiff's Version of Events

2021 WL 4312392

Coleman claims that Coryea and Demers came to his cell and directed him to step out for a pat frisk. Dkt. No. 91-5 at 14-18; Sec. Am. Compl. at ¶¶ 27-28. After the pat frisk, Coryea and Demers directed Coleman to "turn around" so that he could observe the search of his cell. Id. Coleman witnessed Coryea reading his phone book while Demers read through Coleman's legal materials; including his "current Federal claim." [8] Dkt. No. 91-5 at 18-20. Coleman overheard Coryea and Demers whispering, and Demers asked Coleman if he was a "rat" or "snitch," meaning a confidential informant. Id. at 20.

[8]    The claim involved a different correctional officer at Clinton C.F. Sec. Am. Compl. at ¶ 30.

Coryea and Demers began "throwing" Coleman's property onto the floor and out of his cell. Dkt. No. 91-5 at 22-23. At that time, Coleman saw Hutti and Durkin walking toward his cell. Id. at 24. Coleman "addressed" Hutti and "inquired" about the items that were being discarded from his cell. Id. at 24-25. While Coleman was speaking with Hutti about his personal property, Durkin asked Coryea and Demers "what's taking [you] so long." Id. at 26. One of the officers responded, "he has too much shit." Dkt. No. 91-5 at 27. Durkin then "yelled" at Coleman, "if you don't throw this shit away, I'm going to throw it away for you." Id.; Sec. Am. Compl. at ¶¶ 35-36. Coleman responded that he "had the amount of property I'm entitled to have by the State of New York. I have no more or no less." Dkt. No. 91-5 at 27. Durkin continued, "I don't care how much property you're entitled to have. If you don't get rid of this shit, we will." Id.

*3    At that time, Coryea stepped out of Coleman's cell and told Durkin, "he's been running his mouth all day" and approached Coleman. Sec. Am. Compl. at ¶ 37; Dkt. No. 91-5 at 27-28. Coleman alleges that Coryea "struck him" in the face, causing him to lose consciousness. Dkt. No. 91-5 at 28-31. When Coleman awoke, he was handcuffed and carried to the front of the housing block by "a number of Correctional Officers." Sec. Am. Compl. at ¶ 38. Coleman was "savagely beaten for what appeared to be a half an hour" by a number of individuals Id. at ¶ 39; Dkt. No. 91-5 at 30-36. Coleman heard someone say, "pick him up," and, as he was brought to his feet, Coryea "grabbed a handfull [sic] of Plaintiff's hair, lifted Plaintiff's head from off the floor," "spit in Plaintiff's face" and punched him "one last time with a gloved fist" while yelling racial slurs. Sec. Am. Compl. at ¶ 40.

### 2. Defendants' Version of Events

In support of the motion, Defendants proffer declarations from Racette, Durkin, and Demers. Racette and Durkin claim that Racette was not present during the frisk of Coleman's cell on June 8, 2015. Dkt. No. 91-4 at ¶ 13; Dkt. No. 91-3 at ¶ 5. Racette also asserts that he was not responsible for ordering cell frisks and/or searches throughout the facility. Dkt. No. 91-4 at ¶ 13.

Durkin, who supervised the search of Upper H Block, did not observe any officer using excessive force on Plaintiff. Dkt. No. 91-3 at ¶¶ 7, 10-11. Demers claims that he was assigned to frisk cell UH 12/35 ("Cell 35"), which was "20 cells away from Plaintiff's cell." Dkt. No. 91-2 at ¶¶ 7-8. Demers asserts that he did not frisk Coleman's cell, he did not read Plaintiff's legal papers or phone book, and did not use force on Plaintiff. Id. at ¶¶ 7, 10-11. Demers also states that he did not observe any other staff member use force on Plaintiff on June 8, 2015. Id. at ¶ 12.

### B. Procedural History

In April 2018, Coleman commenced the within action. Dkt. No. 1. In December 2018, Coleman filed an Amended Complaint. Dkt. No. 31. Upon review of the Amended Complaint, the Court found that the following claims survived review and required a response: (1) First Amendment retaliation claims against Defendants Durkin, John Doe #1 and Wood; (2) Eighth Amendment excessive force and failure-to-intervene claims against Defendants John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette; and state law claims against Defendants John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette. See Dkt. No. 33. Defendants filed Answers to the Amended Complaint (Dkt. Nos. 36, 68) and, in April 2019, Defendants filed a partial motion to dismiss. Dkt. No. 44. In a Memorandum-Decision and Order filed in February 2020, the Court dismissed several claims, including all claims against Wood. Dkt. No. 54.

On June 24, 2020, Coleman field a motion to amend the Amended Complaint. Dkt. No. 77. On August 11, 2020, Coleman appeared at a deposition. Dkt. No. 91-5 at 4. On August 28, 2020, the Court granted Coleman's motion, accepted the Second Amended Complaint (Dkt. No. 85) and ordered Defendants to respond to the

following: (1) First Amendment retaliation claims against newly-added defendants Coryea and Demers; (2) Eighth Amendment excessive force and failure to intervene claims against defendants Coryea, Demers, Durkin, Hutti, King, Reyell, Wyatt, Tyler, Dubrey, and Spinner; and (3) Eighth Amendment claims based on supervisory liability against Racette. Dkt. No. 84. On October 13, 2020, Defendants filed an Answer to the Second Amended Complaint. Dkt. No. 88

On October 27, 2020, Defendants filed the within motion pursuant to Fed. R. Civ. P. 56 seeking partial summary judgment: dismissal of all claims against Racette and Demers for lack of personal involvement and dismissal of First Amendment claims against Demers and Coryea. See generally Dkt. No. 91. Coleman opposed the motion.[9] Dkt. No. 98.

[9]     In response to the motion for summary judgment, Coleman submitted a Memorandum of Law. Dkt. No. 98-1. In the submission, Coleman introduces arguments related to the denial of medical attention. See id. at 16. The Second Amended Complaint does not include a claim related to deliberate medical indifference. See generally Dkt. No. 85. Thus, this issue is not properly before this Court and will not be considered.

## II. DISCUSSION

### A. Legal Standard

 *4 A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 317, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Eighth Amendment Claims

"The Eighth Amendment requires prison officials to take 'reasonable measures to guarantee the safety of inmates' in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999). The objective element is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted [is] sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (internal quotation marks and citation omitted); Blyden, 186 F.3d at 262.

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims v. Artuz, 230 F.3d 14, 21 (2d Cir. 2000) (internal quotation marks and citations

2021 WL 4312392

omitted) Thus, the key inquiry for an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically [to] cause[ ] harm." Hudson, 503 U.S. at 7 (internal quotation marks and citations omitted); see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (observing that the Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases—"not whether a certain quantum of injury was sustained.") (internal quotation marks and citation omitted). In assessing whether defendants acted maliciously or wantonly, the Second Circuit has set forth five factors to consider:

> *5 the extent of the injury and the mental state of the defendant[;] … the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

Similarly, "a state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may support a claim under § 1983." Morales v. New York State Dep't of Corr., 842 F.2d 27, 30 (2d Cir. 1988). To state a claim for failure to protect under the Eighth Amendment, a plaintiff must demonstrate that (1) he or she was "incarcerated under conditions posing a substantial risk of serious harm," the objective prong; and (2) prison officials acted with deliberate indifference to that risk and the inmate's safety, the subjective prong. Farmer, 511 U.S. at 834.

As to the objective prong, the deprivation must be "sufficiently serious," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991) (internal quotation marks omitted)), and "contemplate[ ] 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " Id. (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990)). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an attacker, coupled with a complaint by plaintiff regarding the altercation

or a request by plaintiff to be separated from the attacker." Gilmore v. Rivera, No. 13-CV-6955, 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014); see Rivers v. Spinnella, No. 9:09-CV-309 (FJS/RFT), 2010 WL 6428486, at *5 (N.D.N.Y. Nov. 4, 2010) (granting the defendants' motion for summary judgment where "there [were] no specific facts, nor even allegations, that indicate the [the d]efendant was aware that [the p]laintiff faced a substantial risk of serious harm until the altercation had already started."). [10]

[10]    Copies of the unpublished decisions cited within this Report-Recommendation & Order have been provided to plaintiff pro se.

As to the subjective prong, the plaintiff must demonstrate that prison officials actually knew of and disregarded an excessive risk of harm to the inmate's health and safety. See Farmer, 511 U.S. at 837. The defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The plaintiff must "show that the defendants actually inferred from that disclosure that a substantial risk of serious harm existed." Murray v. Goord, 668 F. Supp.2d 344, 359 (N.D.N.Y. 2009). A prison official's negligence does not amount to a constitutional violation. See Hathaway, 37 F.3d at 66.

### 1. Claims Against Racette

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. Polk Cnty. v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Wright, 21 F.3d at 501. Thus, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Before deciding Ashcroft v. Iqbal, 556 U.S. 62 (2009), the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or

appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

**\*6** In Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020), the Second Circuit addressed how the Supreme Court's decision in Iqbal affected the standards in Colon for establishing supervisory liability. Consistent with other circuits, the Court concluded that "there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.' " Id. at 618. Therefore, to avoid summary judgment, the plaintiff had to establish that the defendant violated the Eighth Amendment by her "own conduct, not by reason of [her] supervision of others who committed the violation" and could not "rely on a separate test of liability specific to supervisors." Id. at 619.

It is undisputed that Racette was not present during the search of Coleman's cell in the Upper H Block on June 8, 2015. Dkt. No. 91-3 at ¶ 5; Dkt. No. 91-4 at ¶ 13. Racette asserts, and Coleman does not dispute, that he did not see any staff use excessive force on any inmates between June 6, 2015, and June 28, 2015. Dkt. No. 91-4 at ¶ 12. As Coleman does not provide evidence that Racette was present at the time of the alleged assault, the Eighth Amendment excessive force claim against Racette must be dismissed. See Tangreti, 983 F.3d at 619; see also Celestin v. Angeletta, No. 19 CV 1887, 2021 WL 1062344, at \*4 (S.D.N.Y. Mar. 19, 2021) (dismissing the plaintiff's excessive force claim against the captain because the plaintiff "does not connect Captain [ ] to the purported assault"); Forbes v. Doe, No. 6:18-CV-06700, 2021 WL 810020, at \*3 (W.D.N.Y. Mar. 3, 2021) (dismissing claims against employee of Monroe County Sheriff's Department because the plaintiff failed to allege that employee was involved in searches or the use of excessive force against the plaintiff).

With respect to the failure-to-protect claim, Coleman alleges that Racette was personally involved in the constitutional violations because he was aware of Coleman's "many complaints of threats and harassment from the staff at Clinton." See Dkt. No. 98-1 at 9, 2, 12, 17. As support,

Coleman relies upon a DOCCS' computer-generated list of grievances entitled "Closed Cases." Dkt. No. 98-2 at 3. The list includes four grievances: one he filed at Auburn Correctional Facility in December 2010 and three he filed at Clinton C.F. in April 2015, July 2015, and March 2016. Dkt. No. 98-2. The July 2015 grievance relates to the events that transpired on June 8, 2015, and the March 2016 grievance was relates to medical treatment. Id. The April 2015 grievance involves verbal harassment by an unidentified "C.O. at Clinton C.F. Id. The grievance was "reviewed by" Chris M. Vanbergen and "authorized" by Jeffrey A. Hale. Id. The named defendants, including Racette, are not referenced anywhere in the document. Id.

Coleman also contends that Racette was aware of his prior complaints related to harassment and threats at Clinton C.F. because Racette was a defendant in his "prior 1983 claim." Dkt. No. 98-1 at 12-13. Specifically, Coleman refers to a civil rights complaint he filed in this District in January 2015. See Coleman v. Racette, et al., No. 9:15-CV-0040 (TJM/ATB), Dkt. No. 1 (N.D.N.Y. filed on Jan. 14, 2015) ("Coleman I"). In Coleman I, Plaintiff asserted First and Eighth Amendment claims against Racette and Clinton Correctional Officer L. Nolan related to an alleged excessive force incident that he alleged occurred in December 2014. Id., Dkt. Nos. 19, 21. In lieu of an answer, the defendants filed a motion to dismiss. Id., Dkt. No. 28. On January 4, 2016, the Court dismissed all claims against Racette for failure to plead personal involvement. [11] Coleman I, Dkt. No. 38.

[11]    On November 27, 2018, Coleman I was resolved with a Stipulation and Order of Discontinuance. See Coleman I, Dkt. No. 114.

**\*7** Upon review of the record in the instant action, including the list of grievances, and, taking judicial notice of Coleman I, the Court addresses the objective and subjective standards of an Eighth Amendment failure-to-protect claim. As to the first prong – whether plaintiff established that he was incarcerated under conditions posing a substantial risk of serious harm – Coleman provides proof of general allegations of prior verbal harassment and accusations of excessive force against a Clinton C.F. officer not involved with the June 2015 incident. Coleman did not file any grievances or complaints against the officers purportedly involved in the June 2015 incident. Moreover, Coleman does not allege that he had prior altercations or any kind of history with the named defendants. In fact, Coleman testified that he never saw Coryea or Demers before June 8, 2015. Dkt. No. 91-5 at

14. As such, the evidence presented does not support the conclusion that Coleman faced a substantial risk of serious harm from the named defendants.

As to the second prong – whether plaintiff established that Racette acted with the necessary state of mind – the Court notes that Eighth Amendment failure to protect claims cannot be based on a defendant's knowledge of a "general risk" of harm to an inmate. See, e.g., Hogan v. Fischer, No. 09-CV-6225, 2012 WL 4845609, at *6 (W.D.N.Y. Oct. 10, 2012) (internal citation omitted) (holding that the failure to protect the plaintiff from a general threat of harm is insufficient to raise a failure-to-protect claim under the Eighth Amendment) vacated in part on other grounds 738 F.3d 509 (2d. Cir. 2013). Here, nothing in the record suggests that Racette acted with deliberate indifference. Even assuming that Racette was aware of Coleman's April 2015 grievance and Coleman I, prior to June 8, 2015, [12] the complaints set forth therein did not involve the named defendants, physical assault, or threats of physical violence. Thus, Coleman has failed to show that Racette knew that Coleman was under the threat of harm and had the opportunity to prevent such harm. See Farmer, 511 U.S. at 829.

[12]  Racette was not served with the summons and amended complaint in Coleman I until July 28, 2015, after the alleged use of force on June 8, 2015. Coleman I, Dkt. Nos. 23, 26

As Coleman has failed to show that he faced a "substantial risk of harm" from the named defendants, and that Racette failed to protect Coleman from future harm by the defendants, it is recommended that Defendants' partial motion for summary judgment and dismissal of the failure-to-protect claims against Racette be granted. See, e.g., Boyd v. Petralis, No. 6:16-CV-06286, 2021 WL 1100395, at *6 (W.D.N.Y. Mar. 23, 2021) (dismissing failure-to-protect claims based upon Tangreti and lack of evidence that the defendants were aware of the plaintiff's fear of an attack or any prior complaints against the deputies until after the incident); see also Brown v. Annucci, No. 19 CV 9048, 2021 WL 860189, at *5 (S.D.N.Y. Mar. 8, 2021) ("Aside from a general reference to records of misusing force, plaintiff pleads no facts suggesting [defendants] consciously or recklessly disregarded a serious risk of harm certain correction officers allegedly posed to plaintiff.") (internal quotation marks and citations omitted).

Accordingly, it is recommended that the Eighth Amendment claims against Racette be dismissed and that Defendants' motion for summary judgment be granted.

### 2. Claim Against Demers

Defendants argue that the Eighth Amendment claim against Demers must be dismissed for lack of personal involvement because Coleman cannot recollect who was involved in the alleged excessive force incident and did not identify Demers as one of the attackers. Dkt. No 91-1 at 17-18.

"A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." Munoz v. Martinez, No. 03 CIV. 0828, 2005 WL 1355094, at *4 (S.D.N.Y. June 8, 2005) (citation omitted); see Alexander v. Racette, 9:17-CV-309 (BKS/CFH), 2020 WL 5802273, at *11 (holding that, the fact that the plaintiff could not identify with certainty who was involved in the assault was not fatal where the plaintiff presented evidence that his assaulter was wearing a CIU jacket without a name tag but that he had a bag over his head for much of the assault, combined with evidence that a defendant may have worn his CIU jacket on the day in question "raise[d] a triable issue of fact as to whether [the defendant] was personally involved" was the individual involved in questioning the plaintiff and in the assault). "This is especially true where the acts complained of by the plaintiff, if true, (e.g., mace to the eyes, standing on back, 'mushing' face into the ground) are likely to have prevented plaintiff from identifying which of three defendant officers specifically engaged in the bad acts." Shankle v. Andreone, No. 06-CV-487, 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009).

*8  Here, Coleman testified that, at the time of the cell search, he was not able to identify the officers because they were not wearing name tags. See Dkt. No. 91-5 at 14, 20. With assistance, Coleman was later able to identify the officers as Coryea and Demers. Id. at 20-22; Dkt. No. 98-1 at 19-20. Coleman further testified that, although he saw Coryea hit him, he could not identify all of the officers involved in the assault because he was "stomped on" while he was "face down" on his stomach and "in and out of consciousness." Dkt. No. 91-5 at 33-35. Although Coleman cannot affirmatively state which officers participated in the physical assault, he testified that Demers was "present for the incident on June 8 [th] when 2015, when [he] was punched and kicked and stomped [on.]" Id. at 33, 38, 40-42.

Conversely, Demers avers that he was assigned to search Cell 35, twenty cells away from Coleman's cell and that he did not "strike Plaintiff or otherwise use force" on Coleman. Dkt. No. 91-2 at ¶¶ 8, 11. Demers provided a Cell Frisk Sheet which, he contends, supports his position that he searched Cell 35 and Coryea searched Cell 15.[13] Dkt. No. 91-2 at ¶ 4, pp. 5-6. Demers claims that if he had searched Coleman's cell on June 8, 2015, he would have put his name on the cell frisk sheet and signed the form. Id. at ¶ 9.

[13]     Demers stated that the Cell Frisk Sheet is dated June 18, 2015. Dkt. No. 91-2 at ¶ 4. Based upon a review of the document, which is dated June 8, 2015, it is clear that Demers' declaration contains a typographical error in relation to the date.

The competing evidence rests on the credibility of Coleman on one hand and Demers on the other.[14] In these circumstances, the governing law that the evidence must be viewed in the light most favorable to the non-moving party requires the Court to credit Coleman's version of the events for purposes of this motion. See In re Dana Corp., 574 F.3d 128, 152 (2d Cir. 2009) (holding that a court faced with a motion for summary judgment must draw all reasonable inferences in favor of the non-moving party and may not make credibility determinations or weigh the evidence, functions which are reserved for a jury and not a judge) (citing cases).

[14]     Although the record contains a declaration from Durkin, who admits he was present in Upper H Block on June 8, 2015, Durkin does not confirm, refute, or address Demers' claim that he was not personally involved in the alleged use of force.

Thus, although Coleman acknowledges that he is unable to identify which of the defendants exerted what force upon him, he has proffered sufficient evidence to raise an issue of material fact as to Demers' personal involvement to require resolution by a trier of fact. Accordingly, it is recommended that Defendants' motion on this ground be denied.

### C. Retaliation Claims

In order to establish a First Amendment retaliation claim under Section 1983, a prisoner must show the following: that "(1) ... the speech or conduct at issue was protected, (2) ... the defendant took adverse action against the plaintiff, and

(3) ... there was a causal connection between the protected speech and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks and citations omitted). "[P]risoner retaliation claims are easily fabricated, and ... pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks and citations omitted). Accordingly, the Second Circuit requires courts to "examine prisoners' claims of retaliation with skepticism and particular care." Colon, 58 F.3d at 872.

Here, Defendants do not dispute that Coleman allegedly suffered an adverse action to satisfy the second prong of the retaliation claim. Rather, Defendants argue that Coleman's retaliation claims against Demers and Coryea are subject to dismissal because Coleman "failed to explain the nature of his protected speech supporting his First Amendment claim" against Demers and Coryea. Dkt. No. 91-1 at 19. Moreover, Defendants contend that the record lacks evidence demonstrating a causal connection between the protected conduct and the alleged adverse action, the alleged excessive force incident. Dkt. No. 91-1 at 19-20.

*9  It is well settled that the filing of administrative grievances and lawsuits constitutes protected speech. See Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir 2003) ("[T]he filing of prison grievances is a constitutionally protected activity"); Williams v. Ingraham, No. 04-CV-257 (GLS/DRH), 2005 WL 3746222, at *2 (N.D.N.Y. Feb. 3, 2005) ("The [inmate's] conduct at issue—complaints to judicial officials, filing a lawsuit, and grievances—are clearly constitutionally protected rights.") (citing Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)).

As to the third element, the plaintiff bears the burden of establishing that causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991)). A plaintiff may establish a causal connection "with circumstantial evidence if it is 'sufficiently compelling[.]' " Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

In determining whether a causal connection exists between the plaintiff's protected activity and a

Coleman v. Racette, Slip Copy (2021)

2021 WL 4312392

prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

**1. Retaliation Claims Based upon "Many Grievances"**

Coleman claims that Demers and Coryea were motivated to retaliate against him because they were aware of his "many grievances[.]" Dkt. No. 98-1 at 26. However, this conclusory claim, submitted for the first time in opposition to the motion for summary judgment, is not supported by competent, admissible evidence. As discussed supra, the record lacks facts establishing that Coleman filed grievances or complaints against Demers or Coryea prior to the June 2015 incident. Indeed, Coleman has not proffered any evidence establishing that Demers or Coryea were aware that Coleman filed any grievances prior to the June 2015 incident. Accordingly, Coleman has not established a viable retaliation claim based upon his generalized contention that Defendants were aware of his filing "many grievances." Id.

**2. Retaliation Claims Based upon Coleman I**

Defendants concede that the filing of lawsuit is constitutionally protected activity.[15] Dkt. No. 91-1 at 19. Although Defendants' Memorandum of Law lacks any argument in support of dismissal of Coleman's retaliation claims based upon Coleman I, Coleman bears the burden of demonstrating that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682. In this regard, Coleman relies upon the "close proximity in time" between his protected conduct and the adverse action. See Dkt. No. 98-1 at 26.

[15]    In the December 2019 Report-Recommendation and Order, this Court concluded that Coleman

engaged in protected conduct when he filed Coleman I. Dkt. No. 61 at 24.

It is well-settled that "temporal proximity without more is insufficient to survive summary judgment." Flynn v. Ward, No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *11 (N.D.N.Y. June 7, 2018) (internal quotation marks and citation omitted). Instead, a plaintiff must come forward with additional "circumstantial evidence" establishing that the protected activity was "a substantial or motivating factor" in the defendant's conduct. See id. at *10. Retaliation is not "reasonably inferred" where a plaintiff's protected speech does not involve the defendant alleged to have retaliated against him. See Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 (GLS/ATB), 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (citing Hare v. Hayden, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.")).

**\*10** Coleman testified that Demers and Coryea "grabbed" his legal work and began reading through his "claim against another correctional officer within that facility." Dkt. No. 91-5 at 18-19. Coleman overheard Defendants "whispering amongst themselves[,]" and although he admits that he "could not make out nor hear what they were whispering about," the assault occurred "shortly thereafter." Id. at 22; Dkt. No. 98-1 at 28.

As discussed, Coryea and Demers were not named defendants in Coleman I. Even assuming the truth of Coleman's claim that Demers read Coleman's legal materials, the record lacks evidence demonstrating that Demers or Coryea were motivated to retaliate against Coleman based on Coleman's filing of that lawsuit. Coleman has not proffered any explanation as to why Coryea or Demers would be motivated to retaliate against him in response to a lawsuit against Nolan. Coleman does not allege, and the record does not support, a conclusion that Demers or Coryea made any reference to the lawsuit, Nolan, or the December 2014 incident referenced in Coleman I prior to the alleged assault. Coleman's conclusory and speculative allegations are insufficient to support "an inference of a causal connection between" the protected conduct; i.e. filing Coleman I, and the alleged excessive force incident. See Baskerville, 224 F.Supp.2d at 732.

2021 WL 4312392

As there is an absence of factual support to demonstrate a causal connection, Coleman's retaliation claims against Demers and Coryea, based upon Coleman I, lack merit. Celotex Corp., 477 U.S. at 323.

### 3. Retaliation Claims Based Upon Oral Complaints

Construing Coleman's arguments in a light most favorable to him, Coleman asserts that Defendants were motivated to retaliate against him after overhearing his conversations with Hutti and Durkin. Dkt. No. 98-1 at 25. Defendants argue that the verbal exchanges between Coleman, Hutti, and Durkin were "brief and isolated" and cannot be construed as constitutionally-protected speech. Dkt. No. 91-1 at 20.

A prisoner does not have a First Amendment right to engage officers in a verbal dispute. See Torrez v. Mulligan, No. 3:17-CV-677, 2017 WL 2623165, at *3 (D. Conn. June 16, 2017) (dismissing retaliation claim against officer who allegedly assaulted the plaintiff immediately after the plaintiff told the defendant to "stop making inappropriate comments"). However, district courts in the Second Circuit have concluded that an inmate's oral complaints to a correctional officer, under some circumstances, may constitute speech or conduct protected under the First Amendment. See, e.g., Mazyck v. Keller, 6:20_CV-06055, 2021 WL 1201224, at *8 (W.D.N.Y. Mar. 31, 2021) (finding that the plaintiff "plausibly alleged that he engaged in protected activity for purposes of his First Amendment claim" where the plaintiff alleged to have verbally reported an assault by a correctional officer to a supervisor, and as a result, faced retaliation); Smith v. Woods, No. 03-CV-480 (DNH), 2006 WL 1133247, at *10 (N.D.N.Y. Apr. 24, 2006) (noting that "the First Amendment protects, not only the filing of written grievances and complaints, but under some circumstances, the making of oral complaints to correction officers."), aff'd, 219 F. App'x 110 (2d Cir. 2007) (summary order) (citation omitted); Sprau v. Coughlin, 997 F.Supp. 390, 393 (W.D.N.Y. 1998) (finding a prisoner's threat to file a complaint against a prison guard sufficient to establish protected activity); but see Booker v. Griffin, No. 16-CV-00072, 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018) (dismissing First Amendment claims against correctional officers on the basis of qualified immunity "because the law is not well-settled regarding whether an inmate's verbal complaint constitutes protected speech, it would not necessarily be 'clear to a reasonable officer' that taking an adverse action in response to such a complaint

would rise to the level of a constitutional violation.") (internal citation omitted).

**\*11** Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several district courts in this Circuit have held that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity. See Williams v. Smith, No. 11-CV-0601 (LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Mar. 13, 2015) (verbal complaint "about problems with [inmate's] braces" was not protected conduct); Carl v. Griffin, No. 08-CV-4981, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) ("[The p]laintiff's brief and isolated verbal [encounter with the defendant] does not constitute protected First Amendment speech [because] [t]o construe it as such would elevate every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment.") (internal quotation marks and citation omitted); see also Lugo v. Van Orden, No. 07-CV-879 (TJM/GJD), 2008 WL 2884925, at *3 n.4 (N.D.N.Y. July 23, 2008) ("A simple discussion with a corrections officer would not be protected speech unless that discussion was in the form of a complaint or concern about the officer or some policy involved.").

In his grievance, Coleman described his verbal exchange with Hutti as a "conversation" about his property. Dkt. No. 91-5 at 25. During his deposition, Coleman testified that while Demers and Coryea were "throwing stuff out of [his] cell," he "started addressing" Hutti and "started inquiring about the items that these two officers had discarded from [his] cell as rubbish." Dkt. No. 91-5 at 25-26. Coleman summarized his exchange with Hutti:

> A. Basically, there was a particular item that was discarded from my cell which is a property bag is, you know, a bag they sell on commissary that allows inmates to -- to store items in this property bag to create space in your cell.
>
> So Sergeant Coryea was the one who discarded this bag from out of my cell, so I asked -- asked -- asked Sergeant Hutti -- I didn't ask him. I stated to Sergeant Hutti that this officer was discarding property that I'm entitled to have. And I would like to know if I could retrieve it, because I'm entitled to have this.

Dkt. No. 91-5 at 26-27.

Coleman does not allege that he voiced any complaints to Hutti and does not describe the exchange with Hutti as argumentative. In his grievance, Coleman claimed that Durkin "yelled" at him, but Coleman described his tone to Durkin as "respectful." Dkt. No. 1-1 at 43. During his deposition, Coleman testified that while he was speaking with Hutti, Durkin interrupted and "started yelling in [his] face[.]" Dkt. No. 91-5 at 27. Durkin told Coleman, "if you don't throw this shit away, I'm going to throw it away for you." Id. Coleman testified that he responded:

> A. At that time, I interjected, and I stated to Lieutenant Derkin [sic] that I had a lot of amount [sic] of property that I'm entitled to have by the State of New York. I have no more or no less. At that time, he started yelling back in my face again, saying I don't care how much property you're entitled to have. If you don't get rid of this shit we will."

Dkt. No. 91-5 at 27.

Based upon Coleman's sworn testimony and the record before the Court, Coleman did not intend for his statements regarding the manner in which his property was handled to "reach anyone" other than Hutti and Durkin. See Carl, 2011 WL 723553, at *5. The record suggests that the verbal exchanges were, at best, "isolated" disagreements related to the cell search that day. There is no evidence that the parties engaged in any further conversations or arguments regarding these issues. Accordingly, the Court concludes that the oral exchanges between Coleman and Hutti and Coleman and Durkin were not verbal grievances or protected conduct. See Cosby v. McDonald, No. 3:20-CV-432, 2020 WL 5026550, at *6 (D. Conn. Aug. 25, 2020) (finding that there is a distinction between "verbal grievances and verbal confrontations or arguments between a prisoner and a correctional officer and [district courts] have concluded that the latter do not constitute protected speech") (collecting cases); see also Ford v. Martuscello, No. 9:14-CV-1566 (DNH/DEP), 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) (confronting a corrections officer based on a dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity); report

and recommendation adopted, 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016) (citations omitted).

**\*12** Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of Coleman's First Amendment retaliation claims against Coryea and Demers be granted.

## III. CONCLUSION

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for partial summary judgment (Dkt. No. 91) be **GRANTED** as to Plaintiff's claims against Racette and Plaintiff's First Amendment retaliation claims against Demers and Coryea; and **DENIED** in all other respects; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72. [16]

16     If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4312392

**All Citations**

Slip Copy, 2021 WL 4312392

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3508342
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,

v.

Steven RACETTE, Superintendent, Clinton
Correctional Facility; Lt. Durkin, Correctional
Officer, Clinton Correctional Facility; Sgt. Hutti,
Correctional Officer, Clinton Correctional Facility;
Sgt. King, Correctional Officer, Clinton Correctional
Facility; Wyatt, Correctional Officer, Clinton
Correctional Facility; S. Dubrey, Correctional
Officer, Clinton Correctional Facility; Spinner,
Correctional Officer, Clinton Correctional Facility;
J. Tyler, Correctional Officer, Clinton Correctional
Facility; Corrections Officer Coryea; Corrections
Officer Demers; and John Reyell, Defendants.

18-cv-0390 (MAD/CFH)
|
Signed 08/10/2021

**Attorneys and Law Firms**

TOWAUN COLEMAN, 07-A-2215, Clinton Correctional
Facility, P.O. Box 2000, Pine City, New York, Plaintiff, pro se.

OF COUNSEL: ERIK BOULE PINSONNAULT, AAG,
NEW YORK STATE ATTORNEY, GENERAL – ALBANY,
The Capitol, Albany, New York 12224, Attorneys for
Defendants.

**ORDER**

Mae A. D'Agostino, United States District Judge:

 **\*1** Plaintiff commenced this action on April 2, 2018,
alleging various violations of his constitutional rights and
state law while he was incarcerated at Clinton Correction
Facility. *See* Dkt. No. 1. On December 19, 2018, Plaintiff
filed an amended complaint. *See* Dkt. No. 31. In his
amended complaint, Plaintiff alleged (1) violations of his
First, Eighth, and Fourteenth Amendment rights pursuant to
42 U.S.C. § 1983; (2) assault and battery; (3) intentional
infliction of emotional distress; (4) negligence; (5) negligent
infliction of emotional distress; and (6) respondeat superior.

*See id.* at ¶¶ 53-76. The Court conducted a review of
the amended complaint and the following claims survived:
(1) Plaintiff's First Amendment retaliation claims against
Defendants Durkin, John Doe #1, and Wood; (2) Plaintiff's
Eighth Amendment excessive force and failure to intervene
claims against Defendants John Doe #1-4, Durkin, Hutti,
King, Reyell, Wyatt, Dubrey, Tyler, Spinner, and Racette; and
(3) Plaintiff's state law negligence claims against Defendants
John Doe #1-4, Durkin, Hutti, King, Reyell, Wyatt, Dubrey,
Tyler, Spinner, and Racette. *See* Dkt. No. 33 at 16.

Defendants filed a partial motion to dismiss on April 1,
2019. *See* Dkt. No. 44. On December 13, 2019, Magistrate
Judge Hummel issued a Report-Recommendation and Order,
recommending that Defendants' motion to dismiss be granted
in part. *See* Dkt. No. 61 at 44. On February 24, 2020, the
Court adopted in its entirety this Report-Recommendation
and Order. Dkt. No. 64. The Court dismissed Plaintiff's First
Amendment claim against Defendants Durkin and Woods and
all negligence claims. *See id.*

On October 27, 2020, Defendants filed a motion for
partial summary judgment seeking dismissal of the Eighth
Amendment claims against Defendants Racette and Demers
and the First Amendment claims against Defendants
Demers and Coryea. *See* Dkt. No. 91. Magistrate Judge
Hummel issued a Report-Recommendation and Order on
May 27, 2021, recommending that Defendants' motion for
partial summary judgment be granted in part. Specifically,
Magistrate Judge Hummel recommended that Defendants'
motion for partial summary judgment be granted with respect
to Plaintiff's First Amendment retaliation claims against
Defendants Demers and Coryea, and with respect to all claims
against Defendant Racette. *See* Dkt. No. 101. Magistrate
Judge Hummel recommended that Defendants' motion for
partial summary judgment be denied with respect to Plaintiff's
Eighth Amendment claim against Defendant Demers. *Id.*

When a party files specific objections to a magistrate
judge's report-recommendation, the district court makes a
"de novo determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." 28 U.S.C. § 636(b)(1). However, when
a party declines to file objections or files "[g]eneral or
conclusory objections or objections which merely recite
the same arguments [presented] to the magistrate judge,"
the court reviews those recommendations for clear error.
*O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1
(N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted);

*see also McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007). After the appropriate review, "the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate [judge]." 28 U.S.C. § 636(b)(1). Plaintiff has not filed an objection to the report-recommendation and the Court will review it for clear error.

**\*2** A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *See id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (*quoting Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Govan*, 289 F. Supp. 2d at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a pro se party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

In the present matter, the Court finds that Magistrate Judge Hummel correctly determined that Defendants' motion for partial summary judgment should be granted as to Plaintiff's Eighth Amendment claim against Defendant Racette. It is undisputed that Defendant Racette was not present during the search of Plaintiff's cell. Dkt. No. 91-3 at ¶ 5; Dkt. No. 91-4 at ¶ 13. Therefore, the excessive force claim fails. *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020). The failure-

to-protect claim similarly fails; there is no record evidence that Racette acted with "deliberate indifference," as required. *Farmer v. Brennan*, 511 U.S. 825, 829 (1994).

The Court also agrees with Magistrate Judge Hummel that Defendants' motion for summary judgment on the First Amendment retaliation claims should be granted. To prove a First Amendment retaliation claim, a prisoner must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). Magistrate Judge Hummel correctly found that Plaintiff's oral complaints were not protected activity. Dkt. No. 101 at 23-27. Additionally, Plaintiff failed to show a causal connection between his grievances or previous lawsuit and the adverse action. *Id.* at 21-23.

Lastly, the Court adopts Magistrate Judge Hummel's recommendation that Defendants' motion for partial summary judgment be denied with respect to Plaintiff's claim of excessive force by Defendant Demers. "A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene." *Munoz v. Martinez*, No. 03 CIV. 0828, 2005 WL 1355094, \*4 (S.D.N.Y. June 8, 2005). Here, Plaintiff's testimony that Defendant Demers "was present for the incident" is therefore sufficient to withstand the motion for partial summary judgment. Dkt. No. 91-5 at 33, 38, 40-42.

**\*3** After carefully reviewing the Report-Recommendation and Order, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Hummel's Report-Recommendation and Order is **ADOPTED** in its entirety for the reasons set forth herein; and the Court further

**ORDERS** that Defendants' motion for partial summary judgment (Dkt. No. 91) is **GRANTED in part and DENIED in part;** [1] and the Court further

[1]     Plaintiff's Eighth Amendment excessive force claim remains against Defendants Durkin, Hutti, King, Wyatt, Dubrey, Spinner, Tyler, Coryea, Demers, and Reyell.

**ORDERS** that Defendant Racette is **terminated** as a Defendant in this action; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3508342

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Supplemented by   Cao-Bossa v. New York State Dep't of Labor,   N.D.N.Y.,
November 16, 2021

2021 WL 3674745
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Weili CAO-BOSSA, Plaintiff,
v.
NEW YORK STATE DEPARTMENT
OF LABOR, Defendant.

1:18-CV-0509 (GTS/TWD)
|
Signed 08/19/2021

**Attorneys and Law Firms**

WEILI CAO-BOSSA, Plaintiff, Pro Se, 1912 East Country
Club Drive, Schenectady, NY 12309.

HON. LETITIA JAMES, Attorney General for the State of
New York, Counsel for Defendant, 300 South State Street,
Suite 300, Syracuse, NY 13202, OF COUNSEL: AIMEE
COWAN, ESQ., Assistant Attorney General.

**DECISION and ORDER**

Glenn T. Suddaby, Chief U.S. District Judge

 **\*1**  Currently before the Court, in this employment
discrimination action filed by Weili Cao-Bossa ("Plaintiff")
against the New York State Department of Labor
("Defendant"), are the following two motions: (1)
Defendant's motion for summary judgment; and (2)
Defendant's letter-motion to strike Plaintiff's sur-reply. (Dkt.
Nos. 58, 70.) For the reasons set forth below, Defendant's
motion for summary judgment is granted, and its motion to
strike Plaintiff's sur-reply is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Second Amended Complaint**
Generally, in her Second Amended Complaint, Plaintiff
claims that Defendant discriminated against her based on
her national origin and age in violation of Title VII of the
Civil Rights Act of 1964 and the Age Discrimination in
Employment Act ("ADEA"). (Dkt. No. 25 [Pl.'s Second
Am. Compl.].) In support of her claims, Plaintiff alleges that
Defendant discriminated against her by (a) refusing to hire
her for a position for which she interviewed in March 2016,
and (b) terminating her employment in another position after
six months. (*Id.*) More specifically, Plaintiff, who is Chinese
and was 45 years old at the time of her termination, alleges
that she received unfairly poor performance reviews based
on a few sporadic mistakes that resulted in her termination,
but that other American and/or younger employees did not
receive similar negative performance reviews and were not
terminated. (*Id.*)

**B. Undisputed Material Facts on Defendant's Motion
for Summary Judgment**
Under N.D.N.Y. Local Rule 56.1 (formerly Local Rule
7.1[a][3]), a party opposing summary judgment must file a
response to the moving party's Statement of Material Facts
that "shall mirror the movant's Statement of Material Facts
by admitting and/or denying each of the movant's assertions
in a short and concise statement, in matching numbered
paragraphs," supported by "a specific citation to the record
where the factual issue arises." N.D.N.Y. Local R. 56.1(b).
This requirement is not a mere formality; rather "this and
other local rules governing summary judgment are essential
tools intended to relieve the district court of the onerous
task of hunting through voluminous records without guidance
from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL
921688, at \*6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting
*Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y.
2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's
statement of material facts streamlines the summary judgment
analysis 'by allocating responsibility for flagging genuine
factual disputes on the participants ostensibly in the best
position to do so: the litigants themselves.' " *LaFever*, 2021
WL 921688, at \*7 (quoting *Alke v. Adams*, 16-CV-0845, 2018
WL 5297809, at \*2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).
"The Court may deem admitted any properly supported facts
set forth in the Statement of Material Facts that the opposing
party does not specifically controvert." N.D.N.Y. Local R.
56.1(b).

In this case, Plaintiff entirely failed to provide any response
to Defendant's Statement of Material Facts, much less one
that complies with Local Rule 56.1. Where a party has failed
to respond to the movant's statement of material facts in the
manner required under Local Rule 56.1, the facts in the
movant's statement will be accepted as true (1) to the extent
that they are supported by evidence in the record, and (2)

2021 WL 3674745

provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).[1] Here, Defendant served on Plaintiff the standard form for this District entitled "Notification of the Consequences of Failing to Respond to a Summary Judgment Motion," which includes a specific notification of the requirement to respond to the defendant's statement of material facts in matching numbered paragraphs with citation to supporting evidence as well as a warning that failure to do so could result in the Court deeming facts to be true that are not properly disputed. (Dkt. No. 58, Attach. 2.) Moreover, four days later, the Court served Plaintiff with a duplicate copy of that Notification. (Dkt. No. 59.) Eight days later, Plaintiff requested an extension of the response deadline. (Dkt. No. 60.) Plaintiff has therefore received sufficient notice of the possible consequences of her failure to respond to Defendant's Statement of Material Facts.

[1]    Notably, although "courts are required to give due deference to a plaintiff's *pro se* status, that status 'does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.' " *Salaam v. Stock*, 19-CV-0689, 2021 WL 2367123, at *2 (N.D.N.Y. May 12, 2021) (Dancks, M.J.) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 [2d Cir. 2003]), report-recommendation adopted by 2021 WL 2102242 (N.D.N.Y. May 24, 2021) (Sannes, J.).

**\*2**  Although the Court has ensured that Defendant's asserted facts are supported by the cited record evidence, it does not have the duty to scour the record for any and all evidence that may contradict those asserted facts. *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out") (internal quotation marks and citations omitted). As a result, the following facts were asserted and supported with accurate record citations by Defendant in its Statement of Material Facts and deemed admitted by Plaintiff due to her failure to respond and failure to provide any evidence

to dispute the asserted facts. (Dkt. No. 66 [Def.'s Rule 56.1 Statement].)

1. Plaintiff was born on September 21, 1972.

2. Plaintiff is of Chinese national origin.

3. Plaintiff obtained a bachelor's degree in Agriculture in 1996 from Ocean University of China.

4. Plaintiff also received a certificate from Austin Community College in Austin, Texas, in 2012 for "professional accountant with high technology."

5. Plaintiff did not have her Certified Public Accountant ("CPA") license at the time of her deposition.

6. In 2016, Plaintiff did not have the requisite one year of accounting experience, supervised by a CPA, required for CPA licensing.

7. Plaintiff testified that she passed her CPA examinations in 2014.

8. Plaintiff did not have any formal accounting experience before she immigrated from China to the United States in 2008.

9. The first accounting position Plaintiff held after arriving in the United States in 2008 was her position with Defendant in 2016.

10. Defendant is an executive agency of the State of New York, established pursuant to Article 2 of the New York State Labor Law.

11. Defendant's Administrative Finance Bureau ("AFB") is responsible for the budgeting, fiscal management, accounting, and expenditure of all department funds.

12. The AFB also maintains and ensures the accuracy of Defendant's payroll system, provides support operations services, including all procurement and payment activities, and provides property management services covering leasing, space planning, project oversight, and building maintenance.

13. Additionally, the AFB is responsible for the management of Defendant's federal grant funding and ensuring compliance with state and federal reporting requirements.

14. The AFB is divided into multiple sub-units, each with managers who reported to Kathleen Elfeldt when she was the Director of Finance from 2014 until January 2018.

15. The Financial Management Unit ("FMU") is one of the sub-units of the AFB.

16. In March 2016, Defendant posted a job vacancy announcement for an Accountant Trainee 1 & 2 (Grades 14 and 16) and Senior Accountant (Grade 18) position within the AFB's FMU.

17. In order to be eligible for the Accountant Trainee position, a candidate must pass a Civil Service examination and possess a bachelor's degree in accounting, auditing or taxation, or a bachelor's degree or higher degree with 24 semester credit hours of accounting, auditing or taxation courses.

18. A list of candidates who meet these requirements is provided to Defendant by the New York State Department of Civil Service.

19. Plaintiff was the fourth candidate on the Accountant Trainee list, with a score of 90, and thus she was eligible for an interview.

20. On July 12, 2016, Plaintiff was interviewed for the open Accountant Trainee position, and then was interviewed by Director Elfeldt the following day.

21. During the second interview, Director Elfeldt explained that the position for which Plaintiff was interviewing was within the AFB's FMU, which manages Defendant's finances related to federal grants and federal programs.

 *3  22. Director Elfeldt informed Plaintiff that federal requirements made the FMU position unique, but that in the future she expected that there would be open positions in the Accounting Office that could be a better fit for Plaintiff's skills and experience.

23. At the time of her interview, Plaintiff did not have any experience reviewing federal guidance or regulations and was not familiar with federal grant funding and guidance requirements.

24. Plaintiff emailed Director Elfeldt after the interview, asking "[W]hy you set such an interview if government working experience is a necessity to this job?"

25. Director Elfeldt responded that government work experience was not a job requirement for the position, but that the federal grant funding and reporting requirements made the Department of Labor different than a typical state agency, and the position Plaintiff interviewed for was not in the accounting office and would not be entering data into an accounting system.

26. Director Elfeldt indicated that Plaintiff's work experience did not make her a good fit for the position.

27. Plaintiff alleges that she did not receive this position because she was discriminated against based on her age and national origin.

28. Plaintiff does not know the basis for her belief that Director Elfeldt discriminatorily denied her the position based on her age and national origin, other than that "there is no other explanation."

29. Plaintiff admitted at her deposition that she did not have the right experience for this position.

30. On July 15, 2016, Defendant posted another job vacancy for an Accountant Trainee 1 & 2 and Senior Accountant, this one in the Accounting Unit.

31. Plaintiff was again reachable for this position on the Civil Service list.

32. Plaintiff claims that Director Elfeldt had her assistant call Plaintiff to let her know that there was another position open.

33. On July 19, 2016, Plaintiff interviewed for the position in the Accounting Unit.

34. On September 13, 2016, Margaret "Peg" Farrell, the Project Director for the State Financial System ("SFS") Project in the Accounting Unit at the time, requested that Plaintiff be hired for a Senior Accountant Trainee position.

35. Plaintiff's hiring was approved by Michelle Daly, the Director of the Accounting Office, and Director Elfeldt.

2021 WL 3674745

36. Plaintiff accepted the offer, and her employment began on October 6, 2016.

37. Plaintiff was hired as a trainee on a probationary basis and her salary grade was equivalent to a Grade 14.

38. Plaintiff's probationary period was to run concurrently with her two-year traineeship.

39. After she was hired, Plaintiff was assigned to the Accounting Office's SFS Project Team.

40. Plaintiff's direct supervisor was Project Assistant Lindsay Pulcher and the team manager was Ms. Farrell.

41. Ms. Farrell was Ms. Pulcher's direct supervisor.

42. Ms. Pulcher was the Project Assistant for the SFS Project Team from April 2014 to April 2017.

43. Supervisors for probationary trainees such as Plaintiff are required to present trainees with an Individual Development Plan and quarterly probationary evaluations, as well as traineeship evaluations at six-month intervals during the traineeship.

44. On October 26, 2016, Plaintiff met with Ms. Pulcher and was provided an Individual Development Plan that listed the activities, tasks, and performance standards that were expected of her in her position.

 *4  45. However, during the month of November 2016, Plaintiff had many issues completing basic tasks and assignments that were required in her position.

46. On or about December 5, 2016, Ms. Pulcher and Ms. Farrell met with Plaintiff to review her Individual Development Plan to ensure that Plaintiff understood the requirements of her position and what was expected of her.

47. During the meeting, Plaintiff was reminded about the tasks she needed to complete as part of her position and she was reminded as to how she should be completing her assignments.

48. Plaintiff was also reminded during this meeting that her position was a two-year traineeship during which she was on probation and could be terminated for poor performance.

49. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed during this meeting that she needed to choose her wording carefully in emails and on the telephone.

50. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she is not entitled to "flex time" and was not allowed to leave early if she arrived to work early.

51. Plaintiff recalled at her deposition that Ms. Pulcher and Ms. Farrell discussed that she needed to complete her assignments in the format that her supervisor had requested.

52. At no point during the meeting did either Ms. Pulcher or Ms. Farrell discuss Plaintiff's age or national origin.

53. At no point during the meeting did Plaintiff raise any concerns about discrimination.

54. However, following the meeting of December 5, 2016, Plaintiff continued to have issues with her job performance.

55. On January 6, 2017, Plaintiff received a three-month performance evaluation which indicated that she needed to improve in almost all aspects of her job performance.

56. The three-month evaluation was completed by Ms. Pulcher and reviewed by Ms. Farrell.

57. A meeting was held with Plaintiff on January 6, 2017, in which Ms. Pulcher and Ms. Farrell gave the three-month evaluation to Plaintiff.

58. Ms. Pulcher took notes of the meeting, indicating what was reviewed with Plaintiff and Plaintiff's responses.

59. Plaintiff admits that she made mistakes during the first three months of her probationary term.

60. During the meeting, Ms. Pulcher showed Plaintiff an example of an email in which Plaintiff used a harsh, inappropriate tone.

61. Plaintiff testified at her deposition that she disagrees with Ms. Pulcher's assessment of her performance.

62. Following receipt of her three-month evaluation, Plaintiff met with Lin Arbab, a Human Resources Specialist for Defendant.

63. During this meeting, Ms. Arbab explained to Plaintiff that managers and supervisors may appropriately issue evaluations that accurately reflect the quality of an employee's performance.

64. Ms. Arbab explained that sometimes an employee's performance will be rated as "needs improvement" in certain areas, and that it is not unusual for an employee to receive an evaluation that indicates performance areas that need improvement.

65. Ms. Arbab explained that Plaintiff's three-month evaluation reflected her supervisor's assessment of her performance and included examples of the noted performance deficiencies.

*5 66. At the time, Plaintiff did not express to Ms. Arbab any belief that the three-month evaluation was the result of discrimination.

67. On January 12, 2017, Plaintiff wrote an email to Ms. Pulcher and Ms. Farrell, in which she stated that she "appreciate[d] you letting me know your concerns about my performance in the first quarter evaluation," and that she "enjoys very much working" with Ms. Pulcher and Ms. Farrell and "can learn something new every day with [their] help."

68. In the email of January 12, 2017, Plaintiff also listed her plans to improve her performance, including promising to review her emails before sending them to other people, pay attention to formatting details for biweekly downloading and monthly queries, submit a summary of the work she performed that day before she left work every day, take notes so she can stop "asking the same stupid questions," and charge personal time whenever she has to use work time.

69. Plaintiff also asked Ms. Pulcher to remind her if she asks the "same stupid questions" and stated, "Please help me improve my management skills of work assignments. I will improve my quality of work and other virtues required for my work."

70. In the email of January 12, 2017, Plaintiff did not complain about feeling like she was being discriminated against, and did not express disagreement with the three-month performance evaluation.

71. Following the three-month performance evaluation, Plaintiff continued to have job performance issues.

72. Ms. Farrell kept a log of some of the performance issues that Plaintiff exhibited for approximately nine weeks after her three-month evaluation:

a. On January 23, 2017, Ms. Pulcher noted that Plaintiff downloaded the wrong NHRP files.

b. On February 1, 2017, Plaintiff's Monthly Mod Accrual and Stat Ledger queries were for December 2015 rather than December 2016.

c. On February 6, 2017, Ms. Farrell notified Plaintiff that she had made mistakes on the monthly query, to which Plaintiff responded, "[S]orry for the negligence. Will be more careful in the future."

d. Also on February 6, 2017, Ms. Pulcher was forced to remind Plaintiff to download the NHRP522 and NHRP530 files despite the fact that this had been a recurring task for several pay periods.

e. On February 22, 2017, Ms. Pulcher spoke with Plaintiff about her failure to prioritize assignments correctly.

f. On February 27, 2017, Ms. Pulcher emailed Plaintiff to inform her that she

   was enrolled in mandatory training courses, but that those courses were not a priority since they did not need to be completed for eight months, and to identify which assignments were a priority. However, Plaintiff completed these training courses before the priority assignments despite Ms. Pulcher's directions.

g. On March 1, 2017, Ms. Farrell asked Plaintiff to complete an assignment immediately, but Plaintiff submitted the assignment the following day, incorrectly. The assignment was still incorrect the second time Plaintiff submitted it.

h. On March 3, 2017, Ms. Farrell asked Plaintiff to create a tab with a pivot table for each ledger on an Excel spreadsheet. Plaintiff submitted the assignment incorrectly and Ms. Farrell was forced to follow up.

*6 i. Also on March 3, 2017, Ms. Pulcher contacted Plaintiff regarding an assignment that she submitted incorrectly the previous day. Plaintiff responded, "You

are right ... I guess I was kind of in a hurry. Sorry for the abbreviation."

j. On March 8, 2017, Ms. Pulcher requested that Plaintiff provide a summary of an accounting training class Plaintiff had attended; however, Plaintiff did not provide that summary and Ms. Pulcher was forced to follow up on March 21, 2017, at which time Plaintiff still had not completed the assignment.

73. Ms. Farrell recorded at least 13 separate instances between January 11, 2017, and March 20, 2017, on which Plaintiff submitted an incorrect or incomplete assignment or needed to be reminded to complete an assignment.

74. On April 3, 2017, Plaintiff received a six-month evaluation from Ms. Pulcher.

75. Ms. Pulcher recommended that Plaintiff be terminated based on her unsatisfactory performance.

76. Ms. Farrell approved Ms. Pulcher's recommendation for Plaintiff's termination.

77. Director Elfeldt also agreed with the recommendation for termination.

78. Ultimately, termination decisions are made by the Personnel Department.

79. The recommendation was forwarded to Lisa Burrell, Associate Director of Human Resources for Defendant, who made the final determination approving Plaintiff's termination.

80. Plaintiff was presented with the six-month evaluation at a meeting, during which Ms. Pulcher indicated the main reasons why her employment was being terminated, including the fact that her assignments were often not completed per instructions and follow-up was often required, the fact that she needed to be reminded of the same issues repeatedly, and the fact that she did not make the best use of her time or exert a consistent effort.

81. Plaintiff signed the evaluation that recommended her termination.

82. When she received her six-month evaluation, Plaintiff did not complain that her evaluation was the result of discrimination.

83. On April 13, 2017, Plaintiff emailed Director Elfeldt, stating "[T]here were errors in my work because of careless [sic] and inexperience, but they had nothing to do with working abilities."

84. At her deposition, Plaintiff acknowledged that she admitted she was careless and inexperienced during her six months working for Defendant.

85. Plaintiff did not allege in her email of April 13, 2017, that she felt discriminated against.

86. She did, however, thank Director Elfeldt for giving her a chance "to see how unique and complicated the DOL accounting could be."

87. The first time Plaintiff ever expressed that she felt discriminated against while working for Defendant was in an email to Ms. Arbab on April 10, 2017.

88. At no point during her employment with Defendant did anyone make any remarks about Plaintiff's national origin or age.

89. There were "many" employees in Plaintiff's specific unit who were Plaintiff's age or older.

90. On July 17, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR").

91. Her complaint was amended on or about August 2, 2017, and in it she alleged that she was subjected to discrimination based on her age and national origin in violation of the New York State Human Rights Law, Title VII, and the ADEA.

*7 92. On December 20, 2017, the NYSDHR issued a Determination and Order After Investigation, in which it determined that there was no probable cause to believe that Defendant engaged in or was engaging in the unlawful discriminatory practices Plaintiff alleged.

93. On January 26, 2018, the Equal Employment Opportunity Commission ("EEOC") adopted the findings of the NYSDHR.

94. Plaintiff alleges in her Second Amended Complaint that two or three other employees were treated more favorably than her because of their national origin.

Case 9:19-cv-01203-GTS-TWD   Document 57   Filed 12/22/21   Page 61 of 174
Cao-Bossa v. New York State Department of Labor, Slip Copy (2021)
2021 WL 3674745

95. Specifically, Plaintiff alleges that Richard Deitz was treated more favorably than her because of his national origin. However, Plaintiff does not know what position Mr. Dietz held or who he is, and she admits that his job responsibilities were different than her job responsibilities. She also "guesses" that he is "American."

96. According to Mr. Deitz's evaluation in the record, his supervisor was Michelle Daly, not Ms. Pulcher, and Ms. Pulcher has never supervised or evaluated Mr. Deitz.

97. The basis for Plaintiff's belief that Mr. Deitz was treated differently than her is that he was praised for "taking initiative" while she was not.

98. Plaintiff also alleges that Frank Shavel was treated more favorably than her because of his national origin. However, Plaintiff is unaware of where Mr. Shavel worked within Defendant's organization, she did not know what position he held, she did not know who supervised him, she has never worked with him and has never seen him in person, she does not know what his salary grade is, and she does not know whether he was a permanent or probationary employee. Plaintiff also does not know his ethnic background.

99. The only basis for Plaintiff's belief that Mr. Shavel was treated more favorably than her is that he was given a counseling memorandum about failing to complete a mandatory training rather than being terminated, while she did not receive any memoranda before her termination.

100. However, Plaintiff does not know whether Mr. Shavel failed to complete other tasks or training beyond the one related to the counseling memorandum.

101. Plaintiff also alleges that Kayla O'Hara was treated more favorably than her because of her national origin. However, Plaintiff admitted that she does not know Ms. O'Hara's national origin (but she guesses that it is American), she has never worked with Ms. O'Hara or observed her work performance, she has never spoken with anyone who worked with or supervised Ms. O'Hara, she does not know whether Ms. O'Hara made similar mistakes to the ones that are detailed in Plaintiff's own evaluations, and she does not know whether Ms. O'Hara was ever counseled about her time or attendance. Additionally, unlike Plaintiff, who was hired as a Grade 14 Accountant Trainee, Ms. O'Hara was hired as a Grade 18 Senior Budget Analyst effective September 21, 2017.

102. The only basis for Plaintiff's belief that Ms. O'Hara was treated differently than her is because there is no mention of "one-time incident[s]" or "learning process" on Ms. O'Hara's evaluation. Ms. O'Hara's performance evaluation shows that she met performance expectations for her position.

103. Plaintiff also alleges that these employees were treated more favorably than her based on her age.

*8 104. However, Plaintiff admits that Mr. Shavel and Mr. Deitz are both as old or older than her: Mr. Deitz was 45 years old in 2017, and Plaintiff testified that Mr. Shavel is "older than sixty, in his sixties or something .... He's older than me." Mr. Shavel was in fact 61 years old in 2017.

105. Ms. O'Hara was 27 years old in 2017.

106. Ms. Pulcher was not aware of either Ms. O'Hara's or Plaintiff's ages in 2017.

107. The basis for Plaintiff's belief that she was treated differently because of her age was "some clues from [Ms. Pulcher]," such as when Ms. Pulcher "mentioned something about older people. She just didn't believe older people could do good job."

108. Specifically, Plaintiff alleges that Ms. Pulcher commented that a receptionist, Donna, who is around retirement age, "didn't know what she was doing."

109. Plaintiff also alleges that Ms. Pulcher made a comment about a "guy who's doing payroll" and how he needs to retire.

110. Ms. Pulcher denies ever making any comments about "Donna" or "a guy who's doing payroll" with respect to their age or ability to perform their job, and denies making any comments to Plaintiff during her employment about any employees' ages or how their ages impact their ability to perform their jobs.

111. Director Elfeldt was 57 years old at the time of Plaintiff's termination.

112. Assistant Director Cathryn Piccirillo was 51 years old at the time of Plaintiff's termination.

113. Ms. Farrell was 50 years old at the time of Plaintiff's termination.

114. Associate Director of Human Resources Ms. Burrell was 48 years old at the time of Plaintiff's termination.

115. Plaintiff was not the only employee of Asian descent in the AFB at the time Plaintiff was employed there, and there are currently employees of Asian descent employed in Defendant's Finance Bureau.

116. On April 7, 2017, Ms. Burrell sent a letter to Plaintiff indicating that she concurred with the termination recommendation effective close of business April 14, 2017.

117. On April 10, 2017, Plaintiff emailed Ms. Burrell and stated that she felt Ms. Pulcher was an "inexperienced and inapt [sic] supervisor" who was not qualified and who did not provide her with proper training and help, as well as that she felt that Ms. Pulcher was mean to her and that she had been discriminated against.

118. Nowhere in the email of April 10, 2017, does Plaintiff mention that she felt discriminated against specifically based on her age or national origin.

119. At no point during her employment with Defendant did Plaintiff ever complain to Director Elfeldt that she believed she was being discriminated against in any way.

## C. Parties' Briefing on Defendant's Motion for Summary Judgment

### 1. Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant makes three arguments. (Dkt. No. 58, Attach. 1, at 12-43 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's discrimination claims should be dismissed as untimely to the extent they are based on Defendant's failure to hire her for a position with the FMU in July 2016. (*Id.* at 12-15.) Specifically, Defendant argues that this alleged act of discrimination occurred more than 300 days before Plaintiff filed her complaint with the NYSDHR on July 17, 2017, and thus any portion of her claims based on that alleged act of discrimination must be dismissed. (*Id.*) Defendant additionally argues that, timeliness notwithstanding, Defendant's actions in not hiring her for that position in July 2016 were not based on discrimination, but rather because she lacked experience with federal grants and

other regulatory considerations that were a feature of that specific position. (*Id.*)

**\*9** Second, Defendant argues that Plaintiff's national origin discrimination claim pursuant to Title VII should be dismissed. (*Id.* at 15-33.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she was not qualified for her position in that she did not meet legitimate employer expectations of job performance as evidenced by the job evaluations showing unsatisfactory performance, and (ii) the circumstances of her termination do not give rise to an inference of discriminatory intent given that there was evidence that Plaintiff did many things wrong and there have been no comments alleged to have been made about her ethnic group, and, in particular, the other employees identified by Plaintiff are not sufficiently similarly situated to her to raise such an inference; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment, namely her repeated poor performance despite having meetings and reviews in which she was informed of the ways in which she was not meeting expectations; and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because she has no evidence that her national origin was even a factor in that decision, and her own subjective belief that it is is not sufficient to sustain her claim. (*Id.*)

Third, Defendant argues that Plaintiff's age discrimination claim pursuant to the ADEA should be dismissed. (*Id.* at 33-43.) Specifically, Defendant argues as follows: (a) Plaintiff cannot establish a prima facie case of discrimination regarding her termination because (i) she cannot show that she was performing her job satisfactorily (as already discussed), and (ii) she cannot show that her termination occurred under circumstance giving rise to an inference of discrimination based on her age given that the only alleged co-employee who was younger than her is not sufficiently comparable, and any comments that may have been made by Ms. Pulcher about the ages of other employees were merely stray remarks and Ms. Pulcher was nonetheless not the ultimate decisionmaker as to Plaintiff's termination; (b) even if Plaintiff can show a prima facie case, Defendant had a legitimate reason for terminating her employment (as discussed above); and (c) Plaintiff cannot show that Defendant's legitimate reason for terminating her employment was a pretext for discrimination because her subjective belief that she was discriminated against and a few stray remarks about employees other than Plaintiff do not

2021 WL 3674745

show that her age was the but-for cause of her termination. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

In her response to Defendant's motion, Plaintiff requests that the Court deny that motion, noting the reasons she had needed to request an extension in the past to file her response, and noting that, "[w]hile preparing Plaintiff's Memorandum of Law, I found out Defendant's Memorandum of Law did not follow L.R. 7.1. It was 36 pages in length, and it was 45 pages in total with Table of Contents and the cover page." (Dkt. No. 67, at 1-2 [Pl.'s Opp'n Mem. of Law].) Plaintiff does not address any of the substantive arguments made by Defendant, nor does she submit any response to Defendant's Statement of Material Facts, as already discussed above in Part I.B. of this Decision and Order.

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant makes three arguments. (Dkt. No. 68 [Def.'s Reply].) First, Defendant argues that it did not violate the Local Rules of Practice for this Court by filing an overlong brief because the pages for the cover page, the table of contents, and the signature block do not count toward the overall page count, and Defendant's substantive brief was 35 pages as allowed by this Court's Text Order of December 21, 2020. (*Id.* at 4.)

Second, Defendant argues that the Court should accept its asserted facts as true due to Plaintiff's failure to respond to its Statement of Material Facts as required by Local Rule 56.1 because, even though Plaintiff is *pro se*, she was twice provided notice of the consequences of failing to do so. (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff's claims should be deemed to have been abandoned because Plaintiff failed to address or oppose any of Defendant's legal arguments. (*Id.* at 6-7.)

### 4. Plaintiff's Sur-Reply

**\*10** Plaintiff also submitted a sur-reply without the permission of the Court. (Dkt. No. 69 [Pl.'s Sur-Reply].) In this sur-reply, Plaintiff asserts that she was not informed

that Defendant had requested or been granted permission to file an overlong brief with 10 additional pages, and that, because she was not aware of this, she "filed the motion of rejection and was waiting for the Judge's further directions about the allowable length." (*Id.* at 1.) She argues that Defendant's brief exceeds the extended page limit because the Conclusion section was on page 36 of that brief and that Conclusion section is "substantive enough to be counted." (*Id.* at 2.) Plaintiff again requests that the Court deny Defendant's motion for being improperly overlong, noting that she "completed [her] response to Defendant's Material Facts Not in Dispute before [she] filed [her] rejection" and indicating that "I will submit my response in whole when Defendant submit [sic] proper memorandum of law or as further directed by the court if otherwise." (*Id.*)

### 5. Defendant's Letter-Motion to Strike Plaintiff's Sur-Reply

Defendant filed a motion to strike Plaintiff's sur-reply because such responses are not permitted without permission under the Local Rules of this Court, but that, even if the Court considers the sur-reply, Plaintiff was provided with a copy of Defendant's request for additional pages for its memorandum and the Court's order granting that request was served on Plaintiff by regular mail, and thus she has no basis for claiming she was not reasonably made aware of Defendant's increased page limit. (Dkt. No. 70.)

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [2] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law .... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[2]

As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].

As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[3]

[3]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[255] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.).[4]   As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules.[5]

[4]    *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[5]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

 **\*11**  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*,

76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement [6] – even where the non-movant was proceeding *pro se*. [7]

[6]    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

[7]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3). [8]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein ...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

[8]    *See, e.g., Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's

failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

### A. Whether Plaintiff's Sur-Reply Should Be Stricken

Although Defendant is correct that sur-replies are not permitted under Local Rule 56.1 without permission from the Court, the Court finds that whether or not it considers Plaintiff's sur-reply is immaterial to the ultimate outcome of Defendant's motion because the arguments Plaintiff makes within that sur-reply are not meritorious.

**\*12** Plaintiff's argument that she never received the Court's Text Order of December 21, 2020, is unpersuasive. As Defendant argues, there is sufficient evidence that Plaintiff was reasonably apprised of the Court's Text Order granting Defendant's request for 10 additional pages for its memorandum. (Dkt. No. 48 [noting specifically that a copy of the Text Order was served upon Plaintiff via regular mail].) There is no indication that Plaintiff had changed mailing addresses, that the Text Order had been returned as undeliverable, or that there has been any difficulty with her receiving mail throughout the course of this litigation. (*See* Dkt. No. 1 [Pl.'s Comp.] [listing her address at the time of filing in April 2018 as the same address on file with the Court as her current address].) As a result, there is no reason that Plaintiff should not have reasonably known about the request for (and grant of) the additional pages.

Similarly, Plaintiff's argument that Defendant's motion should be denied because the non-substantive portions of Defendant's memorandum were in excess of 35 pages is unavailing. Non-substantive matter such as cover page, table of contents, and signature block do not count toward the substantive page limit. *See Moore v. Syracuse City Sch. Dist.*, 05-CV-0005, 2009 WL 890576, at *2 n.8 (N.D.N.Y. Mar. 31, 2009) (Scullin, J.) (noting that it repaginated plaintiff's memorandum by starting page one following the Table of

Contents and Authorities); *In re Marina Dev., Inc.*, 05-CV-1349, 2007 WL 9752855, at *1-2 (N.D.N.Y. Jan. 11, 2007) (Hurd, J.) (noting that the Local Rules applied to brief format in bankruptcy cases, and concluding that the appellees' briefs should therefore not exceed 25 pages, "exclusive of pages containing the table of contents, table of citations or similar material"). Additionally, although Plaintiff argues that Defendant's one-sentence conclusion is "substantive enough to be counted," the Court disagrees because that conclusion is merely a brief restatement of Defendant's request that the Court grant its motion to dismiss Plaintiff's Second Amended Complaint that contains no additional substantive argument. (Dkt. No. 58, Attach. 1, at 44 [Def.'s Mem. of Law].) Even if the conclusion were considered to be substantive, the proper course of action in this case would be to merely not consider any pages beyond the allowed amount, not to strike the entire motion as Plaintiff requests. *See Helen Cross v. Colvin*, 16-CV-0111, 2016 WL 7011477, at *4 n.3 (N.D.N.Y. Dec. 1, 2016) (Suddaby, C.J.) (noting that, "[b]ecause Plaintiff has exceeded the page limit, the Court will not consider the arguments contained in pages eleven through fifteen of her counsel's reply affidavit"). The Court therefore finds that there is no basis for Plaintiff's arguments that Defendant's motion should be denied based on the length of its memorandum of law.

Also unpersuasive is Plaintiff's argument that she has prepared a more detailed substantive response to Defendant's motion (including a response to Defendant's Statement of Material Facts), but has not yet filed her "response in whole" because she has been waiting for this Court's "further directions about the allowable length" of Defendant's memorandum of law. (Dkt. No. 69 [Pl.'s Sur-Reply].) Even considering Plaintiff's *pro se* status, there is no justification for Plaintiff's blatant failure to comply with the Local Rules by essentially ignoring the Court's imposed deadlines and manufacturing her own procedure that she now expects the Court to follow. Plaintiff was provided with notice that her response to Defendant's motion for summary judgment was due by February 19, 2021, a notice that she received because she subsequently requested (and was granted) two separate 60-day extensions of time on that deadline, such that her response was not ultimately due until June 21, 2021. (Dkt. Nos. 59, 60, 61, 62, 64.) The Notification of the Consequences of Failing to Respond to a Summary Judgment form that was filed along with Defendant's motion clearly states that a failure to file a proper response to the motion including a response to the Statement of Material Facts, copies of all pertinent record evidence, and a response memorandum

containing legal arguments could result in dismissal of some or all of the claims. (Dkt. No. 58, Attach. 2.)

**\*13** Despite being made aware of the need to respond fully and despite being granted multiple lengthy extensions to do so, Plaintiff, without any permission or direction from the Court, chose to instead file a brief "motion" to dismiss Defendant's memorandum due to an alleged failure to comply with the page limits in the Local Rules and seemingly expected (again, without any permission or direction from the Court) that such counter-motion held the deadline for submitting a substantive response to Defendant's motion in abeyance. However, Plaintiff's misunderstanding of the rules of procedure based on her *pro se* status do not excuse her failure to comply with those rules of procedure. *See Alzawahra v. Albany Medical Ctr.*, 546 F. App'x 53, 54 (2d Cir. 2013) (noting that, "[a]lthough a *pro se* litigant is entitled to a liberal construction of his filings, ... his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules"). This is particularly so given that Plaintiff was informed of what she was required to submit in response to Defendant's motion, and the consequences for failing to do so.

Finally, the Court finds that it would not serve the interests of judicial efficiency to allow Plaintiff to submit any further substantive filings in response to Defendant's motion for summary judgment at this point. As already noted, Plaintiff was granted an additional 120 days in which to file her response. In granting her second request to extend that deadline, the Court stated that no more extensions would be granted without documentary evidence that extension was warranted due to medical issues, and noted that this case has been pending for more than three years. (Dkt. No. 64 [Text Order filed Apr. 19, 2021].) Because Plaintiff's response and sur-reply indicate that her failure to file a full response by the deadline was due to her decision to wait to see what the Court ruled as to the propriety of the length of Defendant's memorandum rather than due to any medical or other issue, there is no basis for allowing Plaintiff additional time to submit a full and proper response. Notably, allowing Plaintiff to do so would require Defendant to expend additional time and effort to prepare yet another reply memorandum despite having already filed a reply and a motion to strike in response to Plaintiff's sur-reply. Lastly, the Court notes that, having reviewed the record on this motion, it is unlikely that providing Plaintiff with additional opportunity to respond to Defendant's motion would result in a different outcome on that motion.

As a result, the Court denies Defendant's motion to strike the sur-reply because the sur-reply offers Plaintiff no relief even if considered.

**B. Whether Plaintiff's Discrimination Claim Based on the July 2016 Failure to Hire Must Be Dismissed as Untimely**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

"To sustain Title VII or ADEA claims, a plaintiff must file administrative charges with the EEOC within 300 days of the alleged act of discrimination." *Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 [2d Cir. 1996]; *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 328 [2d Cir. 1999]). Thus, any conduct that occurred more than 300 days before the charge is filed is barred in a federal lawsuit unless an exception applies. *Betterson*, 661 F. App'x at 89.

Here, Plaintiff filed her complaint with the NYSDHR on July 14, 2017. (Dkt. No. 58, Attach. 12, at 1, 23.) As a result, only alleged acts of discrimination that occurred on or after September 17, 2016, are covered under that complaint. Because the failure to hire that Plaintiff alleges occurred in July 2016, any claim related to that alleged action is barred unless Plaintiff meets one of the defined exceptions to the 300-day requirement.

**\*14** Recognized exceptions to the 300-day requirement include waiver, estoppel, equitable tolling, or the existence of a continuing violation. *Barr v. Bass Pro Outdoor World, LLC*, 17-CV-0378, 2019 WL 6828987, at \*9 (N.D.N.Y. Dec. 13, 2019) (Sannes, J.). None of these exceptions are applicable here. There is no apparent basis for applying waiver or estoppel.

As to equitable tolling, a plaintiff must show that (1) she has been pursuing her rights diligently, but (2) some extraordinary circumstance stood in the way and prevented timely filing. *Barr*, 2019 WL 6828987, at \*9 (citing *Bolarinwa v. Williams*, 593 F.3d 226, 231 [2d Cir. 2010]). There is no indication of any circumstances between July 2016 and September 2016 that would have prevented her from filing a charge as to the

2021 WL 3674745

allegedly discriminatory failure to hire in July 2016, much less an extraordinary one.

There is also no basis for applying the continuing violation doctrine here. "Under the continuing violation exception to the ... limitations period, if a ... plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under the policy would be timely even if they would be untimely standing alone." *Chin v. Port Auth. Of New York & New Jersey*, 685 F.3d 135, 156 (2d Cir. 2012). However, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A discrete act is one that "necessarily 'constitutes a separate actionable unlawful employment practice' " that would be individually actionable, such as "termination, failure to promote, denial of transfer, or refusal to hire." *Chin*, 685 F.3d at 157 (citing *Morgan*, 536 U.S. at 114). It is well recognized that discrete acts that fall outside the limitations period "cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin*, 685 F.3d at 157). Because the alleged failure to hire is a discrete act that was actionable in its own right, the continuing violation doctrine cannot be used to make it timely.

For all of the above stated reasons, the Court finds that the portions of Plaintiff's discrimination claims that are based on the failure to hire her in July 2016 are barred due to her failure to file a timely charge as to that act and must be dismissed.

## C. Whether Defendant's Motion Should Be Granted as to Plaintiff's Title VII Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

Claims for discrimination under Title VII are subject to the *McDonnell Douglas* burden-shifting standard. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014). As an initial matter, the plaintiff must proffer sufficient evidence to state a prima facie case of discrimination. *Kirkland*, 760 F.3d at 225. If the plaintiff can make a prima facie case of discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If the defendant does so, the burden shift back to the plaintiff

to show that the defendant's explanation is a pretext for discrimination. *Id.* As to this last step, "once the [defendant] has made a showing of a neutral reason for the complained of action, to defeat summary judgment ... the [plaintiff's] admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [defendant's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 [2d Cir. 2003]).

**\*15** "To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate [the following four elements]: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 F. App.'x 54, 56 (2d Cir. 2016). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that (a) she had satisfactory job performance, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

As to the second element, "[i]n determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors," because "job performance cannot be assessed in a vacuum" and "the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985); *see Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008) (noting that "courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance"). Whether performance is satisfactory "depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Thornley v. Penton Publishers*, 104 F.3d 26, 29 (2d Cir. 1997). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process, ... they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.' " *Meiri*, 759 F.2d at 995.

Here, it is undisputed that Plaintiff was a probationary trainee employee during the relevant time period, and thus subject to termination if she did not meet employer expectations. (Dkt. No. 58, Attach. 3, at ¶ 5 [Arbab Decl.]; Dkt. No. 58, Attach. 9.) Under the terms of this probationary trainee employment, her supervisors were

2021 WL 3674745

required to provide an Individual Development Plan and quarterly probationary evaluations as well as traineeship evaluations at six-month intervals during the traineeship period. (Dkt. No. 58, Attach. 3, at ¶ 6 [Arbab Decl.].) Plaintiff was provided with her Individual Development Plan (which she acknowledged with a signature) on October 25, 2016; this document outlined activities and performance standards for her Grade 14 position. (Dkt. No. 58, Attach. 5.) On January 6, 2017, Plaintiff was provided with a three-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which Plaintiff was rated as "needs improvement" in all listed areas except "relationships," with details related to those areas written in the comments section that highlight the specific tasks and ways in which Plaintiff was noted to not be performing up to expected standards. (Dkt. No. 58, Attach. 6.) On April 3, 2017, Plaintiff was provided with a six-month probation evaluation signed by Ms. Pulcher and Ms. Farrell, in which it was noted that Plaintiff was rated as "unsatisfactory" in the areas of management of work assignments, quality of work, productivity, personal work characteristics, and problem solving/decision-making, "needs improvement" in the areas of attendance and communications, and "meets expectations" in the area of relationships; again, the evaluation includes written comments regarding the specific tasks and ways in which Plaintiff was not performing up to specific expectations. (Dkt. No. 58, Attach. 7.) Plaintiff was also provided with a six-month performance evaluation, in which concerns about her performance as to the activities and tasks outlined in the Individual Development Plan were noted. (Dkt. No. 58, Attach. 8.)

*16 Based on the evidence, it is clear both what the standards of Plaintiff's position were and the reasons that Plaintiff's performance did not meet those standards. As discussed above in Part I.B. of this Decision and Order, Plaintiff herself acknowledged that she made some mistakes in the course of her performance of her duties, and additional evidence from Ms. Pulcher and Ms. Farrell substantiates multiple specific mistakes. (Dkt. No. 58, Attachs. 28-33, 44, 47-54.) Additionally, there is nothing in the record to show that these expectations were in any way illegitimate or arbitrary. Plaintiff has offered no evidence to support her claim but her own subjective belief that her performance was not as bad as her supervisors stated. In an email to Ms. Arbab on April 10, 2017, Plaintiff stated that she believed Ms. Pulcher provided inadequate training or communication to her; however, there is no evidence to substantiate this subjective belief and the undisputed record reflects that both Ms. Pulcher and Ms.

Farrell provided fairly significant feedback and reminders to Plaintiff about her tasks and duties. (Dkt. No. 58, Attachs. 28-33, 39-41, 43, 45-54.) Based on the record before the Court, no reasonable factfinder could conclude that Plaintiff performed her job satisfactorily.

In the alternative, the Court finds that Plaintiff also has not shown that the circumstances surrounding her termination give rise to an inference of discrimination. Notably, the record is devoid of any indication that any of Defendant's employees ever referenced Plaintiff's national origin during her employment or made any kind of disparaging remarks about her national origin. Additionally, the three employees that Plaintiff holds out as comparators who received better treatment because they were not terminated are not sufficiently similar to her to give rise to an inference of discrimination based on national origin for two reasons. First, Plaintiff's deposition makes clear that she is not even certain what the national origins of these individuals are, but she merely assumes that they are "American." (Dkt. No. 58, Attach. 15, at 102-03, 105-06, 109 [Pl.'s Dep.].) Second, there is no evidence to show that these individuals were in comparable positions with comparable responsibilities and that they made comparable mistakes to those made by Plaintiff. To raise an inference of discrimination from more favorable treatment towards similarly situated individuals outside of the protected group, "a plaintiff 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.' " *De Jesus-Hall v. New York Unified Court Sys.*, 2021 WL 1259581, at *1 (2d Cir. 2021) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

As to Ms. O'Hara, although her job tasks and objectives are similar to Plaintiff's, the evidence shows that Ms. O'Hara was hired as Grade 18 Senior Budget Analyst/Senior Accountant (while Plaintiff was a Grade 14 Senior Accountant Trainee) and her performance reviews show that she overwhelmingly performed tasks up to expectations, with the exception of "needs improvement" on her three-month probation evaluation in the areas of managing work assignments and problem solving/decision-making, where it was noted that she needed to improve on working more efficiently to complete her assignments in a timely manner and in completing analyses and problem solving more independently, and "needs improvement" on her six-month probation evaluation in the area of problem solving/decision-making, where it was noted she needed to improve on completing analyses and problem solving more independently; it was noted that she

had improved in these areas and was meeting expectations by the time of her nine-month probation evaluation. (Dkt. No. 58, Attach. 58.) The evidence therefore shows that, even if Plaintiff and Ms. O'Hara performed the same or similar jobs, Ms. O'Hara did so with fewer mistakes and she gradually improved her performance over the course of the documented time, whereas Plaintiff's evaluations showed that she made far more extensive mistakes and did not show improvement. As a result, the Court finds that Ms. O'Hara is not sufficiently similar and thus the disparate treatment between her and Plaintiff would not allow a reasonable fact finder to infer discrimination.

**\*17** As to Mr. Deitz, he was a Grade 18 Senior Accountant in a different section or unit than Plaintiff, and his listed tasks and objectives are not similar to those listed in Plaintiff's Individual Development Plan. (*Compare* Dkt. No. 25, at 21-24 *with* Dkt. No. 58, Attach. 5, at 1-2; *see* Dkt. No. 58, Attach. 15, at 111-12 [Pl.'s Dep.] [testifying that she did not do many of the tasks listed on Mr. Deitz's tasks and objectives list and admitting that his responsibilities were "different" than hers].) Additionally, Mr. Deitz was supervised by Melinda Hansen and Michelle Daly, not Ms. Pulcher and Ms. Farrell, and a summary of his performance completed by Ms. Daly indicates that Mr. Deitz performed his job satisfactorily in all noted respects. (Dkt. No. 25, at 24, 26-27.) Because there is no evidence that Mr. Deitz was a trainee, the evidence shows that he had different job responsibilities and different supervisors than Plaintiff, and there is no evidence of ongoing job performance issues, the Court finds that no reasonable fact finder could conclude that the treatment Mr. Deitz received raises an inference of discrimination.

As to Mr. Shavel, there is little evidence about the details of his employment. Plaintiff's only allegation regarding Mr. Shavel is that he was given a counseling memorandum for failing to complete mandatory training, but did not have his employment terminated. (Dkt. No. 25, at 31.) However, there is no evidence to suggest that Mr. Shavel had engaged in any other actions that made his job performance unsatisfactory, much less that he committed mistakes similar to those documented related to Plaintiff's job performance. Additionally, there is no evidence to suggest that Mr. Shavel was a trainee employee or that he worked in a similar position or with similar tasks and objectives as Plaintiff's position, and the counseling memorandum suggests that Mr. Shavel was supervised in some way by Ms. Hansen, not Ms. Pulcher or Ms. Farrell. (Dkt. No. 25, at 31.) Based on the evidence, the Court finds that no reasonable fact finder could conclude

that the treatment Mr. Shavel received raises an inference of discrimination.

Because Plaintiff has not provided evidence which can prove a prima facie case of national origin discrimination under Title VII and because there is no outstanding issue of material fact evident from the parties' submissions, the Court grants Defendant's motion for summary judgment on this claim.

### D. Whether Defendant's Motion Should Be Granted as to Plaintiff's ADEA Claim

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 58, Attach. 1 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

" 'In order to establish a prima facie case of age discrimination,' the plaintiff 'must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.' " *Green v. Town of East Haven*, 952 F.3d 394, 403 (2d Cir. 2020) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 [2d Cir. 2010]). In this case, Defendant concedes that Plaintiff has established the first and third of these requirements, but disputes that Plaintiff can show that she (a) was qualified for the position, and (b) her termination occurred under circumstances giving rise to an inference of discrimination.

Regarding whether Plaintiff was qualified, under the law of this Circuit, "a plaintiff only needs to demonstrate that she possesses the basic skills necessary for performance of the job." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171 (2d Cir. 2006) (quoting *Owens v. New York City Housing Auth.*, 934 F.2d 405, 409 [2d Cir 1991]). Notably, although misconduct is not a basis for finding an employee lacks the basic qualifications for a position, evidence of performance based on evaluations of an employee's work is appropriate evidence for making that determination. *Owens*, 934 F.2d at 409 (clarifying that it is the ability to perform job duties that is important, not whether the conduct is inappropriate or offensive); *Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (finding summary judgment appropriate on the issue of whether the plaintiff was qualified for the position because there was no "competing evidence" against the unsatisfactory performance evaluations to create an issue of fact about the plaintiff's performance,

and no evidence that the negative evaluations were unfair or incorrect). Here, Plaintiff has offered no evidence that the performance evaluations were inaccurate other than her own general assertions at her deposition that she does not believe they accurately reflect her performance. Because her unsubstantiated assertions and beliefs cannot outweigh the other evidence, the Court finds that Plaintiff has not sufficiently shown that there is a genuine dispute of material fact about whether she was qualified for her position as that term is defined by the law.

**\*18** Regarding whether Plaintiff has raised an inference of discrimination, as already discussed above in Part III.C. of this Decision and Order, Plaintiff's attempt to show that she was treated less favorably than younger similarly situated individuals is unavailing. Notably, it is undisputed that Ms. O'Hara was the only individual of the three named that was not as old or older than Plaintiff. However, as discussed previously, Ms. O'Hara is nonetheless not sufficiently similarly situated to Plaintiff because there is no evidence that Ms. O'Hara made the same or similar mistakes as Plaintiff did at the level and frequency at which Plaintiff made those mistakes. Rather, the evidence shows that Ms. O'Hara was reported to have made fewer overall mistakes and that she improved with each probation evaluation that was conducted. It is undisputed that Plaintiff is not personally familiar with Ms. O'Hara or her work abilities, and that Plaintiff has no knowledge as to how well or not Ms. O'Hara performed her job on a day-to-day basis. As a result, disparate treatment here does not give rise to an inference of discrimination based on Plaintiff's age any more than it does related to her national origin.

The Court also acknowledges Defendant's correct argument that many courts recognize that "an allegation that a decision is motivated by age animus is weakened when the decisionmakers are of the protected class," and also where "Plaintiff was well within the protected age group when she was hired." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (collecting cases). However, these factors are not dispositive. *Ehrbar*, 131 F. Supp. 3d at 26. Here, Plaintiff was within the protected age group when she was hired, and Ms. Farrell, who was 50 at the relevant time, approved her termination, as did Ms. Burrell, who was 48 at the relevant time. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.]; Dkt. No. 58, Attach. 25, at ¶¶ 5, 29 [Farrell Decl.].) Ms. Pulcher, however, was not in the protected age group. (Dkt. No. 58, Attach. 3, at ¶ 13 [Arbab Decl.].) Additionally, "where the person who made the decision to fire was the same

person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 [2d Cir. 1997]); *see also Downey v. Adloox, Inc.*, 789 F. App'x 903, 907 (2d Cir. 2019) (affirming district court's dismissal of age discrimination claim based in part on the fact that plaintiffs were hired and fired by the same executives within a short period of time). Here, Plaintiff's hiring was prompted by a request from Ms. Farrell, and Ms. Farrell also was one of the persons who approved her termination approximately six months later. (Dkt. No. 58, Attach. 25, at ¶¶ 5, 27 [Farrell Decl.].) Although it is unclear who precisely had the last authoritative say about Plaintiff's termination, Ms. Farrell's involvement in both Plaintiff's hiring and firing is a factor to consider in determining whether the evidence can be reasonably interpreted as raising an inference of discrimination based on age.

Unlike the national origin claim, which is unsupported by any evidence of statements made by Plaintiff's supervisors about her or other employee's national origins, there is a genuine dispute of material fact as to whether Ms. Pulcher made comments to Plaintiff about certain other employees being too old to do their jobs effectively. Plaintiff asserts that Ms. Pulcher made such comments, while Ms. Pulcher denies making such comments. It is undisputed that the two employees about whom Ms. Pulcher allegedly made the comments were at, near, or beyond retirement age, while Plaintiff was 45 at the time she was employed by Defendant. (Dkt. No. 58, Attach. 15, at 114-18 [Pl.'s Dep.] [testifying that Ms. Pulcher said that the employees in question did not know what they were doing and should have retired].) However, even if a fact finder were to accept Plaintiff's testimony that Ms. Pulcher made these comments, it would be insufficient to raise an inference of discrimination in light of all of the other evidence, including the fact that Ms. Farrell (who was not alleged to have made any comments about age) was personally aware of Plaintiff's work performance through working directly with her, and also signed Plaintiff's probationary evaluations and recommended her termination. Put another way, even if Ms. Pulcher had made comments suggesting possible age bias, those comments and any inference of discrimination on her part cannot be imputed to Ms. Farrell in the absence of evidence she was aware of any bias Ms. Pulcher may have held, particularly given that Ms. Farrell was directly and independently familiar with Plaintiff's performance issues. As a result, the Court finds that Plaintiff has not established that a reasonable fact finder could

conclude there was an inference of discrimination even if they resolved the issue about Ms. Pulcher's comments in Plaintiff's favor.

**\*19** In the alternative, even if a reasonable fact finder could conclude that Plaintiff was qualified and Ms. Pulcher's statements raised an inference of discrimination, denial of summary judgment is inappropriate here because Plaintiff cannot meet her ultimate burden to show that Defendant's proffered non-discriminatory explanation (i.e., that Plaintiff's performance was poor) was a pretext for discrimination. To establish a claim for discrimination under the ADEA, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." *Green*, 952 F.3d at 403 (citing *Gorzynski*, 596 F.3d at 106). In other words, Plaintiff's age does not need to have been the only consideration, but rather she still must show that she would not have been terminated without her age being considered. *Perez v. Cnty of Rensselaer, New York*, 14-CV-0950, 2018 WL 3420014, at \*4 (N.D.N.Y. July 13, 2018) (Sharpe, J.) (citing *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 [2d Cir. 2014]). A few isolated comments that were not even directed at Plaintiff are insufficient to allow a reasonable fact finder to conclude that Plaintiff's age was the but-for cause of her termination in light of all of the evidence discussed above related to Plaintiff's failure to show an inference of discrimination. No reasonable fact finder could conclude that Plaintiff would not have been terminated despite her performance reviews if not for her age.

Because Plaintiff cannot establish a prima facie case and cannot show that her age was the but-for cause of her termination, the Court grants Defendant's motion for summary judgment on this claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims for national origin and age discrimination pursuant to Title VII and the ADEA are **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 25) is **DISMISSED**.

**All Citations**

Slip Copy, 2021 WL 3674745

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5475293

KeyCite Yellow Flag - Negative Treatment
Distinguished by McDonald v. Zerniak, N.D.N.Y., November 4, 2016

2014 WL 5475293
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles McALLISTER also known
as Charles McCallister, Plaintiff,
v.
Harold CALL, Vocational Supervisor,
Mohawk Correctional Facility, Defendant.

No. 9:10–CV–610 (FJS/CFH).
|
Signed Oct. 28, 2014.
|
Filed Oct. 29, 2014.

**Attorneys and Law Firms**

Charles McAllister, Westbury, NY, pro se.

Hon. Eric T. Schneiderman, Office of the New York State
Attorney General, The Capitol, Keith J. Starlin, AAG, of
Counsel, Albany, NY, for Defendant.

**ORDER**

SCULLIN, Senior District Judge.

**\*1** Currently before the Court are Magistrate Judge
Hummel's October 9, 2014 Report–Recommendation and
Order, *see* Dkt. No. 81, and Plaintiff's objections thereto, *see*
Dkt. No. 83.

Plaintiff, a former inmate who was, at all relevant times, in
the custody of the New York Department of Corrections and
Community Supervision, commenced this action pursuant
to 42 U.S.C. § 1983. In his original complaint, Plaintiff
asserted claims against Brian Fischer, Lucien J. LeClaire,
Patricia LeConey, Carol Woughter, and John and Jane Does.
Defendants moved for summary judgment. *See* Dkt. No.
49. By Report–Recommendation and Order dated July 6,
2012, Magistrate Judge Homer recommended that this Court
dismiss all claims against the named individuals and direct
Plaintiff to join Harold Call as a Defendant. *See* Dkt. No.

55. This Court accepted the Report and Recommendation and
Order in its entirety and directed Plaintiff to file an amended
complaint to "include only one cause of action a procedural
due process claim in connection with his disciplinary hearing
and one Defendant hearing officer Call ." *See* Dkt. No. 58 at
4–5.

Plaintiff thereafter filed his amended complaint and requested
compensatory and punitive damages. *See* Dkt. No. 64,
Amended Complaint at 4. In this amended complaint, Plaintiff
alleged that Defendant violated his constitutional rights under
the First, Eighth and Fourteenth Amendments. *See* Dkt. No.
64, Amended Complaint at ¶¶ 33, 34, 43.

On May 9, 2014, Defendant filed a motion for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. *See* Dkt. No. 74. In a Report–Recommendation
and Order dated October 9, 2014, Magistrate Judge Hummel
recommended that this Court grant Defendant's motion in
part and deny his motion in part. *See* Dkt. No. 81 at
33. Plaintiff filed objections to Magistrate Judge Hummel's
recommendations. *See* Dkt. No. 83.

Where a party makes specific objections to portions of a
magistrate judge's report and recommendation, the court
conducts a *de novo* review of those recommendations. *See*
*Trombley v. Oneill,* No. 8:11–CV–0569, 2011 WL 5881781,
*2 (N.D.N.Y. Nov. 23, 2011) (citing Fed.R.Civ.P. 72(b)
(2); 28 U.S.C. § 636(b)(1)(C)). Where a party makes no
objections or makes only conclusory or general objections,
however, the court reviews the report and recommendation
for "clear error" only. *See Salmini v. Astrue,* 3:06–CV–
458, 2009 WL 1794741, *1 (N.D.N.Y. June 23, 2009)
(quotation omitted). After conducting the appropriate review,
a district court may decide to accept, reject, or modify those
recommendations. *See Linares v. Mahunik,* No. 9:05–CV–
625, 2009 WL 3165660, *10 (N.D.N.Y. Sept. 29, 2009)
(quoting 28 U.S.C. § 636(b)(1)(C)).

Although Plaintiff's objections are, in most respects, general
or conclusory, given his *pro se* status, the Court has conducted
a *de novo* review of Magistrate Judge Hummel's Report–
Recommendation and Order. Having completed its review,
the Court hereby

**\*2 ORDERS** that Magistrate Judge Hummel's October 9,
2014 Report–Recommendation and Order is **ACCEPTED
in its entirety** for the reasons stated therein; and the Court
further

**ORDERS** that Defendant's motion for summary judgment is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Plaintiff's First Amendment claims, his Eighth Amendment claims, and his challenge to the constitutionality of Directive 4913 are **DISMISSED;** and the Court further

**ORDERS** that, to the extent that Plaintiff has asserted claims against Defendant in his official capacity, those official-capacity claims are **DISMISSED;** and the Court further

**ORDERS** that Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment due process claims and with respect to Defendant's qualified immunity defense; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Charles McAllister ("McAllister"), a former inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), [2] brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Harold Call ("Call"), Vocational Supervisor, Mohawk Correctional Facility ("Mohawk"), violated his constitutional rights under the First, Eighth and Fourteenth Amendments. Am. Compl. (Dkt. No. 64) ¶¶ 33, 34; 4. McAllister initially commenced this civil rights action against defendants Brian Fischer, Lucien J. LeClaire, Patricia LeConey, Carol Woughter, and John and Jane Does. Defendants moved for summary judgment. Dkt. No. 49. By report and recommendation dated July 6, 2012, (1) all claims against identified defendants

were dismissed; and (2) defendant was directed to join Call, who was identified in the motion papers as a John Doe defendant. Dkt. No. 55; Dkt. No. 58. The report and recommendation was accepted in its entirety, and McAllister was directed to file an amended complaint to "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing—and one Defendant—hearing officer Call." Dkt. No. 58 at 4. McAllister thereafter filed his amended complaint wherein he requested punitive and compensatory damages. Am. Compl. at 4. Presently pending is Call's motion for summary judgment on the amended complaint pursuant to Fed.R.Civ.P. 56. Dkt. No. 74. McAllister did not respond. For the following reasons, it is recommended that Call's motion be granted in part and denied in part.

[2] McAllister is no longer incarcerated and is currently under the supervision of DOCCS.

## I. Failure to Respond

The Court notified McAllister of the response deadline and extended the deadline for his opposition papers on two occasions. Dkt. No. 75; Dkt. No. 77; Dkt. No. 80. Call also provided notice of the consequence of failing to respond to the motion for summary judgment in his motion papers. Dkt. No. 74–1. Despite these notices and extensions, McAllister did not respond.

**\*3** Summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Thus, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Id.* at 486. Even in the absence of a response, defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted); *see also Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 219 (2d Cir.2004) (same). The facts set forth in defendant's Rule 7.1 Statement of Material Facts (Dkt. No. 74–2) are accepted as true as to those facts that are not disputed in McAllister's amended complaint. N.D.N.Y.L.R. 7.1(a)(3) ("The Court shall deem admitted any properly

supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.").

## II. Background

The facts are reviewed in the light most favorable to McAllister as the non-moving party. *See* subsection III(A) *infra.* At all relevant times, McAllister was an inmate at Mohawk. Am. Compl. ¶ 3.

On or about July 15, 2009, nonparty Correction Officer Femia, pursuant to authorization from nonparty Captain Dauphin, searched McAllister's personal property while McAllister was confined in a secure housing unit ("SHU"). [3] Dkt. No. 74–3, Exh. A, at 14; Am. Compl. ¶¶ 5–6. Femia confiscated approximately twenty documents from McAllister's locker, including five affidavits that were signed by other inmates. Dkt. No. 74–3, Exh. A, at 14. As a result of the search, Femia issued McAllister a Tier III misbehavior report, alleging violations of prison rules 113.15 [4] (unauthorized exchange) and 180.17 (unauthorized assistance). [5] *Id.;* Am. Compl. ¶ 7.

[3]  SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b) (1999). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]  Rule 113.15 provides that "[a]n inmate shall not purchase, sell, loan, give or exchange a personally owned article without authorization." 7 NYCRR 270.2.

[5]  Rule 180.17 provides that "[a]n inmate may not provide legal assistance to another inmate without prior approval of the superintendent or designee. An inmate shall not receive any form of compensation for providing legal assistance." 7 NYCRR 270.2.

McAllister was assigned as his inmate assistant nonparty Correction Officer A. Sullivan. Am. Compl. ¶ 7; Dkt. No. 74–3, Exh. A, at 11. McAllister requested five inmate witnesses,

documents, prison directives 4933 and 4982, and a facility rule book. Am. Compl. ¶ 8; Dkt. No. 74–3, Exh. A, at 11. He also asked Sullivan for permission to retrieve documents from his personal property. *Id.* The requested witnesses were those inmates whose signatures were affixed to the five confiscated affidavits. Dkt. No. 74–3, Exh. A, at 14. Sullivan retrieved the requested materials, and all inmate witnesses agreed to testify. *Id.* at 11.

On or about July 21, 2009, a Tier III disciplinary hearing was held before Call, who served as the hearing officer. Am. Compl. ¶ 10. McAllister pleaded not guilty to both alleged violations. Dkt. No. 74–3, Exh. A, at 38. McAllister objected to the misbehavior report as violative of prison directive 4932 because the copy he was given (1) provided insufficient notice of the charges against him and (2) differed from the report that Call read into the record. *Id.* at 39–41. McAllister stated that his copy did not list the names of the inmates to whom the confiscated affidavits allegedly belonged. *Id.* Call acknowledged the difference between the reports but concluded that the misbehavior report informed McAllister of the charges against him and the bases for the charges. *Id.* at 39, 41–42. McAllister also argued that his copy of the misbehavior report referred to confiscation of twenty documents from his cell, but did not identify the papers that were taken. *Id.* at 42. He contended that the misbehavior report's general reference to "legal work" was insufficient to provide him with notice of the documents to which the report was referring because he had several volumes of legal work. *Id.* at 42, 59. In response to this objection, Call recited the body of the misbehavior report, which described the confiscated documents as "[a]rticles of paper which appear to be legal work including some signed affidavits" and asked McAllister, "[t]hat didn't ring a bell for you? How much paperwork did you have that fit that description?" *Id.* at 42. Call also expressed his belief that the affidavits qualified as legal work. *Id.* at 45, 57–58.

**\*4**  McAllister next argued that he did not provide unauthorized legal assistance to another inmate in violation of rule 180.17 because the inmate affidavits were used as evidence to prove that the Division of Parole had a "practice" of "fail[ing] to respond to appeals over the last four years .... " Dkt. No. 74–3, Exh. A at 45–49, 56. These inmates were aware that their affidavits were created for, and to be used solely in support of, McAllister's case and that they were receiving no legal benefit. *Id.* at 48–49. McAllister further contended that he did not need permission from prison personnel to collect the affidavits. *Id.* at 64.

McAllister also argued that rule 113.15 is ambiguous because it does not list the specific items which, if found in an inmate's possession, would violate the rule. Dkt. No. 74–3, Exh. A, at 54. Finally, to the extent it can be determined from the hearing transcript, McAllister objected to the SHU procedures for handling his personal property. *Id.* at 70.

At the conclusion of the hearing, Call informed McAllister that he would be considering testimony from a confidential witness. Dkt. No. 73–3, Exh. A, at 13, 38, 73. McAllister objected to consideration of confidential testimony without being informed of the contents. *Id.* at 74. Finally, McAllister declined to call the inmates that he had requested as witnesses. *Id.* at 37, 71.

Call found McAllister guilty of violating prison rules 113.15 and 180.17. Dkt. No. 74–3, Exh. A, at 8–9, 76. He imposed a penalty of three months in SHU and three months loss of privileges. *Id.* at 8. Call relied upon the misbehavior report, the confidential testimony, the packet of legal work containing the other inmates' affidavits, and McAllister's testimony and statements. *Id.* at 9.

The disciplinary determination was reversed upon administrative appeal on the ground that the evidence failed to support a finding of guilt. Dkt. No. 74–3, Exh. B, at 79; Exh. C, at 81. In May 2010, McAllister commenced this action pursuant to 42 U.S.C. § 1983.

### III. Discussion [6]

[6]     All unpublished decisions referenced herein are appended to this report and recommendation.

McAllister argues that Call violated his rights under (1) the First Amendment, by (a) retaliating against him by finding him guilty and (b) hindering his access to the courts; (2) the Eighth Amendment, by imposing a three-month SHU assignment, plus ten additional days following reversal of the disciplinary hearing; and (3) the Fourteenth Amendment, because (a) he was given insufficient notice of the charges against him, (b) he was denied advance notice of the use of a confidential witness, (c) he was forced to spend approximately fifty-two days in SHU as a result of the misbehavior report, (d) Call failed to follow certain DOCCS directives and prison regulations, (e) Call demonstrated bias

against him during the Tier III hearing and prejudged his guilt, and (f) he was denied equal protection.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

### B. Eleventh Amendment

Call argues that he is entitled to Eleventh Amendment immunity relating to McAllister's claims for money damages against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. AMEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because McAllister seeks monetary damages against Call for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Call's motion on this ground be granted.

### C. Personal Involvement

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of

damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered personally involved if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873 (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [7] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[7]     Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

As to any constitutional claims beyond those surrounding the denial of due process at the Tier III hearing, the undersigned notes that evaluation of such is unnecessary as it is outside

of the scope set forth in this Court's prior order. Dkt. No. 58 at 4. However, to the extent that Call acknowledges these claims and provides additional and alternative avenues for dismissal, McAllister fails to sufficiently allege Call's personal involvement in impeding his access to the courts, in violation of the First Amendment. McAllister argues that, as a result of Call's determination that he violated rules 113.15 and 180.17, his legal paperwork was confiscated, which impaired his ability to continue to represent himself in pending state and federal court claims. Am. Compl. ¶¶ 38–40. However, McAllister does not suggest that Call was personally involved in either the search and confiscation of paperwork that led to the filing of the misbehavior report nor the subsequent reduction in his paperwork pursuant to directive 4913. To the contrary, McAllister concedes that the paperwork was reduced pursuant to the directive.

McAllister also fails to sufficiently allege Call's personal involvement in the SHU procedures for storing property or in holding him in SHU for ten additional days following the reversal of the Tier III determination. Call stated that hr had no involvement with the storage of property in SHU. Dkt. No. 74–3, at 5. Call also contended that he "was not responsible for plaintiff's being held in SHU for additional days following the August 26, 2009 reversal of the disciplinary hearing decision of July 22, 2009." *Id.* McAllister does not allege Call's involvement in this delay. McAllister's sole reference to the ten-day delay is his claim that he "was not released from Special Housing until September 4, 2009, approximately 10 days after the reversal" Am. Compl. ¶ 43. This conclusory statement is insufficient to demonstrate Call's personal involvement in an extension of his time in SHU following the reversal of the Tier III determination. *Brown,* 647 F.Supp.2d at 200.

**\*7** Accordingly, it is recommended that Call's motion be granted insofar as McAllister alleges that Call: denied him access to the courts in violation of the First Amendment, was at all involved with the storage of his property while he was in SHU, and caused him to be held an additional ten days in SHU following administrative reversal of the Tier III determination.

### D. First Amendment

McAllister appears to argue that, in retaliation for his filing of grievances and lawsuits, Call found him guilty of misconduct in the Tier III hearing and imposed SHU time.

He suggests that his transfer to SHU, as a result of the Tier III determination, triggered enforcement of his compliance with directive 4913, which impeded his ability to proceed with active legal matters and resulted in dismissals. Am. Compl. ¶ 41. Thus, McAllister also argues that he was denied access to the courts. Am. Compl. ¶ 38. As a preliminary matter, McAllister's First Amendment retaliation and access claims are beyond the scope of the prior order of this Court directing McAllister to limit his amended complaint "include only one cause of action—a procedural due process claim in connection with his disciplinary hearing." Dkt. No. 58, at 4. Regardless, McAllister fails to plausibly allege either retaliation or denial of access to the courts.

Courts are to "approach [First Amendment] retaliation claims by prisoners with skepticism and particular care." *See e.g., Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, NA,* 534 U.S. 506 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft,* 556 U.S. at 678; *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). To survive a motion to dismiss, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Taylor v. Fischer,* 841 F.Supp.2d 734, 737 (W.D.N.Y.2012). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007).

**\*8** Here, McAllister baldly states that Call's disciplinary determination was imposed in retaliation for his filing of grievances and lawsuits; however, McAllister does not identify these grievances and lawsuits nor does he claim that any of these were lodged against Call. *See generally Ciaprazi v. Goord,* No. 02–CV–915, 2005 WL 3531464,

at *9 (N.D.N.Y. Dec. 22, 2005) (dismissing the plaintiff's claim of retaliation where the plaintiff could "point to no complaints lodged by him against or implicating the conduct of [the] defendant ... who issued the disputed misbehavior report."). McAllister also provides no time frame for the apparent grievance and lawsuits. Thus, it cannot be discerned whether or how these unnamed grievances and lawsuits were a "motivating factor" in Call's Tier III determination. *Doyle,* 429 U.S. at 287 (internal quotation marks and citation omitted). McAllister's unsupported, conclusory claim fails to plausibly demonstrate that Call's determination was a product of retaliatory animus.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. *Bounds v. Smith,* 430 U.S. 817, 824 (1977); *Lewis v. Casey,* 518 U.S. 343, 350 (1996) ("The right that *Bounds* acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them." *Lewis,* 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). Second, the plaintiff must demonstrate that he suffered an actual injury. *Id.; Monsky v. Moraghan,* 123 F.3d 243, 247 (2d Cir.1997) (internal citations, quotation marks, and alterations omitted) (quoting *Lewis,* 518 U.S. at 329) ("In order to establish a violation of access to courts, a plaintiff must demonstrate that a defendant caused actual injury, *i.e.,* took or was responsible for actions that hindered a plaintiff's effort to pursue a legal claim"). Thus, a plaintiff must allege that the defendant was "responsible for actions that hindered his efforts to pursue a legal claim." *Davis,* 320 F.3d at 351 (internal quotation marks omitted).

Here, there is insufficient evidence to give rise to a genuine dispute of fact regarding either element of a denial of court access claim. As noted, McAllister merely states that, as a result of the property reduction pursuant to directive 4913, his "ability to continue litigation in Federal and State court caused adverse decisions by the court and dismissals." Am. Compl. ¶ 41. This claim is insufficient to demonstrate that Call was responsible for actions that hindered his legal claims. Insofar as McAllister's claim could be read to suggest that Call denied him access to the courts by confiscating his legal documents, as noted *supra,* McAllister fails to present any plausible facts to support a finding that Call was involved in the initial search

of his property or in the later reduction of his property or that it was maliciously imposed by Call. As noted, the initial cell search which led to the misbehavior report was ordered by Captain Dauphin and executed by Correction Officer Femia. Similarly, McAllister concedes that his property was reduced pursuant to directive 4913. Although McAllister suggests that his transfer to SHU as a result of the Tier III hearing triggered the application of directive 4913, he was transferred to SHU on July 9, six days before the initial cell search occurred. *Id.* ¶ 5. Thus, if McAllister were forced to comply with directive 4913 because of his transfer to SHU, he failed to demonstrate that the compliance arose from the SHU term ordered by Call rather than the unknown incident that resulted in his transfer to SHU on July 9. Further, McAllister failed to establish any actual injury because he did not specify which cases were allegedly dismissed as a result of the property reduction. *See Monsky,* 123 F.3d at 247.

 **\*9** Accordingly, it is recommended that Call's motion for summary judgment be granted on this ground.

### E. Eighth Amendment

In his amended complaint, McAllister references the Eighth Amendment. Am. Compl. ¶ 31. However, McAllister's only reference to the Eighth Amendment is his assertion that Call's use of a confidential witness violated his Eighth Amendment right to be free from cruel and unusual punishment. However, in support of this argument, McAllister states only that this right was violated when Call stated, "[s]o, um there is a lot of stuff going on through my paperwork and I want to bring it to your attention before we move on ..." *Id.* ¶ 33; Dkt. No. 74–3, at 73. When read in context, it becomes clear that Call made this statement immediately before informing McAllister of his consideration of confidential information. Dkt. No. 73–3, at 73. Although, in referencing this portion of the hearing transcript McAllister alleges that he was subject to cruel and unusual punishment, it appears that McAllister intended to assert that the use of a confidential witness was a due process violation. Even if McAllister had intended to argue that use of a confidential witness violates the prohibition of cruel and unusual punishment, such a claim would necessarily fail because the Eighth Amendment protects an inmate's right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 & 837 (1994). As McAllister makes no claim that he faced conditions of confinement imposing a risk to his health or safety and instead focuses

his argument on notice of a confidential witness, giving McAllister due solicitude, his claim regarding the use of a confidential witness will be incorporated as part of the due process analysis below.

### F. Fourteenth Amendment

#### 1. Due Process

Well-settled law provides that inmates retain due process rights in prison disciplinary hearings." *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, inmates do not enjoy "the full panoply of rights" accorded to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). For a plaintiff to state a claim that he was denied due process at a disciplinary hearing, the plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (per curiam) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). To satisfy the first prong, a plaintiff must demonstrate that the deprivation of which he complains is an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted).

#### a. Denial of Liberty Interest

**\*10** In assessing whether an inmate plaintiff was denied procedural due process, the court must first decide whether the plaintiff has a protected liberty interest in freedom from SHU confinement. *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). If the plaintiff demonstrates the existence of a protected liberty interest, the court is then to determine whether the deprivation of this interest "occurred without due process of law." *Id.* at 351, citing *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460–61 (1989). Due process generally requires that a state afford an individual "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Although not dispositive, duration of disciplinary confinement is a significant factor in determining

atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Blackshear v. Woodward,* No. 13–CV–1165, 2014 WL 2967752 (N.D.N.Y. July 1, 2014).

McAllister suggests that his confinement in SHU for forty-two to fifty-five days is a sufficient deprivation that requires procedural protections. Freedom from SHU confinement may give rise to due process protections; however, the plaintiff must allege that the deprivation imposed "an atypical and significant hardship." *Sandin,* 515 U.S. at 484; *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001) (concluding that SHU confinement does not give rise to due process protections where inmate failed to demonstrate atypical hardship while confined). Although the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard (*Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)), it has made clear that confinement in SHU for a period of one year constitutes atypical and significant restraint on inmates, deserving due process protections. *See e.g. Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (holding confinement in SHU exceeding 305 days as atypical); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999) (concluding confinement for fewer than 101 days in SHU, plus unpleasant but not atypical conditions, insufficient to raise constitutional claim). Although the Second Circuit has generally held that confinement in SHU for 101 or fewer days without additional indicia of atypical conditions generally does not confer a liberty interest (*Smart v. Goord,* 441 F.Supp.2d 631, 641 (2d Cir.2006)), it has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealey* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d 60, 65 (2d. Cir.2004) (citing, *inter alia, Ortiz,* 323 F.3d at 195, n. 1).

The undersigned notes that it is unclear what portion of McAllister's relatively brief time in SHU is attributable to the Tier III determination, because it appears that McAllister was already in SHU when the instant disciplinary report was filed. Am. Comp. ¶ 5; Dkt. No. 74–3, Exh. A, at 14. The undersigned also notes that there is no indication that McAllister endured unusual SHU conditions. The only reference McAllister makes to his time in SHU is that, upon his transfer to SHU, several bags of his paperwork were confiscated pursuant to directive 4913. *Id.* ¶ 37. However, review of directive 4913 reveals that the personal and legal

property limit set forth in directive 4913 applies to the general prison population and inmates in other forms of segregated confinement. Dkt. No. 49–2, at 5–19. Thus, the fact that McAllister was forced to comply with directive 4913 does not indicate that he was subjected to conditions more severe than the normal SHU conditions or conditions imposed on the general prison population. Dkt. No. 74–3, Exh. A, at 14.

**\*11** Although the record is largely absent of detail of the conditions McAllister faced in SHU, there is also nothing in the record comparing the time McAllister was assigned and spent in disciplinary confinement with the deprivations endured by other prisoners "in the ordinary course of prison administration," which includes inmates in administrative segregation and the general prison population. *Welch v. Bartlett,* 196 F.3d 389, 394 (2d Cir.1999) (holding that, after *Sandin,* "the relevant comparison concerning duration is between the period of deprivation endured by the plaintiff and periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration, including general population prisoners and those in various forms of administrative and protective custody"). Because "[t]he record does not reveal whether it is typical for inmates not being disciplined to spend similar periods of time in similar circumstances," Call's motion for summary judgment should be denied. *Id.* at 394 (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

Accordingly, it is recommended that defendant's motion for summary judgment on this ground be denied.

**b. Procedural Due Process**

Assuming a liberty interest exists, it must be determined whether McAllister was denied due process at his Tier III hearing. Where disciplinary hearings could result in SHU confinement or loss of good time credit, "[i]nmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *see also Wolff,* 418 U.S. at 556; *Sira v. Morton,* 380 F.3d 57, 59 (2d Cir.2004).

i. **Notice**

McAllister first appears to argue that he was denied procedural due process because the misbehavior report (1) violated unnamed DOCCS rules, regulations, and procedures, and (2) failed to provide him with adequate notice of the charges against him because it did not list the five inmates whose affidavits were confiscated and, thus, impacted his ability to prepare a defense to the charges. Am. Compl. ¶¶ 11–13, 16–17. Although inmates are entitled to advance written notice of the charges, "[t]his is not to suggest that the Constitution demands notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct ...." *Sira,* 380 F.3d at 72 (2d Cir.2004) (citing *Wolff,* 418 U.S. at 564). "[T]here must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.*

First, to the extent that McAllister's argues that the differing disciplinary reports violated unspecified DOCCS rules, regulations, and procedures (Am.Compl.¶¶ 12–13), this claim must fail. A section 1983 claim is not the "appropriate forum" in which to seek review of a violation of a prison regulation. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulation or state law ... the allegations asserted must constitute violations of constitutional due process standards."). Next, McAllister fails to plausibly allege the existence of a question of fact whether the difference between the misbehavior reports deprived him of the ability to identify relevant evidence so that he could prepare a defense. Although McAllister's copy of the report was missing the names of the inmates whose affidavits were confiscated, it informed McAllister of the date, time, and location of the alleged violations; the rules alleged to have been violated; and a description of the documents that were confiscated. *Johnson v. Goord,* 305 Fed. Appx. 815, 817 (2d Cir.2009) (concluding where the inmate's copy of misbehavior report included details of alleged violation and charges against him, a sentence missing from the inmate's copy of report did not violate the inmate's due process rights). It is clear that the discrepancy between the misbehavior reports did not affect McAllister's ability to prepare and present a defense. Prior to the hearing, McAllister requested as witnesses the five inmates whose affidavits were found during the property search. Indeed, the record demonstrates that McAllister was able to both identify the

documents referenced in the misbehavior report and address them at the hearing. Dkt. No. 74–3, Exh. A at 45, 47–48.

**\*12** Thus, because he received sufficient notice of the charges against him and was able to prepare and present a defense on his behalf, McAllister fails to raise a question of fact as to whether he was denied sufficient notice of the charges against him.

### ii. Hearing Officer Bias/Pre-determination of Guilt

McAllister also contends that his procedural due process rights were violated because Call was biased against him and prejudged his guilt. The Fourteenth Amendment guarantees inmates the right to the appointment of an unbiased hearing officer to address a disciplinary charge. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). An impartial hearing officer "does not prejudge the evidence" and is not to say "how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). However, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Russell v. Selsky,* 35 F.3d 55, 60 (2d Cir.1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Nelson v. Plumley,* No. 9:12–CV–422, 2014 WL 4659327, at \*11 (N.D .N.Y. Sept. 17, 2014) (quoting *Allred v. Knowles,* No. 06–CV–0456, 2010 WL 3911414, at \* 5 (W.D.N.Y. Oct. 5, 2010) (quoting *Waldpole v. Hill,* 472 U.S. 445, 455 (1985)). However, "the mere existence of 'some evidence' in the record to support a disciplinary determination does not resolve a prisoner's claim that he was denied due process by the presence of a biased hearing officer." *See Smith v. United States,* No. 09–CV–729, 2012 WL 4491538 at \*8 (N.D.N.Y. July 5, 2012).

Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." *Allen,* 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." *Washington v. Afify,* 968 F.Supp.2d 532, 541 (W.D.N.Y.2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez,* No. 09–CV–

626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 1, 2011) (citing *Francis,* 891 F.2d at 46).

McAllister first argues that Call prejudged his guilt. He supports this contention by pointing to moments during the Tier III hearing where Call expressed his belief that McAllister's possession of affidavits signed by other inmates was sufficient to support a violation of prison rules 113.15 and 180.17. Am. Compl., ¶¶ 13, 15, 23–25, 36. Here, however the challenged affidavits were not evidence that Call prejudged because he had the opportunity to review the affidavits and did so at the hearing. Although McAllister disagreed with Call's opinion that possession of such documents would be a *per se* violation of the rules, Call's assertion of belief in this matter was an opinion he reached following his personal review of this evidence. *See Johnson v. Doling,* No. 05–CV–376, 2007 WL 3046701, at \* 10 (N.D.N.Y. Oct. 17, 2007) (holding that where the "[p]laintiff was provided the opportunity to testify, [and] call and question witnesses .... [d]isagreement with rulings made by a hearing officer does not constitute bias"). Thus, it does not appear that Call prejudged this evidence.

**\*13** To support his claim that Call exhibited bias and partiality against him in the Tier III hearing, McAllister points out that, after he objected to the misbehavior report for failing to provide him sufficient notice of the documents confiscated, Call read the portion of the misbehavior report describing the documents as "[a]rticles of paper which appear to be legal work including some signed affidavits," and stated "that didn't ring a bell for you?" *Id.* ¶¶ 19, 32). When read in context, this statement does not establish bias on Call's part, rather it appears to be a genuine question. Though it may be said that Call could have couched this question in a kinder manner, this statement does not demonstrate bias. Moreover, that the Tier III determination was reversed on appeal, without more, is not evidence of bias or other due process violation. *Eng v. Therrien,* No. 04–CV–1146, 2008 WL 141794, at \*2 (N.D.N.Y. Jan. 11, 2008).

Thus, McAllister fails to plausibly allege the existence of question of fact whether Call prejudged his guilt or was otherwise biased in the Tier III hearing.

### iii. Failure to Investigate

McAllister next suggests that he was denied procedural due process because Call declined to interview the law library officer. Am. Compl. ¶ 29. Call permitted McAllister to present

testimony on his behalf and afforded him the opportunity call witnesses. Had McAllister wished to hear testimony from the law library officer, he could have requested the law library officer as a witness. *Wolff,* 418 U.S. at 566 (inmates have a right to call witnesses in their defense at disciplinary hearings). That Call found it unnecessary to independently interview the law library officer—especially where McAllister did not demonstrate that his testimony would be relevant—does not result in a denial of due process because "[t]here is no requirement ... that a hearing officer assigned to preside over a disciplinary hearing conduct an independent investigation; that is simply not the role of a hearing officer." *Robinson v. Brown,* No. 9:11–CV–0758, 2012 WL 6799725, *5 (N.D.N.Y. Nov. 1, 2012).

Accordingly, McAllister fails plausibly raise a due process violation based on Call's alleged failure to investigate.

#### iv. Confidential Witness

To the extent it can be discerned, McAllister contends that he was denied due process because Call relied on confidential witness testimony, yet failed to provide him with advance notice of the confidential witness and refused to inform him of his or her identity or the nature of the testimony. Am. Compl. ¶¶ 30–34. The Second Circuit has held that a hearing officer must perform an independent assessment of a confidential informant's credibility for such testimony to be considered reliable evidence of an inmate's guilt. *Sira,* 380 F.3d at 78 (noting that, "when sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened.").

 **\*14** Here, the record provides no indication that Call independently assessed the credibility and reliability of the confidential witness. The confidential witness form merely states that Call "was provided confidential information relating to the misbehavior report ." Dkt. No. 74–3, at 13. Similarly, Call does not provide whether or how he performed an assessment of the witness's credibility. *Id.* at 4. Therefore, there exist questions of fact whether Call deprived McAllister of due process by relying on this testimony without an independent assessment of the witness's credibility.

To the extent that McAllister argues that he was denied due process by Call's decision to refuse to disclose the content of the confidential witness's testimony, the law in this circuit provides that where a prison official decides to keep certain witness testimony confidential, he or she "must offer a reasonable justification for their actions, if not contemporaneously, then when challenged in a court action." *Sira,* 380 F.3d at 75 (citing *Ponte v. Real,* 471 U.S. 491, 498 (1985)). Although "[c]ourts will not readily second guess the judgment of prison officials with respect to such matters ... the discretion to withhold evidence is not unreviewable...." *Id.* (citations omitted). Here, Call failed to provide his rationale for refraining to share the substance of this testimony, stating merely that McAllister could not be told the substance of the testimony because "it is by definition it is ... confidential." Dkt. No. 74–3, at 74. As Call presented no reason to justify withholding the identity or substance of the confidential witness's testimony, McAllister presents a viable due process claim based on the nondisclosure of this evidence. *Sira,* 380 F.3d at 76.

Accordingly, Call's motion for summary judgment should be denied on this ground.

#### v. Some Evidence

"Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence which supports the decision of the [hearing officer]." *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) (citations omitted). In considering whether a disciplinary determination is supported by some evidence of guilt, "the relevant question is whether there is any evidence in the record [before the disciplinary board] that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill,* 472 U.S. 445, 455–56 (1985) (citations omitted); *Sira,* 380 F.3d at 69. The Second Circuit has interpreted the "some evidence" standard to require "reliable evidence" of guilt. *Luna,* 356 F.3d at 488.

In making his determination, Call relied upon McAllister's testimony and statements, testimony of a confidential witness, the misbehavior report, and the legal documents confiscated during the property search. Dkt. No. 74–3, at 4. As noted, based on the record provided, Call did not perform an independent assessment of the witness's credibility. Thus, Call's reliance on confidential testimony would be insufficient to support a finding of guilt. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (determining that reliance on confidential informant's testimony insufficient to provide "some evidence" of guilt where there was no independent

examination of indicia relevant to informant's credibility). The remaining evidence relied upon—McAllister's testimony, the misbehavior report, and the affidavits—does not constitute some evidence of guilt, as required by the Due Process clause.

**\*15** The affidavits alone do not constitute some evidence of guilt because mere possession of affidavits signed by other inmates would not violate prison rules 113.15 and 180.17 were it true that these documents were McAllister's property and drafted solely for his benefit. Similarly, although a written misbehavior report may serve as some evidence of guilt, such is the case where the misbehavior report charges the plaintiff for behavior that the author of the misbehavior report personally witnessed. *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214 (W.D.N.Y.2010) (citations omitted) (misbehavior report drafted by officer who personally observed plaintiff possess and transfer pieces of sharpened metal to another inmate constituted some evidence of guilt). In this case, where a determination of guilt would appear to turn on knowledge of the ownership of the documents and an understanding of the circumstances under which the papers were drafted, a misbehavior report which merely states that papers appearing to be legal work signed by other inmates were found in McAllister's property, it does not establish a per se violation of rules 113.15 and 180.17. *See Hayes v. Coughlin,* No. 87 CIV. 7401, 1996 WL 453071, at \*3 (S.D.N.Y. Aug. 12, 1996) ("if a misbehavior report can serve as 'some evidence' for a hearing decision and thereby insulate a hearing from review, there would be little point in having a hearing"); *see also Williams v. Dubray,* No. 09–CV–1298, 2011 WL 3236681, at \*4 (N.D.N.Y. July 13, 2011) (holding that there were questions of fact whether the determination was based on some evidence of guilt where the hearing officer relied on misbehavior report that was based on a corrections officer's unsupported accounts, without additional evidence to support its charges). Thus, absent additional evidence that these papers belonged to other inmates or that McAllister drafted the documents for other inmates' use, the fact that the misbehavior report identified these documents as being found in McAllister's secured property does not constitute reliable evidence of guilt.

Finally, McAllister's testimony does not constitute reliable evidence of guilt. In response to the charge of violating rule 113.15, McAllister testified that the affidavits were his property because he drafted them solely as evidence in his personal litigation against the Department of Probation. Similarly, in defense of the charge for violating rule 180.17,

McAllister repeatedly testified that he did not provide legal assistance to the inmates in question because the affidavits were written solely to serve as supporting evidence in his personal action, the inmates were aware that they would receive no legal benefit as a result, and he did not receive any compensation from the inmates. Regardless whether Call considered McAllister's testimony to be credible, without some other reliable evidence, such as, perhaps, a statement from one of the other inmates claiming that he signed the affidavit under the belief that McAllister would provide him with legal assistance, McAllister's testimony denying violations of the charged prison rules would not constitute some evidence of guilt.

**\*16** Accordingly, it is recommended that Call's motion for summary judgment be denied as to McAllister's procedural due process claim.

### c. **Directive 4913**

McAllister further argues that, as a result of the SHU placement, he suffered an unconstitutional deprivation of his legal and personal property because he was required to comply with the limits set forth in directive 4913. This Court has already ruled upon this claim when it was raised at earlier stages. In deciding Call's motion for summary judgment on the McAllister's first complaint, this Court held that the directive did not violate his Fourteenth Amendment rights:

> Directive # 4913 was reasonably related to valid institutional goals given DOCCS' responsibility to provide for the health and safety of its staff and inmates and the alternatives provided to inmates in being able to seek exceptions and choose which four or five draft bags of material would remain with them. Moreover, the rules were neutral and reasonably related to the ultimate goals of the facility, security and safety.

*McAllister v. Fischer,* 2012 WL 7681635, at \*12 (N.D.N.Y. July 6, 2012) (Dkt. No. 55, at 22–23), *Report and Recommendation adopted by* 2013 WL 954961 (N.D.N.Y. Mar. 12, 2013) (Dkt. No. 58), *appeal dismissed* 2d Cir. 13–

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 84 of 174

111 (Jan. 13.2014). Further, the Court concluded that directive 4913 "did not violate[ ] McAllister's Fourteen Amendment rights" and was "reasonably related to valid institutional goals." Dkt. No. 55, at 23–24; Dkt. No. 58. Thus, any such claim is barred by the law of the case. *Arizona v. California,* 460 U.S. 605, 618 (1983) (citations omitted); *see also United States v. Thorn,* 446 F.3d 378, 383 (2d Cir.2006) (internal quotation marks and citations omitted) ("The law of the case doctrine counsels against revisiting our prior rulings in subsequent stages of the same case absent cogent and compelling reasons ...."); *Arizona,* 460 U.S. at 618 (citations omitted); *Wright v. Cayan,* 817 F.2d 999, 1002 n. 3 (2d Cir.1987) (citations omitted) ("Even when cases are reassigned to a different judge, the law of the case dictates a general practice of refusing to reopen what has been decided.").

Accordingly, it is recommended that defendant's motion for summary judgment be granted on this ground.

### 2. **Equal Protection**

McAllister's only reference to an equal protection violation in the amended complaint is his conclusory claim that Call's reference to a confidential witness during the Tier III hearing was in violation of his right to equal protection. Am. Compl. ¶ 31. Further, in this Court's previous order, McAllister's equal protection claim was dismissed for failure to demonstrate, among other things, that he was part of a protected class or that he was treated differently from any similarly-situated inmates. Dkt. No. 58, at 4; Dkt. No. 55, at 24–25. Thus, any such claim would also be barred by the law of the case. *Thorn,* 446 F.3d at 383. Regardless, McAllister's equal protection claim must also fail for the reasons discussed *infra.*

 **\*17**  To establish an equal protection violation, a plaintiff must show that "he was treated differently than others similarly situated as the result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). McAllister has not identified, nor does the record disclose, any basis for a reasonable fact-finder to conclude that he was treated differently from similarly-situated individuals. Rather, plaintiffs only support for his equal protection claim is the following:

> Call, throughout the entire disciplinary hearing deprive [sic] plaintiff equal protection when he stated: "This is hearing officer Call, this is 2:21 as I was going through my paperwork I realized something that I wanted to point out to Mr. McAllister."

> Defendant Call discriminated against plaintiff when he stated: "I reviewed it this morning the 22nd when it was received again is confidential"

Am. Compl. ¶¶ 31–32. McAllister does not explain how these statements denied him equal protection. McAllister fails to plausibly suggest that he was treated differently from any similarly-situated individuals. Further, even if these statements demonstrate the existence of questions of fact regarding whether McAllister was treated differently from similarly-situated persons, he fails to identify disparity in the conditions "as a result of any purposeful discrimination directed at an identifiable suspect class." *See Dolberry v. Jakob,* No. 11–CV–1018, 2014 WL 1292225, at \*12 (N.D.N.Y. Mar. 28, 2014).

Accordingly, it is recommended that defendant's motion on this ground should be granted.

### G. **Qualified Immunity**

Call contends that, even if McAllister's claims are substantiated, he is entitled to qualified immunity. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614 (1999)) (internal quotation marks omitted). This assessment is made "in light of the legal rules that were clearly established at the time it was taken." *Wilson,* 526 U.S. at 614; *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 Fed. Appx. 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*18** First, as discussed, McAllister presented a viable due process claim that the determination was not based on some evidence of guilt because Call (1) relied on confidential witness testimony without making an independent assessment of the witness's credibility and (2) did not otherwise have sufficient reliable evidence to support his finding of guilt. McAllister has also raised issues of fact whether the remaining evidence relied upon—the misbehavior report, McAllister's testimony and statements, and the confiscated legal papers—provided reliable evidence of guilt.

Addressing the second prong of the analysis, there is a clearly-established right to procedural due process protections, including the right to have a disciplinary determination be based on some evidence of guilt. There is also a clearly-established right to an independent assessment of confidential witnesses performed where a hearing officer relies on the witness's testimony (*Vasquez v. Coughlin,* 726 F.Supp. 466, 472 (S.D.N.Y.1989) (right clearly established by 1986); see also *Sira,* 380 F.3d at 80). Further, although there is no bright-line for what suffices as "some evidence" in every prison disciplinary proceeding (*Woodard v. Shanley,* 505 Fed. Appdx. 55, 57 (2d Cir.2012)), there were questions of fact surrounding the allegedly reliable evidence demonstrating that McAllister was in possession of other inmates' legal documents or that he provided them with unauthorized legal assistance. *Cf. Turner v. Silver,* 104 F.3d 354, at *3 (2d Cir.1996) (some evidence to support determination that the defendant violated rule against unauthorized legal assistance where documentary evidence indicated the plaintiff received payment from other inmates, author of misbehavior report testified regarding an interview with informant who implicated defendant, prison official testified that inmate told her he had been charged for law library services and inmate testified the same). Call both failed to perform an independent assessment of the confidential witness's credibility and provided no explanation for why both the identity of the witness and the substance of his or her testimony could not be disclosed to McAllister. *Sira,* 380 F.3d at 75 (citing *Ponte,* 471 U.S. at 498).

Thus, given the state of the law regarding the rights to which an inmate is entitled in his disciplinary hearing, it was not objectively reasonable for Call to have believed that (1) he need not perform an independent assessment of the witness credibility or (2) the misbehavior report, confiscated affidavits, and McAllister's consistent testimony

and statements, without more, sufficiently supported a determination that McAllister violated rules 113.15 and 180.17.

Accordingly, defendant's motion for summary judgment should be denied on this ground.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 74) be

**\*19** 1. **GRANTED** insofar as:

  a. dismissing plaintiff's First Amendment claims;

  b. dismissing plaintiff's Eighth Amendment claims;

  c. dismissing plaintiff's challenge to the constitutionality of Directive 4913;

  d. defendant's Eleventh Amendment immunity defense;

2. **DENIED** as to:

  a. plaintiff's Fourteenth Amendment procedural due process claims;

  b. defendant's qualified immunity defense.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)).

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'v of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: October 9, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5475293

**McAllister v. Call, Not Reported in F.Supp.3d (2014)**

2014 WL 5475293

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

2013 WL 5437617
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David DOUGLAS, Sr., Plaintiff,

v.

PERRARA, Corrr. Officer, Great Meadow
C.F.; Lawrence, Corr. Officer, Great
Meadow C.F.; Whittier, Corr. Officer, Great
Meadow C.F.; Mulligan, Corr. Officer,
Great Meadow C.F.; Deluca, Corr. Sergeant,
Great Meadow C.F.; and Russel, Deputy
Superintendent, Great Meadow C.F, Defendants.

No. 9:11–CV–1353 (GTS/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

David Douglas, Sr., Liverpool, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Colleen D. Galligan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

 **\*1**  Currently before the Court, in this *pro se* civil rights
action filed by David Douglas, Sr., ("Plaintiff") against the
six above-captioned New York State correctional employees,
are the following: (1) Defendants' motion for partial summary
judgment (requesting the dismissal of Plaintiff's claims
against Defendant Russell, and his claims against the
remaining Defendants in their official capacities); and (2)
United States Magistrate Judge Randolph F. Treece's Report–
Recommendation recommending that Defendants' motion be
granted. (Dkt.Nos.70, 80.) Neither party filed an objection
to the Report–Recommendation, and the deadline by which
to do so has expired. (*See generally* Docket Sheet.) After
carefully reviewing the relevant filings in this action, the
Court can find no clear error in the Report–Recommendation:
Magistrate Judge Treece employed the proper standards,
accurately recited the facts, and reasonably applied the law
to those facts. As a result, the Court accepts and adopts the

Report–Recommendation for the reasons stated therein. (Dkt.
No. 80.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Treece's Report–
Recommendation (Dkt. No. 80) is ***ACCEPTED*** and
***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for partial summary
judgment (Dkt. No. 70) is ***GRANTED;*** and it is further

**ORDERED** that the following claims are ***DISMISSED*** from
this action: (a) all claims asserted against Defendant Russell,
and (b) all claims asserted against Defendants in their official
capacities only. The Clerk is directed to terminate Defendant
Russell from this action; and it is further

**ORDERED** that the following claims ***REMAIN PENDING***
in this action: (a) Plaintiff's claim that Defendants Whittier,
Mulligan, Perrara and/or Lawrence subjected him to
inadequate prison conditions by depriving him of meals for
approximately five consecutive days in December 2009, in
violation of the Eighth Amendment; (b) Plaintiff's claim
that Defendants Whittier, Mulligan, Perrara and Lawrence
used excessive force against him, and that Defendant Deluca
failed to protect him from the use of that excessive force,
in violation of the Eighth Amendment and New York State
common law; and (c) Plaintiff's claim that Defendant Deluca
was deliberately indifferent to Plaintiff's serious medical
needs (following the assaults) in violation of the Eighth
Amendment; and it is further

**ORDERED** that Pro Bono Counsel be appointed for the
Plaintiff for purposes of trial only; any appeal shall remain
the responsibility of the plaintiff alone unless a motion for
appointment of counsel for an appeal is granted; and it is
further

**ORDERED** that upon assignment of Pro Bono Counsel, a
final pretrial conference with counsel will be scheduled in
this action before the undersigned, at which time the Court
will schedule a jury trial for Plaintiff's remaining claims as set
forth above against Defendants Whittier, Mulligan, Perrara,
Lawrence and DeLuca. Counsel are directed to appear at the
final pretrial conference with settlement authority from the
parties.

Douglas v. Ferrara, Not Reported in F.Supp.2d (2013)

2013 WL 5437617

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*2** *Pro se* Plaintiff David Douglas brought a civil rights Complaint, pursuant to 42 U.S.C. § 1983, asserting that Defendants violated his constitutional rights while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and housed in the Great Meadow Correctional Facility. Specifically, Plaintiff alleges that in early December 2009, he wrote a letter to Defendant Eileen Russell [1] complaining that he had been denied meals for several days. *See* Dkt. No. 1, Compl. at ¶¶ 8, 64, & 66. Plaintiff further alleges that the remaining Defendants violated his constitutional rights when they used excessive force against him on several occasions and denied him medical care in order to treat the injuries he sustained therewith. *See generally id.* And, according to Plaintiff, Defendant Russell's failure to take disciplinary action against these individuals and curtail their "known pattern of physical abuse of inmates" renders her liable for violating his constitutional rights. *Id.* at ¶ 66.

[1]    Although Plaintiff spells this Defendant's name as "Russel," it is clear from Defendants' submissions that the correct spelling of this individual's name is "Russell" and the Court will refer to her accordingly. Compl. at ¶ 8; Dkt. Nos. 10 & 70–3.

Presently pending is Defendants' Motion for Partial Summary Judgment whereby they seek dismissal of Defendant Russell from this action as well as dismissal of all claims against the remaining Defendants in their official capacities. Dkt. No. 70. A response to that Motion was due on February 22, 2013. To date, the Court has not received a response from Plaintiff.

### I. DISCUSSION

#### A. Standard of Review

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v.*

*Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ( "Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

**\*3** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991). Summary judgment is appropriate "[w]here

Douglas v. Ferrara, Not Reported in F.Supp.2d (2013)

2013 WL 5437617

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Pursuant to the Local Rules of Practice for the Northern District of New York, "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file to serve any papers ... shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown." N.D.N.Y.L.R. 7.1(b)(3). "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Even in the absence of a response, Defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* FED. R. CIV. P. 56(c). Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 70–2), supplemented by Plaintiffs' verified Complaint (Dkt. No. 1), as true. *See Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997).

**B. Personal Involvement**

As noted above, Plaintiff brings this civil rights action for alleged violations of his constitutional rights during his incarceration in December 2009 at Great Meadow Correctional Facility. Plaintiff claims that in early December 2009, he was subjected to threats and harassment by other inmates and correctional officers. Compl. at ¶ 1. Plaintiff alleges that beginning on December 11, 2009, he was denied several meals for several consecutive days by unnamed individuals, prompting him to file grievances and write two letters to Defendant Russell. *Id.* at ¶¶ 2–8. [2] Thereafter, on December 16, 2009, Plaintiff's meals were delivered to him and, on the following date, he was moved to protective custody. *Id.* at ¶¶ 9–10. The remainder of Plaintiff's Complaint describes a series of events wherein the remaining Defendants are accused of using excessive physical force against him and denying him medical attention.

[2]   Plaintiff alleges that in addition to filing several grievances he submitted sick call requests and sent letters to the Inspector General, all explaining how his Eighth Amendment rights were being violated. Compl. at ¶¶ 5–8.

*\*4  With regard to the pending, unopposed Motion, the Court notes that there is a paucity of factual allegations contained in the Complaint concerning Defendant Russell. In fact, the only factual allegation that this Court can point to is that Plaintiff wrote two letters to Defendant Russell complaining about being denied meals. Defendant Russell is not named nor referenced throughout the remainder of the Complaint. Nevertheless, in the section of the Complaint where Plaintiff lists his causes of action, he seemingly seeks to hold Defendant Russell liable for her alleged failure to intervene and take disciplinary action against the Defendants in order to curb their known pattern of physical abuse against inmates. *Id.* at ¶¶ 64 & 66.

According to Defendants' uncontroverted submissions, Defendant Eileen Russell is employed by DOCCS and worked at Great Meadow in 2006 as the Assistant Deputy Superintendent for Special Housing assigned to the Behavioral Health Unit. Dkt. No. 70–3, Eileen Russell Decl., dated Feb. 4, 2013, at ¶¶ 1, 3, & 4. During her tenure in that position, Plaintiff neither worked nor was housed as a patient in the Behavioral Health Unit. Russell Decl. at ¶ 11. Russell did not have any responsibilities related to delivery of meals to inmates nor does she have any recollection of speaking with Plaintiff or seeing any correspondence from him. *Id.* at ¶ 13. Furthermore, at no time was she made aware of any assault against Plaintiff by any DOCCS employee. *Id.* at ¶ 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted)). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

It appears that Plaintiff seeks to hold Defendant Russell liable due to her employment as a supervisor at Great Meadow. The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if she: (1) directly participated

in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.[3] *Colon v. Coughlin,* 58 F.3d at 873 (citations omitted); *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted).

[3]    The Second Circuit has yet to address the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), upon the categories of supervisory liability under *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995). *See Grullon v. City of NewHaven,* 720 F.3d 133 (2d Cir.2013) (noting that the Court's decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement," but declining to resolve the issue). Lower courts have struggled with this issue, specifically whether *Iqbal* effectively calls into question certain prongs of the *Colon* five-part test for supervisory liability. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 543 (S.D.N.Y.2009). While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.,* 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd,* 387 F. App'x 55 (2d Cir.2010), others disagree and conclude that whether any of the five categories apply in any particular cases depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010). Nevertheless, this Court, until instructed to the contrary, continues to apply the entirety of the five-factor *Colon* test.

**\*5**  Here, the evidence shows that Defendant Russell did not directly participate in any constitutional wrongdoing, she was not aware that Plaintiff had been experiencing any problems with other inmates and staff, in her assignment to the Behavioral Health Unit she did not come into contact with the Plaintiff, and, she was not responsible for creating policies or customs nor for rectifying any of the alleged constitutional infirmities Plaintiff is alleged to have been subjected to. Because Plaintiff failed to respond to Defendants' Motion,

he has not created any material issue of fact regarding Russell's non-involvement in any constitutional wrongdoing. Thus, based upon the record before the Court, we find that Defendant Russell was not personally involved in any wrongdoing and should be **dismissed** from this action. *See Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

## C. Eleventh Amendment

By their Motion, Defendants seek dismissal of claims brought against them in their official capacities. Dkt. No. 70. In making this request, the Defendants note that during the pendency of this action, Plaintiff was released from DOCCS's custody, thereby rendering moot any request he has made for injunctive relief. Dkt. No. 70–4, Defs.' Mem. of Law, at pp. 7–8. After reviewing the Complaint, the Court notes that Plaintiff primarily seeks monetary compensation for both compensatory and punitive damages. *See* Compl. at Relief Requested. In addition, he seeks a declaratory judgment that his rights have been violated, but does not seek other injunctive relief. *Id.*

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state by its own citizens. *Hans v. Louisiana,* 134 U.S. 1 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 447–48 (2d Cir.1999) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't. of Corr. Servs.,* 915 F.Supp. 525, 539 (N.D.N.Y.1995)

(citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

**\*6** However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540. While much of the relief sought herein is compensatory and punitive monetary relief, to the extent Plaintiff seeks some form of declaratory relief, such claims against the Defendants in their official capacities could go forward insofar as the Plaintiff seeks prospective relief. However, in light of his release from DOCCS's custody, the Court finds that any request for prospective injunctive relief is moot and the claims against the remaining Defendants in their official capacities should be **dismissed.** *Khalil v. Laird,* 353 F. App'x 620 (2d Cir.2009) (citing *Muhammad v. City of New York Dep't of Corr.,* 126 F.3d 119, 123 (2d Cir.1997)).

## II. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 70) be **GRANTED** and all claims against Defendant Russell be **DISMISSED** and claims against the remaining Defendants in their official capacities be **DISMISSED;** and it is further

**RECOMMENDED,** that if the above recommendations are accepted, this case be set down for a final pre-trial conference with the parties to assess whether this matter is trial ready; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5437617

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1064330

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2010 WL 1064330
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Joseph Paul GUARNERI, Plaintiff,

v.

LT. James HAZZARD, Corporal J. Crook, Deputy
Paul March; Deputy Grippin, Deputy Howland,
Deputy Mace, Deputy John Doe, the Schoharie
County Jail Medical Department, Dr. Weitz, Jane
Doe Nurse Practitioner, Commissioner Frederick
C. Lamy, and Francis T. Sullivan, Defendants.

No. 9:06–CV–985 (NAM/DRH).
|
March 22, 2010.

West KeySummary

1    **Prisons**  🔑 Particular Conditions and
Treatments

**Sentencing and Punishment** 🔑 Medical
Care and Treatment

State prisoner failed to show that his knee
injury was a serious medical need since he
never exhibited any limitations in his range
of motion or complained of an inability to
ambulate, and thus, his Eighth Amendment
rights were not violated. The prisoner alleged
that he had a torn ACL, which was supported
by the medical evidence. However, he played
basketball, even after being advised to avoid
outdoor recreation. He alleged that he suffered
from severe pain, but exhibited a normal gait
and no swelling or difficulty walking. He alleged
that he was in severe pain prior to being treated
in the emergency room, but after he received
an injection of pain medication he did not feel
pain. Within an hour or two of his return, he
was involved in a physical altercation and kicked
multiple sealed doors off the hinges. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Joseph Paul Guarneri, Schoharie, NY, pro se.

O'Connor, O'Connor, Bresee & First, P.C., Justin O'C.
Corcoran, Esq., of Counsel, Albany, NY, for Defendant Weitz.

Lemire, Johnson Law Firm, Gregg T. Johnson, Esq., Scott
Quesnel, Esq., of Counsel, Malta, NY, for Defendants Lt.
James Hazzard, Cpl. J. Cronk, Deputy Paul Marsh, Jr., Deputy
Grippin, Deputy Howland County of Schoharie and Deputy
Mace.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1**  In this *pro se* civil rights action under 42 U.S.C. §
1983, plaintiff claims that defendants violated his First,
Eighth and Fourteenth Amendment rights while plaintiff
was incarcerated at the Schoharie County Jail. In the
second amended complaint, plaintiff asserts that defendants
violated: (1) the Eighth Amendment for failing to provide
plaintiff with adequate medical care; (2) the First Amendment
and Religious Freedom Restoration Act ("RFRA") for
denying plaintiff the right to practice his chosen religion;
(3) the Fourteenth Amendment for denying plaintiff Equal
Protection on account of his religious beliefs; and (4)
the First Amendment for denying plaintiff access to
the courts. Defendants move for summary judgment and
dismissal of plaintiff's second amended complaint pursuant to
Fed.R.Civ.P. 56.

**FACTUAL BACKGROUND**

The facts in this case, unless otherwise noted, are
undisputed. [1] The Schoharie County Sheriff's Department
("SCSD") operates the Schoharie County Jail Facility
("SCJ") in Schoharie County, New York. At the relevant
time period, James Hazzard ("Lt.Hazzard") was employed
as a lieutenant in the SCSD. In 2006, Lt. Hazzard was
the Chief Administrative Officer for the SCJ and was
responsible for reviewing inmate grievances. Allen Nelson
("Nelson") was employed by the SCSD as a Corrections

2010 WL 1064330

Officer and acted as the SCJ Inmate Grievance Coordinator with responsibilities that included receiving, investigation and making determinations on inmate grievances. [2] Paul Marsh ("Marsh") was employed as a Corrections Officer at SCJ. However, Officer Marsh was injured on November 5, 2005 and, as of December 2008, had not returned to work. James Grippin ("Grippin") was employed as a Corrections Officer at SCJ from February 2003 through August 2006. Donald Mace ("Mace") was employed as a Corrections Officer at SCJ and was employed in that capacity for 19 years. Dr. Weitz ("Weitz") is board certified in internal medicine and rheumatology and licensed to practice medicine in the State of New York. Dr. Weitz began working at SCJ in January 2004. Defendant Weitz has submitted a twenty page affidavit which details his contacts with plaintiff and comments on all of plaintiff's visits for sick call. [3] Defendant Weitz's affidavit chronologically details all of the dates and states whether plaintiff was seen by other medical personnel or treated by defendant Weitz.

[1]     The facts set forth in this section are taken from: (1) the Second Amended Complaint; (2) the Answer; (3) Defendants' Statements of Material Facts; (4) the exhibits and evidence submitted by Defendants in support of their Motions for Summary Judgment; (5) plaintiff's deposition transcript; and (6) the exhibits and evidence submitted by Plaintiff in Opposition to Defendants' Motion for Summary Judgment. Plaintiff does not dispute the accuracy of the facts. In opposition to the motion, plaintiff provided copies of several grievances filed in 2008. The Court has reviewed those submissions and determines that they are not relevant to the issues at hand and therefore, will not be considered within the context of these motions.

[2]     Officer Nelson is not a defendant in this action but provided an affidavit in support of defendants' motion.

[3]     Defendant Weitz summarizes plaintiff's medical treatment from January 2004 until July 2006. The relevant portions of plaintiff's medical records are sealed medical records on file with the court. As plaintiff has not objected to the admissibility of these records, the Court accepts the medical records as evidence and the statements contained therein as true. *See Jackson v. Onondaga County,* 1998 WL 713453, at *5 (N.D.N.Y.1998).

Plaintiff has been arrested over 70 times in the past 20 years and has spent most of his adult life in and out of correctional facilities on various charges and convictions. Since 2000, plaintiff has been housed at SCJ on 16 separate occasions. [4] Plaintiff claims that he suffers from herniated discs in his neck and lower back, torn ligaments in his knee, post-traumatic stress disorder ("PTSD"), bi-polar disorder and depression.

[4]     Plaintiff was incarcerated at SCJ from 2000–2005. However, for the purposes of the within motion, only he relevant dates of his confinement and medical treatment are summarized herein.

**Plaintiff's Incarceration from 2004 until 2005**
Plaintiff was incarcerated at SCJ from January 2004 until January 2005. On January 29, 2004, plaintiff was evaluated by a social worker at SCJ. Plaintiff denied suicidal and homicidal ideation and was found not to be an "imminent risk" to himself or others. On February 27, 2004, a nurse practitioner examined plaintiff and prescribed Flexeril for his back pain. [5] At plaintiff's request, the nurse agreed to discuss plaintiff's mental health complaints with Dr. Weitz. On March 2, 2004, Dr.Weitz evaluated plaintiff's mental health condition and consulted with Kelly Farnum, N.P., at Schoharie County Mental Health Clinic. [6] Dr. Weitz and Nurse Farnum discussed plaintiff's medical condition and agreed that Dr. Weitz would prescribe Prozac and Depakote. [7] On March 23, 2004, plaintiff was seen Nurse Farnum upon Dr. Weitz's request. Nurse Farnum noted that plaintiff was cooperative, his thoughts were organized and goal directed and plaintiff denied any suicidal or homicidal tendencies. Nurse Farnum noted that plaintiff's impulse was "intact during interview" but that his insight and judgment were "poor" and his intelligence was, "below average". Nurse Farnum suggested that plaintiff continue with his current medication.

[5]     Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary,* 465, 725 (31st ed.2007).

[6]     Kelly Farnum treated plaintiff prior to his incarceration.

[7]     Prozac is used in the treatment of depression and obsessive-compulsive disorder. *Id.* at 730, 1562. Depakote is used in the treatment of manic episodes associated with bipolar disorder. *Id.* at 497, 565.

Guarnieri v. Hazzard, Not Reported in F.Supp.2d (2010)

2010 WL 1064330

**\*2** In April 2004, the medical staff at SCJ noted that plaintiff requested a transfer to "Mercy" or another "psychiatric hospital". The staff denied this request concluding that plaintiff had "adequate care" and that he was "manipulating for psychiatric hospitalization". In May 2004, plaintiff demanded to be seen by a psychiatrist. The medical staff discussed plaintiff's request with Dr. Weitz and an appointment was made for plaintiff to see Dr. Warren Becker at Schoharie County Mental Health Clinic.

On May 18, 2004, plaintiff was treated by a nurse practitioner after complaining that he hurt his right knee playing basketball. The nurse noted that plaintiff's range of motion was intact but his patella was tender. The nurse diagnosed plaintiff with a right knee strain and prescribed Bextra. [8]

[8]     Bextra is an anti-inflammatory used for symptomatic treatment of osteoarthritis or rheumatoid arthritis. *Dorland's* at 215, 2048.

On June 15, 2004, Nurse Practitioner Nancy McDonald at SCJ noted that plaintiff was refusing to take his medication including Bextra, Wellbutrin, Flexeril, Depakote and Amoxicillin. [9] Plaintiff reported that he did not take his medications because they "masked the problems".

[9]     Wellbutrin is used as an antidepressant and as an aid in smoking cessation to reduce the symptoms of nicotine withdrawal. *Id.* at 265, 2107.

On June 25, 2004, plaintiff was taken to Bassett Hospital with a prescription from Dr. Weitz for x-rays of his cervical spine, thoracic spine and lumbar spine. The x-rays revealed mild degenerative changes in the lumbar spine. Plaintiff was advised to avoid playing basketball and other outdoor recreation.

On July 28, 2004, plaintiff was examined by Dr. Warren Becker, a psychiatrist at Schoharie County Mental Health Clinic. [10] Dr. Becker found that plaintiff did not display any psychiatric disorder that required medication but noted that the medication would make him "feel calmer". Dr. Becker found plaintiff to be polite and cooperative and did not conclude that he was suffering from PTSD.

[10]     Plaintiff made a request for his own psychiatrist and that request was denied. Plaintiff did not file a grievance with respect to that denial.

On August 24, 2004, plaintiff requested a knee brace so that he could play basketball. Plaintiff was seen by a nurse practitioner on August 30, 2004 and complained that he "went to jump up and when he came down, the right knee buckled". Plaintiff was diagnosed with a right knee strain. The nurse practitioner told plaintiff to avoid basketball and ordered a knee brace. On September 27, 2004, plaintiff requested a different knee brace claiming that the neoprene knee brace he was wearing did not allow for the proper lateral movement of his knee. Nurse McDonald advised plaintiff that his brace was sufficient but stated she would discuss the issue with Dr. Weitz. Dr. Weitz stated that plaintiff needed an orthopedic evaluation to determine his need for a brace. Plaintiff was advised that an appointment would be made for a consultation.

On November 4, 2004, plaintiff was examined by Dr. Shep Friedman, an orthopedist at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament ("ACL") tear. Dr. Friedman suggested exercise and possible surgery. Dr. Friedman indicated that a brace was medically necessary and that he would speak with someone at the jail to discuss a more supportive brace that would meet jail guidelines. The medical staff told plaintiff that if the facility paid for the brace, it would become facility property when he was transferred. Sgt. Newman and Sgt. Santoro gave Nurse McDonald permission to purchase the brace. [11]

[11]     On December 14, 2004, the brace arrived at SCJ but did not comply with the facility's standards.

**\*3** In December 2004, plaintiff refused to wear a neoprene knee brace. In January 2005, Dr. Friedman re-examined plaintiff and found a normal gait and normal range of motion with some tenderness in the right knee. Dr. Friedman diagnosed plaintiff with a chronic ACL tear and noted that the jail would not permit plaintiff to use a brace with metal stays outside of his cell. Dr. Friedman suggested surgical intervention or conservative measures including physical therapy.

**Plaintiff's Incarceration in 2006**

Plaintiff was incarcerated at SCJ in June 2006 and remained there until August 24, 2006 for a parole violation. [12] During the three months that he was incarcerated at SCJ in 2006, plaintiff filed 102 separate inmate requests and approximately 12 medical requests.

12      Defendants allege that plaintiff was admitted on June 7, 2006. Plaintiff claims he was admitted on June 5,

In June 2006, upon plaintiff's arrival at SCJ, Sgt. Newman noted that plaintiff had an "old black knee brace in his personal property. Issued a new blue knee brace-must be returned upon release".

**Plaintiff's Medical Treatment–2006**
On June 9, 2006, plaintiff completed a medical request form complaining of dizziness and insomnia. The same day, plaintiff was prescribed Prozac. On June 10, 2006, plaintiff completed another medical request complaining of pain in his right leg. Plaintiff was seen by a member of the medical staff and prescribed 800 mg of Motrin.

On June 15, 2006, Dr. Weitz examined plaintiff and noted a history of low back pain and degenerative disc disease of his lower spine. Upon examination, Dr. Weitz found that plaintiff could walk without limping, had no motor sensory loss and no symptoms with straight leg raises. Dr. Weitz diagnosed plaintiff with low back pain and prescribed Flexeril. On the same day, plaintiff completed a medical request asking for medication called "trigosamine", a consultation with a neurosurgeon, a back brace and back surgery. Plaintiff also refused to see Dr. Weitz. Plaintiff was seen by Melissa Becker, a nurse practitioner, who noted that plaintiff's request was for an herbal remedy that was not FDA regulated. Nurse Becker noted, "I am not ordering unnecessary testing. I am trained medically to make judgment decisions."

On June 16, 2006, plaintiff submitted a grievance claiming that he was denied a back brace and adequate x-rays for herniated discs. On June 21, 2006, after an investigation, Officer Nelson concluded that plaintiff was unwilling to follow the course of action recommended by the medical staff and refused to take prescribed medication and Motrin. Therefore, Officer Nelson responded to the grievance stating, "I have no choice but to deny this grievance". Plaintiff appealed the decision to Lt. Hazzard who found that, "[y]ou again are refusing any course of action by medical. They have a plan set up which they discuss with you and you refuse to abide by it. Grievance denied". Plaintiff appealed Lt. Hazzard's decision to the Citizens Policy and Complaint Review Council ("CPCRC") and on August 10, 2006, CPCRC issued a decision denying plaintiff's grievance.

*4  On June 18, 2006, plaintiff complained of severe pain in his lower back. Plaintiff was treated on June 19, 2006 and advised to continue with his medications. On July 19, 2006, plaintiff requested a hinged knee brace. On July 20, 2006, plaintiff's medications were increased.

On July 21, 2006, at approximately 2:00 a.m., plaintiff allegedly sustained a knee injury when his knee, "gave out" while he was in the medical holding cell. 13  Officer Nelson claims that he went to plaintiff's cell at approximately 3:00 a.m. and that plaintiff demanded to be taken to the emergency room immediately and refused to wear his knee brace. Officer Nelson claims that at approximately 3:12 a.m., he spoke with Dr. Weitz by telephone who directed Officer Nelson to put the brace on plaintiff's knee for the rest of the evening. Dr. Weitz further advised Officer Nelson that the medical staff would examine plaintiff the next morning at the facility. Plaintiff claims that he did not put his brace on because his knee "swelled up".

13      Plaintiff refers to this incident as the "give way" episode.

Later the same day, plaintiff was seen by Nurse Becker who noted that plaintiff's knee was tender to the touch with minimal swelling. Nurse Becker convinced plaintiff to use the brace but plaintiff insisted that he be taken to the emergency room to be fitted for a metal brace. 14  The nurse recommended that plaintiff be evaluated and "scanned".

14      Plaintiff claims that he was not examined by any member of SCJ medical staff prior to being seen at the emergency room. Officer Nelson claims that when he advised plaintiff that he would be examined in the morning, plaintiff requested, completed and submitted a Pre–Grievance form. Sgt. Newman claims that he denied the grievance on July 24, 2006 because plaintiff was taken to the hospital on July 21, 2006 and July 24, 2006. Sgt. Newman asserts that plaintiff accepted the decision and that plaintiff took no further action with respect to that grievance.

On July 21, 2006, at approximately 1:45 p.m., plaintiff was seen in the Bassett Hospital Emergency Room. Plaintiff claims he was in "severe" pain. The doctors in the emergency room prescribed Tylenol, wrapped the knee in an ace bandage and advised plaintiff to rest. The doctors also suggested that plaintiff follow with Dr. Friedman. Plaintiff claims he was

Case 9:19-cv-01203-GTS-TWD   Document 57   Filed 12/22/21   Page 96 of 174
Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)
2010 WL 1064330

able to walk out of the hospital because he was "injected" with pain medication. Plaintiff testified that within an hour or two, he was "feeling no pain". On July 21, 2006, upon plaintiff's return from the hospital, plaintiff was involved in an incident with the SCJ correctional staff. Plaintiff admitted to engaging in a verbal exchange with the staff and also admitted that he kicked one of the Corrections Officers. [15]

15    On August 10, 2006, Sgt. Newman presided over a disciplinary hearing and issued an Inmate Hearing Disposition sanctioning plaintiff to 40 days punitive segregation. Plaintiff was transferred out of SCJ on August 24, 2006 and did not complete his sentence.

On July 24, 2006, plaintiff was examined by Dr. Friedman at Bassett Hospital. Dr. Friedman diagnosed plaintiff with a chronic anterior cruciate ligament tear with some arthritic change and limited range of motion. Dr. Friedman noted that plaintiff was fitted for a "Genu ACL brace" which plaintiff was "comfortable with".

From July 24, 2006 through August 24, 2006, plaintiff was permitted to wear the hinged knee brace. On August 24, 2006, Officer Mace escorted plaintiff to the Elmira Correctional Facility ("ECF") and upon arrival, advised ECF staff that the brace needed to be returned to SCJ. The ECF staff removed the brace from plaintiff, outside of Officer Mace's presence. Officer Mace returned the brace to the SCJ.

**Plaintiff's Request for a Catholic Priest**
On June 9, 2006, plaintiff submitted an Inmate Request seeking "religious assistance" from a Catholic priest. Plaintiff received a response from Cpl. Rodriguez–Stanley which stated, "I contacted our jail Chaplain Rev. Ferenczy, and he will try to reach the local Catholic priest to see when he could come out and see you". According to Lt. Hazzard, the SCJ staff, including the facility Chaplain, Reverend Paul Ferenczy, made efforts to obtain the services of a Catholic priest. Plaintiff testified that he previously met with Rev. Ferenczy. On June 26, 2006, plaintiff filed a grievance claiming that he was being denied his, "First Amendment of not having his Catholic religion for 'no' reason at all". Plaintiff claimed that SCJ was deliberately violating the "Religious Freedom Restoration Act". Plaintiff sought to have "Catholic servicers [sic]". Lt. Hazzard explained to plaintiff that ongoing efforts were being made to obtain the services of a Catholic priest. According to Lt. Hazzard, plaintiff accepted that explanation. On June 29, 2006,

plaintiff's request for rosary beads was granted. In August 2006, Lt. Hazzard denied plaintiff's grievance noting that, "[e]very attempt was made to get [ ] Catholic priest into facility, our own Chaplain had been trying to assist us. Inmate was sent back to state on August 24, 2007". [16]

16    According to the record, plaintiff was transferred to ECF in August 2006.

**Plaintiff's Access to Courts**
**\*5** Plaintiff testified that while incarcerated at SCJ, he filed four lawsuits. Moreover, his requests for addresses, supplies and a notary were routinely granted. On June 13, 2006, plaintiff submitted an Inmate Request seeking, "[l]egal reference material called Chapter on Parole and on Article 78 from the Jailhouse Lawyer Manual New Edition". On June 15, 2006, plaintiff filed a second Inmate Request with respect to the materials. On June 16, 2006, plaintiff was advised that the Jailhouse Lawyer Manual, "is not required library material set forth in minimum standards as outline by Commission of Corrections". On June 16, 2006, plaintiff filed two grievances with regard to this issue. Plaintiff sought to have all forms and chapters referenced in his prior request provided immediately and sought copies from the Jailhouse Lawyer Manual on Article 78 and parole and all legal forms from that book, "when requested in the future". Officer Nelson claims that Cpl. Wood investigated the issues and prepared a report. After reviewing the report, Officer Nelson concluded that SCJ was not required to maintain the requested information. On June 21, 2006, Officer Nelson issued a decision stating that, "[a]ll legal reference materials required by NYSCOC minimum standards are available for your review in the facility library and case law copies are available, as you well know, by request. Grievance Denied". Lt. Hazzard reviewed Officer Nelson's decisions and upheld the denial. In July 2006, plaintiff made at least three requests for extended library time and all requests were granted. Plaintiff appealed the determination to the CPCRC and on August 10, 2006, the CPCRC denied plaintiff's grievance.

**Prior Litigation**
On May 11, 2005, plaintiff filed an Amended Complaint in an action entitled *Joseph Paul Guarneri v. John Bates, Jr., Lt. Hazzard, Mr. Santoro, Mr. Newman, Roland Hirot, Mr. Gordon, Paul Marsh, Jr., Schoharie County Jail Medical Department, Dr. Weitz, Nancy McDonald, State Commission of Correction, Frederick C. Lamy, Frank T. Sullivan and Eliot Spitzer,* 05–CV–444 (GLS/DRH) (Dkt. No. 5) (*"Guarneri*

Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)

2010 WL 1064330

*I"* ).[17] That action involved plaintiff's medical treatment while he was incarcerated at SCJ from January 2004 until January 2005. Plaintiff alleged that the defendants violated his right to medical care under the Eighth Amendment. Specifically, plaintiff alleged that during the course of his arrest on January 5, 2004, he sustained from a rotator cuff tear in his shoulder that caused him severe pain. Plaintiff claimed that the defendants were deliberately indifferent to his medical needs with regard to the shoulder injury. Further, plaintiff alleged that he suffered from knee injuries and that the defendants were deliberately indifferent to his needs as they refused to allow plaintiff to wear his hinged knee brace outside his cell.

[17]     Plaintiff's original complaint was filed on April 15, 2005. On May 3, 2005, Judge Sharpe issued a Decision and Conditional Order of Dismissal directing plaintiff, *inter alia*, "to set forth a short and plain statement of the alleged wrongdoing or misconduct committed by each defendant, the date of the conduct complained of and the nexus between that conduct and plaintiff's constitutional and statutory rights in order that the Court can properly assess the sufficiency of plaintiff's claims." *See Guarneri v. Bates,* 05–CV–444 (Dkt. No. 3).

On May 31, 2007, the defendants filed motions for summary judgment seeking dismissal of plaintiff's complaint. *See Guarneri v. Bates,* 05–CV–444, (Dkt. No. 72). The matter was referred to U.S. Magistrate Judge David R. Homer for a Report and Recommendation. In his report, Magistrate Judge Homer provided a factual "Background" that included a discussion of plaintiff's medical treatment from August 2004 through January 2005. Magistrate Judge Homer found that plaintiff's shoulder injury may constitute a serious medical need, however, plaintiff failed to establish that the defendants were deliberately indifferent. (Dkt. No. 86). Moreover, Magistrate Judge Homer found that plaintiff failed to offer evidence that his knee injury was serious or that the defendants were deliberately indifferent. Accordingly Magistrate Judge Homer recommended that the Court grant the defendants' motions for summary judgment and dismissal of all claims. (Dkt. No. 86).

**\*6** On March 10, 2008, District Judge Gary L. Sharpe issued a Memorandum–Decision and Order accepting and adopting Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 88).

## SECOND AMENDED COMPLAINT
## AND PROCEDURAL HISTORY

On August 14, 2006, plaintiff filed a complaint in this action.[18] On February 7, 2007, plaintiff filed a Second Amended Complaint. Specifically, plaintiff alleges two causes of action under the First Amendment: (1) denial of meaningful access to courts; and (2) denial of religious freedom. Plaintiff also asserts causes of action with regard to his religious freedom pursuant to the RFRA and the Fourteenth Amendment. Plaintiff also alleges that defendants violated the Eighth Amendment claiming that: (1) defendants did not allow him to keep his hinged knee brace upon arrival at ECF; (2) defendants delayed in providing adequate emergency treatment in July 2006; (3) plaintiff received inadequate emergency care in 2000 and 2003 for herniated discs; and (4) defendants denied plaintiff proper medical care by refusing to provide a back brace.

[18]     On August 14, 2006, plaintiff filed a complaint in this action. (Dkt. No. 1). Plaintiff was named as a "co-plaintiff" with another inmate, Ryan McNamee. On November 9, 2006, this Court issued a Decision and Order severing plaintiff's action from the action of Ryan McNamee and directing plaintiff to file an amended complaint that, "sets forth only his claims for relief and the facts in support of his claims". (Dkt. No. 9).

On June 13, 2007, defendant Weitz filed a motion pursuant to Fed. R. Civ. P 12(b)(1) and 12(b)(6) seeking dismissal of plaintiff's complaint arguing that: (1) he was not personally involved in the deprivation of plaintiff's knee brace and in plaintiff's medical care; (2) the complaint failed to state a cause of action; (3) the complaint was barred by res judicata and collateral estoppel; and (4) the claims relating to plaintiff's back were barred by the statute of limitations. (Dkt. No. 19). The motion was referred to Magistrate Judge Homer for a Report and Recommendation. On February 6, 2008, Magistrate Judge Homer concluded that plaintiff failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at ECF and recommended granting Weitz's motion for summary judgment based upon lack of personal involvement with the confiscation of the knee brace. However, Magistrate Judge Homer also found that plaintiff sufficiently alleged that Dr. Weitz was personally

Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)

2010 WL 1064330

involved in his medical care for mental health issues and back and neck injuries sustained in 2003.

Magistrate Judge Homer also found that plaintiff sufficiently alleged an Eighth Amendment violation with respect to his knee injury, mental health and 2003 back injury and recommended denial of Weitz's motion on that ground.[19] However, plaintiff's claims relating to medical indifference occurring in 2000 were "clearly outside the three-year [statute of limitations] period". With regard to Weitz's res judicata argument, Magistrate Judge Homer concluded that there had not been a final determination in the pending federal case (09–CV–444) against Dr. Weitz and therefore, that aspect of the motion should be denied without prejudice. On February 27, 2008, this Court adopted Magistrate Judge Homer's Report and Recommendation in its entirety. (Dkt. No. 55).

[19]    In the Conclusion portion of the recommendation, Magistrate Judge Homer did not address defendant's motion with respect to plaintiff's Eighth Amendment claim with regard to his knee injury. However, in the text of the Report and Recommendation, Judge Homer discussed plaintiff's knee injury. Judge Homer noted:

[C]onstruing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition. Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

(Dkt. No. 54).

*7  Presently before the Court are two motions for summary judgment. Defendant Weitz moves for summary judgment and dismissal of plaintiff's complaint arguing that: (1) plaintiff's claims are precluded under the doctrine of res judicata and collateral estoppel; (2) plaintiff cannot establish that defendant was deliberately indifferent to any serious medical condition relating to plaintiff's knee, back or mental health treatment; (3) plaintiff cannot demonstrate defendant's personal involvement in medical decisions concerning plaintiff's emergency medical treatment in 2003 for herniated discs; (4) plaintiff's claim of mistreatment of a back injury in 2003 is precluded by the statute of limitations; and (5) Dr. Weitz is entitled to qualified immunity. (Dkt. No. 70). Defendants Hazzard, Marsh, Grippin, Mace, Howland, Cronk and the County of Schoharie move for summary judgment arguing: (1) plaintiff did not suffer from a serious medical need with respect to his knee, back and mental health and even assuming plaintiff suffered from serious medical need(s), defendants were not deliberately indifferent to plaintiff's condition(s); (2) plaintiff was not denied the ability to freely exercise his religious beliefs; (3) plaintiff was not denied equal protection on account of his religious beliefs; (4) plaintiff was not denied meaningful access to the courts; (6) defendants were not personally involved in the alleged constitutional deprivations; and (7) defendants are entitled to qualified immunity. (Dkt. No. 71). Plaintiff opposes the motions. (Dkt. No. 77).

**DISCUSSION**

**I. Summary Judgment Standard**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See id.* The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must

Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)

2010 WL 1064330

demonstrate that there is a genuine unresolved issue for trial. *See* Fed.R.Civ.P. 56(e).

Where a plaintiff has failed to properly respond to a defendant's Statement of Material Facts ("Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true to the extent that those facts are supported by the evidence in the record. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) (holding that the court may not rely solely on the movant's statement of undisputed facts contained in its Rule 56.1 statement and must be satisfied that the movant's assertions are supported by the evidence in the record). Although a plaintiff is *pro se,* bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment. *See Higgins v. Davis,* 2001 WL 262930, at \*2 (S.D.N.Y.2001).

**\*8** "Defendants can meet their burden of establishing their entitlement to motion for summary judgment by relying on plaintiff's medical records to establish the absence of any evidence supporting deliberate indifference to his mental health needs." *Mills v. Luplow,* 2009 WL 2579195, at \*8 (W.D.N.Y.2009). Though conventional wisdom might dictate the submission of affidavits from the primary actors ... [the] defendants' decision to rely instead upon the lack of evidentiary support for plaintiff's claims, is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact for trial with regard to those claims." *Id.*

## II. Collateral Estoppel/Res Judicata

Defendant Weitz seeks dismissal of plaintiff's claims based upon res judicata arguing that plaintiff should be precluded from "splitting" his claims into separate actions when he had, "a full and fair opportunity to litigate his claims in the previous lawsuit". [20]

[20]  Plaintiff does not respond to this argument.

Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits in an action "precludes the parties or their privies from relitigating issues that were or could have been raised in that action". *Computer Assoc. Int'l v. Altai, Inc.,* 126 F.3d 365, 369 (2d Cir.1997). "It must first be determined that the second suit involves the same 'claim' or 'nucleus of operative fact' as the first suit" *Interoceanica v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997) (citation omitted). New York law follows a transactional approach

which bars the relitigation of not only matters that were litigated between parties in a preceding action, but also any matters that could have been litigated in that action. *Ramsey v. Busch,* 19 F.Supp.2d 73, 83 (W.D.N.Y.1998). To ascertain whether the two actions arise from the same claim, courts look to whether the underlying facts are "related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations". *Interoceanica,* 107 F.3d at 90 (citations omitted). A plaintiff cannot avoid claim preclusion by " 'splitting' his claim into various suits based on different legal theories (with different evidence 'necessary' to each suit)". *Waldman v. Vill. of Kiryas Joel,* 207 F.3d 105, 110 (2d Cir.2000) (citing *Woods v. Dunlop Tire Corp.,* 972 F.2d 36, 39 (2d Cir.1992)).

"As a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play." *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997) (citing *S. E. C. v. First Jersey Secs.,* 101 F.3d 1450, 1464 (2d Cir.1996)); *see also Waldman,* 207 F.3d at 113 (res judicata will not bar a suit based upon legally significant acts occurring after the filing of a prior suit that was itself based on earlier acts). "Claims arising after the prior action need not, and often perhaps could not, have been brought in that action and are not barred by res judicata unless they represent a continuance of the same 'course of conduct' ". *Stewart v. Transport Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 443 (S.D.N.Y.2008) (citing *Green v. Illinois Dep't of Transp.,* 609 F.Supp. 1021, 1026 (N.D.Ill.1985)) (the court declined to read the doctrine of res judicata to require the plaintiff to amend his first complaint to allege a claim that arose after the suit had been filed). A party may file a supplemental pleading but it not required to do so and may file a new suit if he chooses. *Garcia v. Scoppetta,* 289 F.Supp.2d 343, 350 (E.D.N.Y.2003). In *Maharaj,* the Second Circuit held:

> **\*9** If, after the first suit is underway, a defendant engages in actionable conduct, plaintiff may-but is not required to-file a supplemental pleading setting forth defendant's subsequent conduct. Plaintiff's failure to supplement the pleadings of his already commenced lawsuit will not result in a res judicata bar when he

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 100 of 174
Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)
2010 WL 1064330

alleges defendant's later conduct as a
cause of action in a second suit.

*Maharaj,* 128 F.3d at 97.

Res judicata, if applied too rigidly, could work considerable injustice. *Reilly v. Reid,* 45 N.Y.2d 24, 28, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978) (holding that claim preclusion is tempered by recognition that two or more different and distinct claims or causes of action may often arise out of a course of dealing between the same parties) (citations omitted). "A party's choice to litigate two such claims or causes of action separately does not bar his assertion of the second claim or cause of action." *Id.* at 29, 407 N.Y.S.2d 645, 379 N.E.2d 172 (citation omitted).

In May 2005, plaintiff filed his complaint in *Guarneri I* alleging constitutional violations relating to medical care for his shoulder and knee injuries. [21] On August 14, 2006, while *Guarneri I* was pending, plaintiff filed a complaint in the instant action alleging constitutional violations relating to medical care for his knee, back, neck and mental health issues. Defendant argues that plaintiff is attempting to "split" his claims and that he "could have raised the claims at issue here in the previous action". Defendant contends that "most of the complaints and treatment relating to [plaintiff's] back and mental health complaints occurred in 2004, the same period of time at issue in his previous lawsuit".

[21]    Plaintiff has made no claims with regard to his shoulder in this action.

It is undisputed that a final judgment on the merits was entered in *Guarneri I.* However, in *Guarneri I,* plaintiff did not allege any violations with respect to his back, neck or mental health issues. Applying the "transactional"approach for res judicata purposes, the Court finds that the claims and factual circumstances in the present action pertain to a different time period and are not sufficiently related in time, space and origin. In both actions, plaintiff alleged constitutional violations relating to medical treatment for his knee. However, plaintiff was examined by Dr. Weitz in June 2006 and the "give way" incident occurred in July 2006. Thus, these "legally significant" acts occurred after the complaint was filed in *Guarneri I* and are not precluded under res judicata. Defendants argue that when plaintiff testified at his deposition in *Guarneri I,* the medical treatment about which plaintiff complained in the instant action had

already occurred. While the record supports that assertion, the appropriate analysis involves the date of the filing of the first complaint, not the date of the deposition. Based upon the record before the Court in *Guarneri I* and the record in the present action, the factual scenarios and evidence relevant to *Guarneri I* and the present action are sufficiently different such that a judgment in the present action will not destroy or impair the rights or interests established in *Guarneri I. See Ramsey v. Coughlin,* 94 F.3d 71, 83 (2d Cir.1996). Accordingly, Weitz's motion for summary judgment and dismissal of plaintiff's claims based upon res judicata is denied.

## III. Eighth Amendment

 **\*10**  Defendants claim that they are entitled to summary judgment and dismissal of plaintiff's § 1983 claims because plaintiff cannot demonstrate that any defendant was deliberately indifferent to any serious medical need.

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." [22] *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

[22]    Plaintiff claims that he was a pretrial detainee and enjoyed greater privileges than a convicted prisoner. However, plaintiff offers no support for this allegation. "As a pretrial detainee, plaintiff's conditions of confinement were subject to safeguards emanating from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which governs such claims brought by inmates serving prison sentences." *McQueen v. County of Albany,* 2010 WL 338081, at \*10 (N.D.N.Y.2010) (citing *Benjamin v. Fraser,* 343 F.3d 35, 49–50 (2d Cir.2003)). However, the Second Circuit has held that, "[c]laims for deliberate indifference to a serious medical condition of a person in custody should be analyzed under the same standard irrespective of whether

they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). A medical condition is considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). If unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)). "Because there is no distinct litmus test, a serious medical condition is determined by factors such as '(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment; (2) whether the medical condition significantly affects daily activities; and (3) the existence of chronic and substantial pain.' " *Whitcomb v. Todd,* 2008 WL 4104455, at *10 (N.D.N.Y.2008) (citing *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Sonds,* 151 F.Supp.2d at 310 (citing *Estelle,* 429 U.S. at 105–106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Sonds,* 151 F.Supp.2d at 310 (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*11** Denying or delaying access to medical care or intentionally interfering with prescribed treatment may constitute deliberate indifference. *Jones v. Lindblad,* 2009 WL 804155, at *6 (W.D.N.Y.2009) (citing *Estelle,* 429 U.S. at 104). Culpable intent requires the inmate to establish both that a prison official "has knowledge that an inmate faces a substantial risk of serious harm and he disregards

that risk by failing to take reasonable measures to abate the harm." *Id.* (citing *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996)). Delays must be purposeful or intended or the plaintiff must establish that the deprivation of not having treatment in the stated period was sufficiently serious. *Woods v. Goord,* 1998 WL 740782, at *12 (S.D.N.Y.1998).

Disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds,* 151 F.Supp.2d at 311. Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that a plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id; see also Whitcomb,* 2009 WL 4104455, at *10 (noting that disagreements over medications, diagnostic techniques (e.g., the need for x-rays), forms of treatment or the need for specialists are not adequate grounds for a § 1983 claim). Even if medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Dean,* 804 F.2d at 215.

**A. Knee Injury**

Defendants argue that plaintiff did not suffer from a serious knee injury and further, that plaintiff received prompt medical attention after the "give way" episode in his cell. Plaintiff claims that the "give way" episode occurred at 2:00 a.m. and that he did not receive medical treatment until five hours later. Plaintiff alleges that defendants deliberately and intentionally denied plaintiff emergency medical care after the episode.

**1. Serious Medical Need**

A plaintiff's allegation that he suffered a knee injury in and of itself does not constitute a serious medical need. *Lowman v. Perlman,* 2008 WL 4104554, at *5 (N.D.N.Y.2008) (citing *Williamson v. Goord,* 2006 WL 1977438, at *14 & 16 (N.D.N.Y.2006)). Generally, "knee injuries have been [held] insufficient to trigger Eighth Amendment protection". *Johnson v. Wright,* 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered in a basketball injury was not a serious medical need) (quoting *Moody v. Pickles,* 2006 WL 2645124, at *6 (N.D.N.Y.2006)) (holding that a "medial meniscal tear, with joint effusion" which did not render the plaintiff immobile was not a serious

medical need); *see also Williamson,* 2006 WL 1977438, at *9–16 (knee injuries such as a torn meniscus, arthritis, degenerative joint disease and ligament tears are not serious injuries under the Eighth Amendment).

 *12 In this matter, plaintiff alleges that he suffers from severe pain and torn ligaments in his knee. Plaintiff's claim that he suffers from an ACL tear is supported by Dr. Friedman's diagnosis. However, in *Guarneri I,* Magistrate Judge Homer concluded that, "the allegations of pain and chronic ACL tear do not constitute a serious medical need in these circumstances". The record in *Guarneri I* included medical records from 2004 through 2005. In the instant action, plaintiff has not produced any additional evidence demonstrating that he suffers from a serious medical condition with respect to his knee. Plaintiff never exhibited any limitations in his range of motion and never complained of an inability to ambulate. Indeed, plaintiff continued to played basketball even after he was advised, on more than one occasion, by medical staff to avoid outdoor recreation. *See Price v. Engert,* 589 F.Supp.2d 240, 245–46 (W.D.N.Y.2008) (citing *Chatin v. Artuz,* 28 F.App'x. 9, 10 (2d Cir.2001)) (two weeks after receiving alleged injuries, the plaintiff was able to play basketball, suggesting that he was not in serious pain and that his injuries did not interfere with his daily activities); *see also Lowman,* 2008 WL 4104554, at *5 (the fact that the plaintiff was able to walk and play basketball suggested that the plaintiff did not suffer from a serious medical need). Plaintiff's claim that he suffered from "severe pain" as a result of his knee injury is contradicted by the medical records wherein plaintiff exhibited a "normal gait" and "no swelling or difficulty walking".

On July 21, 2006, the "give-way" episode occurred in plaintiff's cell. Plaintiff was evaluated by a nurse practitioner who noted that plaintiff ambulated without a limp and found minimal swelling in the knee with tenderness upon palpation. Plaintiff testified that he was in severe pain prior to being treated in the emergency room but that after he received an injection of pain medication, he was "feeling no pain". Indeed, within an hour or two of his return to SCJ, plaintiff had a physical altercation with Correction Officers and kicked "multiple sealed doors off the hinges". Thus, even assuming plaintiff suffered extreme pain after the "give way" episode, such a short period of pain is de minimis and does not constitute a serious medical condition under the Eighth Amendment. The medical evidence pertaining to plaintiff's knee injury/complaints fails to establish that plaintiff suffered from a serious or urgent medical condition. Plaintiff failed

to provide any medical evidence, either with affidavits or medical records, that defendants' failure to provide treatment caused serious harm.

### 2. Deliberate Indifference

Even assuming plaintiff had a "serious medical need", plaintiff cannot establish that defendants were deliberately indifferent. This court has carefully outlined the extensive attention that plaintiff received for his complaints. From January 2004 until August 2006, plaintiff was examined and/ or treated by the medical staff at SCJ or outside medical personnel approximately thirty times. In addition, after plaintiff made a request for a knee brace, Dr. Weitz arranged for an orthopedic consultation with Dr. Friedman. During the relevant time period, plaintiff had three appointments with Dr. Friedman-including an appointment three days after the "give way" episode. Plaintiff's complaints were never ignored, and in most instances, plaintiff only waited a few days to see medical personnel.

 *13 Plaintiff's complaints of deliberate indifference are also contradicted by the fact that he received several prescription medications including Bextra, Flexeril and Motrin for knee pain. According to the record, plaintiff was non-compliant and refused to take the medications claiming that they "masked his symptoms". Plaintiff's history of refusing to comply with the directions of the medical staff and physicians undermines his claims of deliberate indifference. *See Wright v. Genovese,* 2010 WL 890962, at *15 (N.D.N.Y.2010) (citing *Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986)). In addition to medication, during his incarceration in 2004, the medical staff also offered plaintiff support for his knee including a neoprene brace. Plaintiff refused to wear the brace. Upon his arrival at SCJ in June 2006, plaintiff presented with an "old knee brace" and was provided with a new knee brace on the same day.

Plaintiff claims that his requests for physical therapy and injections were intentionally denied. Based upon the record, the medical staff deemed the requests "not medically necessary" as plaintiff did not exhibit objective signs of a serious injury. The fact that plaintiff disagreed with the course of treatment does not rise to a level of deliberate indifference and provides no basis for relief under § 1983.

Even crediting plaintiff's claim that he waited five hours for medical care after the "give way" episode, the timing of these events does not establish a disregard of a risk to plaintiff or "deliberate indifference" to his medical needs. *Shankle v.*

*Androne,* 2009 WL 3111761, at *6 (E.D.N.Y.2009) (citations omitted). Although the record contains conflicting accounts with regard to how quickly the medical staff responded to plaintiff's needs, by his own admission, plaintiff was treated within five hours of the incident. Courts have held that delays longer than five hours were insufficient to implicate the Eighth Amendments. *See Rodriguez v. Mercado,* 2002 WL 1997885, at *9 (S.D.N.Y.2002) (the plaintiff was seen within eight or nine hours of the incident; *see also Davidson v. Harris,* 960 F.Supp. 644, 648 (W.D.N.Y.1997) (holding that even assuming that the plaintiff's factual allegations were true and that he was forced to wait six to eight hours before receiving oxygen and pain medication, the plaintiff has failed to demonstrate that the alleged deprivation was "a condition of urgency, one that may produce death, degeneration or extreme pain", and therefore, failed to state a cause of action of deliberate indifference to serious medical needs).

Plaintiff's conclusory assertions that he received improper medical attention, absent other documentation, fails to constitute evidence sufficient to raise issues of fact to defeat summary judgment. *See Williams v. Coughlin,* 650 F.Supp. 955, 957 (S.D.N.Y.1997) (granting summary judgment where "plaintiff's affidavit and deposition ... [did] not contain facts involving manifestations of ... deliberate indifference ..."). Indeed, plaintiff's complaints are contradicted by the record which establishes that plaintiff received more than adequate medical care for his knee complaints.

**\*14** Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claims that defendants violated his Eighth Amendment rights with regard to his knee injury is granted.

### B. Knee Brace [23]

[23] This Court previously granted Weitz's motion to dismiss plaintiff's claim with regard to the confiscation of the knee brace due to lack of personal involvement. (Dkt.Nos.54, 55).

Defendants argue that they did not interfere with plaintiff's medical treatment when they confiscated the knee brace provided to plaintiff by SCJ.

Where a "prisoner is receiving appropriate on-going treatment for his condition" and brings a claim for denial of adequate medical care for an "interruption in treatment," the Second Circuit has stated that the "serious medical need inquiry can properly take into account the severity of the

temporary deprivation alleged by the prisoner." *Smith,* 316 F.3d at 186. Plaintiff must submit some evidence that a defendant interfered with his prescribed course of treatment and caused plaintiff to suffer pain. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 270 (W.D.N.Y.1998) (holding that the plaintiff submitted evidence that the defendant's repeatedly took his cane from him on a number of occasions thereby creating an issue of fact as to whether the defendant acted with wantonness); *see also Williamson,* 2006 WL 1977438, at *18 (finding that the defendants refusal to renew the plaintiff's permit for crutches did not threaten to produce death, degeneration or extreme pain). A single, isolated occurrence, might not support an Eighth Amendment claim. *Id.*

This portion of plaintiff's claim belies his argument that defendants were deliberately indifferent to his knee condition. Plaintiff concedes that defendants provided him with a hinged knee brace after the "give way" episode in July 2006 and further, that he was permitted to wear the brace until his transfer to ECF in late August 2006. Under these circumstances, the record does not support a finding of deliberate indifference. Plaintiff has not provided evidence of any additional adverse effects or injuries stemming from the time he was forced to return the brace to SCJ to the present. There is no evidence that the deprivation of the hinged knee brace created or had the potential to create serious harm to plaintiff. Moreover, plaintiff has failed to establish that defendants "maliciously took away" his brace. *Cf. Hemmings v. Gorczyk,* 134 F.3d 104, 107 (2d Cir.1998). According to Mace's affidavit, he confiscated the knee brace upon plaintiff's transfer at the request of Lt. Hazzard. Plaintiff has failed to establish that Mace acted out of anything other than a reasonable belief that the brace was "SCJ property". Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's complaint with regard to the confiscation of the knee brace is granted.

### C. Back Injury

Defendants allege that plaintiff's activities and refusal to take medication or adhere to the recommended course of treatment by his physicians demonstrates that he did not suffer from a serious medical need with regard to his back. Defendants also claim that they were not deliberately indifferent to his medical needs as plaintiff was prescribed pain medication and muscle relaxants. Plaintiff alleges that defendants: (1) should have provided him with a back brace: (2) refused to provide emergency medical care for plaintiff's back injuries in 2000

and 2003 [24]; and (3) defendants refused to allow him to obtain treatment with a neurosurgeon [25].

[24]    This Court previously determined that any allegations from 2000 were barred by the applicable statute of imitations.

[25]    The allegations with regard to the neurosurgeon are not contained in the Second Amended Complaint. Rather, plaintiff raised the issue for the first time in his opposition to defendants' motions.

**\*15** The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Williams v. Smith,* 2009 WL 2431948, at \*8 (S.D.N.Y.2009) (although the plaintiff may have difficulty meeting the seriousness issue at trial, all inferences must be drawn in his favor at the summary judgment stage). As this Court stated in the prior Memorandum–Decision and Order:

> Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* 2002 WL 31075804, at \*14 (S.D.N.Y.2002) (citations omitted); *see also Farraday v. Lantz,* 2005 WL 3465846, at \*5 (D.Conn.2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need).

(*See* Dkt. No. 55).

Back pain does not constitute a serious medical need where despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications." *Jackson v. Fairchild,* 2007 U.S. Dist. LEXIS 17497, at \*5–9, 2007 WL 778133 (N.D.N.Y.2007).

Based upon the record, there is an issue of fact with respect to whether plaintiff suffered from a serious back injury. Dr. Weitz noted that plaintiff complained of back pain "since his arrival to jail". Plaintiff continued to complain of back pain throughout 2004 and underwent x-rays in June 2004 which revealed mild degenerative changes in the lower spine. Conversely, the record indicates that plaintiff was prescribed Tylenol, Bextra and Flexeril for his pain but that he was not

compliant with his medication and disobeyed doctor's orders by playing basketball.

Even assuming plaintiff suffered from a serious medical need, plaintiff has not submitted competent evidence demonstrating that defendants were deliberately indifferent and disregarded his health or safety. As noted previously, plaintiff's request for medical treatment were routinely granted and in most cases, within 2 days of such requests. Plaintiff was evaluated by an orthopedic specialist, was prescribed several medications for his back pain and underwent x-rays of his back at an outside facility at Dr. Weitz's request. Accordingly, plaintiff cannot establish that defendants were deliberately indifferent to his medical needs.

Plaintiff alleges that defendants ignored his requests for a back brace and refused to allow him to consult with a neurosurgeon based upon non-medical concerns. Upon a review of the record, it is clear that plaintiff's requests were denied due to plaintiff's refusal to adhere to the medical staff's prescribed course of action and his unwillingness to accept medication for his complaints of pain. The record establishes that defendants were responsive to plaintiff's request but did not provide plaintiff with the specific treatment he requested. Plaintiff was provided with muscle relaxants and other prescription medication. Plaintiff clearly disagreed with defendants course of treatment. However a disagreement, without further evidence, is insufficient to sustain a cause of action for violations of plaintiff's Eighth Amendment right. Plaintiff was treated by a number of different medical professionals who are afforded wide discretion in their treatment of prisoners. *See Aquino v. Kooi,* 2007 WL 201169, at \*4 (N.D.N.Y.2007).

**\*16** Finally, plaintiff claims that defendants' deliberately refused to provide "emergency care" in 2003 after a slip and fall in the shower area and assault by another inmate at the SCJ. [26] As a result of the incident(s), plaintiff claims that he sustained herniated discs in his neck and lower back. Plaintiff has not provided any competent, admissible evidence to support that allegation. Indeed, the record does not contain any evidence or medical records relating to any of plaintiff's medical treatment in 2003 either within or outside of SCJ. The record is also devoid of any medical requests for treatment or any other complaints by plaintiff of pain in his neck.

[26]    From a review of the complaint, the Court is unable to determine which event occurred in 2000 and which occurred in 2003. The Court has already

determined that plaintiff's claims with respect to any injury in 2000 are precluded by the statute of limitations.

Dr. Weitz argues that he is entitled summary judgment and dismissal of plaintiff's claims relating to the denial of "emergency care" 2003 because he did not begin treating plaintiff until January 2004. The record establishes that Dr. Weitz did not treat plaintiff until January 2004 and plaintiff does not dispute this contention. Accordingly, summary judgment and dismissal of this cause of action as against Dr. Weitz is appropriate on this basis as well. [27]

[27]     The Court has determined that Weitz was not personally involved in plaintiff's complaints of inadequate emergency care in 2003. Thus, the Court declines to engage in an analysis of Weitz remaining argument that any cause of action arising from the 2003 injury is barred by the statute of limitations.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's claim that defendants were deliberately indifferent to his medical needs for back and neck injuries is granted.

### D. Mental Health

Defendants argue that plaintiff did not suffer from a serious mental health condition. Further, defendants claim that plaintiff cannot establish that they were deliberately indifferent to his medical needs as defendant responded to plaintiff's requests for mental health treatment and plaintiff never filed any grievance with respect to the issue. Plaintiff claims that he suffers from mental illness and that the, "psychiatric care he received can be such a substantial deviation from accepted standard as to constitute deliberate indifference". Plaintiff claims he was denied supportive therapy and follow up interviews with mental health providers.

The denial of mental health care may constitute a violation of the Eighth Amendment if plaintiff alleges "pain, discomfort or risk to health". *Mills,* 2009 WL 2606240, at * 16 (citation omitted). Support for the claim of mental illness may be presented in the form of "medical evidence, such as a physician's diagnosis." *Selah v. N.Y.S. Docs Com'r.* 2006 WL 2051402, at *5 (S.D.N.Y.2006) (citing *Aswegan v. Henry,* 49 F.3d 461, 464 (8th Cir.1995)). Plaintiff must provide evidence that a condition is of urgency. *See Beckford v. Portuondo,*

151 F.Supp.2d 204, 218 (N.D.N.Y.2001) (holding that even if the plaintiff's mental health care was "far from optimum", he was provided significant psychotropic medication, bi-weekly individual therapy sessions, and monthly medical reviews while incarcerated). Disagreements with the treatment offered or allegations that he should have received more time with a psychiatrist do not constitute deliberate indifference. *Id.* Moreover, plaintiff cannot establish a "serious medical need" when he is offered but refuses medication that may alleviate his mental anguish. *Sims v. Daley,* 1997 WL 33608, at *5 (S.D.N.Y.1997).

**\*17**  In this case, plaintiff alleges that he suffers from post-traumatic stress disorder, severe depression, anti-social disorder and bipolar disorder. Plaintiff presents conclusory allegations and fails to submit medical records or an affidavit from any physician or mental health provider to support his assertions. In fact, plaintiff's allegations are wholly inconsistent with the record. Dr. Becker opined that plaintiff did not suffer from PTSD. Moreover, according to the record, the mental health staff at SCJ and Schoharie Mental Health Clinic continually noted that plaintiff was not a risk to others, not a suicide risk and did not display homicidal ideation.

Even assuming plaintiff could establish that his mental health condition was serious, plaintiff cannot establish that defendants were deliberately indifferent to his condition. When plaintiff began complaining of mental health issues, Dr. Weitz contacted Schoharie Mental Health Clinic and consulted with Kelly Farnum and arranged for an evaluation by Dr. Becker. The record demonstrates that each time plaintiff requested a mental health evaluation, he was seen and treated within days of the request. *See Mills* 2009 WL 2606240, at * 17 (holding that the record demonstrated that the plaintiff received adequate care for his mental health condition while incarcerated as the plaintiff was seen by the prison's mental health staff each time he requested). In 2004, Dr. Weitz and Dr. Becker prescribed Depakote, Welbutrin and Prozac. Moreover, within a few days of arriving at SCJ in June 2006, plaintiff received a prescription for Prozac from SCJ's medical staff. Based upon the record, plaintiff cannot establish that defendants were deliberately indifferent to his mental health needs and therefore, defendants' motions for summary judgment and dismissal of plaintiff's Eighth Amendment claims with respect to his mental health is granted.

### IV. Plaintiff's Request for a Catholic Priest [28]

28      This cause of action has not been asserted against Weitz.

Plaintiff has alleged causes of action under the Religious Freedom Restoration Act ("RFRA") and the First Amendment. [29] Plaintiff claims that defendants "tried to pass off Rev. Ferenczy as a Catholic Priest" and thus, committed fraud. Defendants claim that plaintiff was not inhibited from practicing any sincerely held religious belief.

29      Plaintiff asserted a cause of action pursuant to the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. ("RFRA"). The RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). *See Hamilton v. Smith,* 2009 WL 3199531, at *1 (N.D.N.Y.2009) (citation omitted). Therefore, the Court construes plaintiff's RFRA claim as a RLUIPA cause of action.

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") (42 U.S.C. § 2000cc–1), imposes duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009) (citation omitted). Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion. *Redd v. Wright,* 2010 WL 774304, at *3 (2d Cir.2010). "The state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id.*

**\*18** Under the First Amendment, "a generally applicable policy will not violate a plaintiff's right to free exercise of religion if the policy is 'reasonably related to legitimate penological interests' ". *Id.* (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). To succeed on a claim under the First Amendment, the plaintiff must prove that defendants conduct substantially burdened his sincerely held religious beliefs. *Pugh v. Goord,* 571 F.Supp .2d 477, 497 (S.D.N.Y.2008). The defendant must then establish that legitimate penological interests justify the impinging conduct. *Id* .

In order to be considered a "substantial burden", the plaintiff must demonstrate that the government's action pressured him to commit an act forbidden by his religion or prevented him from engaging in conduct or having a religious experience mandated by his faith. *Muhammed v. City of New York*

*Dep't of Corrections,* 904 F.Supp. 161, 188 (S.D.N.Y.2005) (citations omitted). The burden must be more than an inconvenience, it must be substantially interfere with a tenet or belief that is central to the religious doctrine. *Id.* (citations omitted); *see also Jones v. Shabazz,* 2009 WL 3682569, at *2 (5th Cir.2009) (holding that a government action or regulation only creates a "substantial burden" on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs). If the plaintiff demonstrates a substantial burden, the onus shifts to the government to prove that an action or policy is the least restrictive means of furthering a compelling state interest. *See Pugh,* 571 F.Supp.2d at 503. A court must consider whether there is a compelling government reason, advanced in the least restrictive means, to apply the prison regulation to the individual claimant. *Kikumura v. Hurley,* 242 F.3d 950, 962 (10th Cir.2001). Prison security and penological institutional safety goals are unquestionably compelling state interests. *Muhammed,* 904 F.Supp. at 189. Moreover, in enacting RLUIPA, Congress "anticipated that courts would apply the Act's standard with due deference to the experience ... of prison [ ] administrators in establishing necessary regulations ... to maintain security and discipline ..." *Jova,* 582 F.3d at 415 (citing *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)).

While an inmate has a constitutional right to practice his religion, the prison staff "is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice". *Davidson v. Davis,* 1995 WL 60732, at *5–6 (S.D.N.Y.1995) (citing 42 U.S.C. § 2000bb–1(b)); *see also Reimers v. Oregon,* 863 F.2d 630, 632 (9th Cir.1988) (an inmate does not have the right under the Free Exercise Clause to have the particular clergyman of his choice provided to him). The Constitution does not require that a religious advisor be provided for every sect in a penitentiary. *Weir v. Nix,* 114 F.3d 817, 820–821 (8th Cir.1997) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)) (prison officials need not provide exactly the same religious facilities or personnel to prisoners of every faith). A plaintiff cannot demonstrate that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for coordinating visits with spiritual advisors. *See Pogue v. Woodford,* 2009 WL 2777768, at *8 (E.D.Cal.2009) ("[i]f the rule were to the contrary, prisons would have to fund any other religion facilitating request without which an inmate could claim a substantial burden") (citations omitted). Only when a prisoner's sole opportunity

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 107 of 174
Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)
2010 WL 1064330

for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are substantially burdened in this manner. *Id.* (citing *SapaNajin v. Gunter,* 857 F.2d 463, 464 (8th Cir.1988)).

 **\*19**  In the case at hand, defendants do not dispute that plaintiff had sincerely-held religious beliefs. Accordingly, the Court analyzes whether defendants' conduct created a substantial burden upon those beliefs. Plaintiff makes the conclusory allegation that defendants attempted to perpetrate a fraud by "passing Rev. Ferenczy off as a Catholic". However, plaintiff has provided no factual basis for these assertions. Plaintiff testified that SCJ provided him with a Bible and rosary beads, upon request. Further, plaintiff admits that he had access to the facility Chaplain, Rev. Ferenczy and testified that he actually met with the Reverend on at least one occasion. As part of the motion herein, Sgt. Newman provided a copy of the SCJ's Inmate Rules and Regulations which were in effect during plaintiff's incarceration. The Rules provided, *inter alia,* "[y]ou may request religious assistance. Every effort will be made to assist you with your request, starting with the Facility Chaplain". The Rules and Regulations clearly stated that the facility would make "every effort" to honor requests for religious assistance. Moreover, according to the Regulations, SCJ allowed outside clergy to visit. Defendants have provided evidence that the SCJ staff attempted to locate a Catholic priest to meet with plaintiff. Plaintiff has not submitted any evidence demonstrating that defendants' failure to provide a Catholic priest pressured him to commit an act forbidden by his faith. Plaintiff has not demonstrated that he was "prevented" from meeting with a spiritual advisor of his choice. Rather, plaintiff argues, without legal or factual support that defendants are obligated to provide him with such an advisor. Plaintiff's argument lacks merit. Defendants' failure to comply with plaintiff's request does not amount to either a constitutional or statutory violation. Based upon the record, plaintiff 's free exercise of religion was not substantially burdened by defendants' failure to provide him with a Catholic priest.

Even if plaintiff could establish that his rights were substantially burdened, plaintiff's claim would nonetheless fail because defendants actions were the least restrictive means in furtherance of a compelling interest. Construing plaintiff's complaints in a favorable light, plaintiff seemingly argues that he was denied visits with personal spiritual advisors. Plaintiff claims that SCJ personnel told him that Henry Eckerd, a Jehovah's Witness, would not come to

see him. Plaintiff also claims that he asked to be allowed to see his godfather, a Catholic priest, but that he wasn't allowed to have visitors. Plaintiff cannot prevail on this claim for two reasons. First, according to the SCJ Inmate Rules and Regulations, "[m]eetings with attorneys, counselors and clergy are not charged as visits". Plaintiff has not submitted evidence proving that he contacted his godfather and that defendants explicitly refused to allow visitation. Further, during his deposition, plaintiff admitted that he did not call Mr. Eckerd because he did not want to "run up his phone bill". Second, even assuming plaintiff was denied visits with clergy, based upon the record, defendants' had a compelling interest in revoking plaintiff's visitation privileges. Defendants do not dispute that plaintiff's visitation privileges were revoked. Throughout his deposition, plaintiff admitted that he was prone to violence indicating that he had kicked corrections officers during altercations and that he became, "physical with the staff to see medical". Plaintiff admitted that he, "assault[ed] the staff" to get them to take him to the medical unit. Plaintiff stated that this occurred on two or three occasions. There is no unqualified constitutional right to visitation, which may be regulated in keeping with legitimate penological objectives. *Smith v. Beatty,* 1996 WL 166270, at \*1 (7th Cir.1996) (citing *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984)). Even assuming plaintiff could establish that he was denied the right to visit with clergy, based upon the record, plaintiff's violent outbursts and behavior resulted in the decision to restrict plaintiff's visitation privileges. Clearly, this was the least restrictive means of furthering a compelling governmental interest. Moreover, plaintiff admitted that even before his visitation privileges were revoked, he was not visited by a Catholic priest.

 **\*20**  Based upon the record, plaintiff was not deprived of the right to exercise the religion of his choice. Accordingly, defendants' motion for summary judgment and dismissal of plaintiff's First Amendment claims and RLUIPA claims relating to religion is granted.

## VI. Fourteenth Amendment–Equal Protection [30]

[30]    This cause of action has not been asserted against Weitz.

Plaintiff alleges that, "Lt. Hazzard deliberately and intentionally tried to force a different religion on plaintiff" and denied plaintiff the right to Equal Protection under the Fourteenth Amendment. Defendants contend that there is no

2010 WL 1064330

evidence that plaintiff was treated differently on account of his religious beliefs.

"The equal protection clause directs state actors to treat similarly situated people alike." *Salahuddin v. Perez,* 2006 WL 266574, at \*9 (S.D.N.Y.2006) (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)). To prove an equal protection violation, plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). "[T]he Equal Protection Clause does not require that "every religious sect or group within a prison must have identical facilities or personnel". *Allen v. Toombs,* 827 F.2d 563, 569 (9th Cir.1987) (citing *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). Rather, it entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.' " *Shakur v. Schriro,* 514 F.3d 878, 891 (9th Cir.2008) (quoting *Cruz,* 405 U.S. at 322).

Plaintiff has failed to produce any evidence that defendants intentionally or purposefully discriminated against him on the basis of his faith. Plaintiff has not provided any evidence of bias, discriminatory remarks or evidence of comparable situations where fellow inmates were treated differently. Plaintiff's conclusory assertions that defendants committed "fraud" by attempting to "pass off" Rev. Ferenczy as Catholic are unsupported by facts or the record. Based upon the record, the Court finds that plaintiff has been provided with "reasonable opportunities" to practice his faith and therefore, has not been denied equal protection. *See Card v. Dugger,* 709 F.Supp. 1098, 1109 (M.D.Fla.1988).

## VII. Access to Courts [31]

[31]    This cause of action has not been asserted against Weitz.

Defendants argue that plaintiff was not denied meaningful access to the courts. Specifically, defendants contend that SCJ maintains a law library that complies with New York State's Minimum Standards and Regulations for Management of County Jails and Penitentiaries and provides all required texts. Plaintiff claims that defendants impeded his ability to do legal research and that the SCJ law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system. Further, plaintiff argues that his time in the library was "intentionally and unreasonably limited".

**\*21** Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds,* 430 U.S. at 828; *Bourdon,* 386 F.3d at 92. However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. 343, 351–54, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The government does not have to afford inmates unlimited access to a library. *Bounds,* 430 U.S. at 828; *see also Shell v. Brun,* 585 F.Supp.2d 465, 468 (W.D.N.Y.2008) (holding that a prison law library may not be to an inmate's liking but that does not make it constitutionally inadequate). The plaintiff must prove that the "alleged shortcomings in the library [ ] hindered his efforts to pursue a legal claim". *Davis v. Buffardi,* 2005 WL 1174088, at \*1–2 (N.D.N.Y.2005) (citing *Lewis,* 518 U.S. at 351; *see also Santiago v. James,* 1998 WL 474089, at \*4–5 (S.D.N.Y.1998) (holding that the plaintiff failed to offer specific facts regarding the type of materials requested, who allegedly denied him the materials or when/frequency of these alleged occurrences).

In order to survive a motion for summary judgment, the plaintiff must present evidence showing that: (1) the defendants acted deliberately and maliciously; and (2) that he has suffered actual injury. *Lewis,* 518 U.S. at 351–54. Where it is alleged that access to a law library or necessary materials has been denied, plaintiff must establish that the deprivation proximately causes some prejudice or denial of a legal claim. *Ramsey v. Coughlin,* 1 F.Supp.2d 198, 204–05 (W.D.N.Y.1998) (citing *Lewis,* 518 U.S. at 351).

If the plaintiff cannot articulate any actual injury as a result of purported efforts by the defendants to prevent him from litigating his case, his access claim can not survive scrutiny. *Odom v. Kerns,* 2002 WL 31059341, at \*4 (S.D.N.Y.2002). "The underlying action that the plaintiff alleges being denied access to must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope". *Key v. Fischer,* 2007 WL 2522352, at \*4–5 (S.D.N.Y.2007) (citing *Christopher v.*

Guarnieri v. Hazzard, Not Reported in F.Supp.2d (2010)

2010 WL 1064330

*Harbury,* 536 U.S. 403, 416, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)) (holding that the complaint should state the underlying claim in accordance with Fed.R.Civ.P. 8(a)). A plaintiff must offer specific references to the injury and must demonstrate that he sustained dismissal of or prejudice to a lawsuit because of the lack of law books. *Gill v. Pact Org.,* 1997 WL 539948, at *4–6 (S.D.N.Y.1997). When the plaintiff fails to provide the court with the case number of the habeas petition that was allegedly dismissed due to the defendants' alleged actions, he has failed to demonstrate how he was actually injured or prejudiced by the alleged denial of access to the courts. *Bolton v. King,* 2008 WL 2952769, at *5 (S.D.Miss.2008); *see also Smith v. Henderson,* 2007 WL 142765, at *4 (S.D.Ga.2007) (holding that the plaintiff failed to establish a genuine issue of fact regarding whether he suffered an actual injury as the plaintiff was not specific about his previous case).

**\*22** Based upon the record, plaintiff has failed to show that a reasonable factfinder could conclude that his access to the courts was caused by defendants' deliberate misconduct. Conversely, the record demonstrates that plaintiff was routinely given extended library time and that his requests for addresses, pens, notebooks and a notary were all approved. Plaintiff admittedly has filed a multitude of lawsuits and testified that he filed four lawsuits while incarcerated at SCJ including an Article 78 petition filed on April 7, 2004. *See Hopper v. John Doe Myers Recreational Coach Northwest Detention Center,* 2006 WL 3337388, at *5 (W.D.Wash.2006) (holding that the numerous civil suits, pleadings, and motions the plaintiff was able to successfully bring and vigorously prosecute in District Court, showed that he had sufficient access to the courts while detained).

Even assuming that defendants intentionally denied plaintiff access to the library and legal materials, plaintiff has not submitted evidence that he sustained any actual injury. Specifically, plaintiff testified that he was denied access to Article 78 documents and that he was prevented from filing a writ of habeas corpus. However, when plaintiff was asked about missing deadlines for filing papers due to the inadequacy of the library, plaintiff could not recall the deadline dates. Plaintiff could only state that his "divorce, my visitation and [ ] a couple Article 78s against the defendants" were dismissed based upon the fact that the complaints were insufficiently drafted. Plaintiff failed to provide any details about his Article 78 submissions or habeas petition other than the fact that he made such a petition. *See Waters,* 2009 WL 750217, at *5; *see also Swift v. Tweddell,* 2008 WL 4615053,

at *9 (W.D.N.Y.2008) (holding that the plaintiff failed to identify any judicial proceeding that the plaintiff attempted to pursue that was hindered by the alleged deficiencies of the law library). Plaintiff has failed to offer any evidence establishing that the alleged deficiencies in the SCJ law library impeded his efforts to bring a viable legal claim. Plaintiff has not produced copies of petitions or lawsuits that were allegedly dismissed nor has plaintiff provided case numbers for these alleged submissions. Plaintiff has failed to submit evidence that the dismissal of any cause of action was proximately caused by his alleged denial of access to the courts. Based upon the lack of evidence, plaintiff has not established that his underlying Article 78 filing(s) or habeas petition(s) were nonfrivolous.

Accordingly, defendants' motions for summary judgment and dismissal of plaintiff's cause of action alleging that his First Amendment right to access to the courts was violated is granted.

**VIII. Personal Involvement**

Defendants Cronk, Marsh, Grippin, Howland and Mace move for summary judgment arguing that they were not personally involved in the alleged constitutional violations.

**\*23** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a cause of action under 42 U. S .C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the

Case 9:19-cv-01203-GTS-TWD Document 57 Filed 12/22/21 Page 110 of 174
Guarneri v. Hazzard, Not Reported in F.Supp.2d (2010)
2010 WL 1064330

rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 973 (2d Cir.1995).

"In order to defeat the portion of [the] defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon [the] plaintiff to present evidence to support an inference that the defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care." *Mendoza v. McGinnis,* 2008 WL 4239760, at *8 (N.D.N.Y.2008) (citations omitted). Personal involvement is generally a question of fact and summary judgment may be granted only where the defendant establishes that no issues of material fact exist such that the defendant is entitled to summary judgment as a matter of law. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (citing Fed .R.Civ.P. 56(c) and cases)).

In the complaint, plaintiff referred only once to Cpl. Cronk claiming that he deliberately denied plaintiff appropriate mental health care by not allowing plaintiff speak to mental health counselors when having mental health episodes. Plaintiff failed to offer any evidence with regard to Cpl. Cronk's alleged involvement in his mental health care or such "episodes". Indeed, plaintiff testified that Cpl. Cronk was "one step of supervision before a sergeant" and that he improperly reacted to plaintiff's mental health crisis. The fact that Cpl. Cronk may have had some supervisory authority is insufficient to create liability under § 1983. Plaintiff has failed to submit any proof demonstrating that Cpl. Cronk was personally involved in any of his alleged constitutional violations. Accordingly, the Court grants Cronk's motion for summary judgment and dismissal of plaintiff's complaint for lack of personal involvement, in addition to the reasons that the Court has previously discussed.

 **\*24** With respect to the remaining defendants, plaintiff has provided sufficient evidence to raise a triable issue of fact with regard to defendants involvement in the alleged constitutional violations. Plaintiff testified that Deputy Howland and Deputy Grippin refused to communicate his medical needs to the medical staff. Defendant Howland failed to submit an affidavit setting forth facts that would be admissible into evidence. *See Davis v. Goode,* 995 F.Supp. 82, 91 (E.D.N.Y.1998) (holding that the defendants failed to carry their burden of presenting affidavits or other evidence to support their claim that no material issues of fact exist as to the personal involvement of these individual defendants).

Thus, Howland has failed to sustain his burden on a motion for summary judgment on this issue.

Defendants Grippin and Mace provided affidavits admitting that they were employed at SCJ at the relevant time. Although Grippin and Mace deny any wrongdoing in the matter, there are triable issues of fact regarding Grippin and Mace's personal involvement in plaintiff's alleged constitutional violations.

Finally, plaintiff alleges that Deputy Paul Marsh denied him adequate emergency medical care after an incident that occurred at SCJ in 2003. On the motion, Marsh provided an affidavit and stated that he was injured on the job on November 7, 2005 and did not return to work. Deputy Marsh does not deny that he was working at SCJ prior to November 2005. Therefore, plaintiff has sufficiently alleged personal involvement as against Deputy Marsh. Thus, the Court denies Marsh's motion for summary judgment on this basis.

## IX. Qualified Immunity

Public officials enjoy qualified immunity from liability under § 1983 "so long as their conduct does not violate a clearly established statutory or constitutional right." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Second Circuit has held that "[a] right is clearly established if: (1) the law is defined with reasonable clarity; (2) the Supreme Court or the Second Circuit has recognized the right; and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004) (quoting *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003)).

In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. "If no constitutional right would have been violated were

the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

**\*25** Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation, defendants are entitled to summary judgment on this ground. *Dorcely v. Wyandanch Union Free Sch. Dist.,* 665 F.Supp.2d 178, 219 (E.D.N.Y.2009) (citing *The Cathedral Church of the Intercessor v. The Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005)) ("[w]ithout an underlying constitutional violation, qualified immunity cannot attach").

## CONCLUSION

To summarize, the Court denies defendant Weitz's motion for summary judgment on the basis of res judicata. Weitz's motion for summary judgment and dismissal of plaintiff's Eighth Amendment claims relating to plaintiff's knee, back and mental health is granted as plaintiff has failed to establish that Weitz was deliberately indifferent to any serious medical need. Moreover, Weitz's motion for summary judgment and dismissal of plaintiff's claim that Weitz deliberately and wilfully denied "emergency care" for plaintiff's back injury in 2003 is granted based upon Weitz's lack of involvement. Accordingly, plaintiff's complaint as against defendant Weitz is dismissed in its entirety and Weitz is awarded summary judgment.

Defendant Cronk's motion for summary judgment and dismissal of plaintiff's Eighth Amendment, First Amendment and Fourteenth Amendment claims based upon lack of personal involvement is granted. [32]

[32]   In the alternative, Cronk's motion for summary judgment is also granted for the reasons discussed in the context of defendants Hazzard, Marsh, Grippin, Howland and Mace's motions for summary judgment.

Defendants Hazzard, Marsh, Grippin, Howland, and Mace motions for summary judgment and dismissal of plaintiff's Eighth Amendment causes of action are granted as plaintiff has failed to establish that defendants were deliberately indifferent to any serious medical need. Defendants motions

for summary judgment and dismissal of plaintiff's First Amendment right to free exercise of religion are granted as plaintiff has failed to establish that defendants prevented him from engaging in religious activities without any reasonably related penological interest. Defendants motions for summary judgment and dismissal of plaintiff's Fourteenth Amendment Equal Protection cause of action is granted as plaintiff has failed to submit evidence that defendants intentionally discriminated against plaintiff on the basis of his faith. Defendants motions for summary judgment and dismissal of plaintiff's First Amendment access to courts cause of action is granted as plaintiff has failed to demonstrate that defendants intentionally deprived him of access to courts and further, that he sustained an actual injury as a result of such denial.

In the alternative, all defendants are entitled to summary judgment and dismissal of plaintiff's complaint, in its entirety, based upon qualified immunity.

**Accordingly, it is hereby**
**ORDERED,** that defendant Weitz's motion for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 70) is **GRANTED,** and it is further;

**ORDERED,** that defendants Hazzard, Marsh, Grippin, Howland, Mace and County of Schoharie's motions for summary judgment and dismissal of plaintiff's complaint (Dkt. No. 71) are **GRANTED,** and it is further;

**\*26 ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order upon the parties by regular or electronic mail, and it is further;

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED,** as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1064330

---

🚩 KeyCite Red Flag - Severe Negative Treatment
Affirmed in Part, Vacated in Part, Remanded by  Brandon v. Kinter,  2nd
Cir.(N.Y.),  September 10, 2019

2016 WL 1638242
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chamma K. BRANDON, Plaintiff,
v.
Dr. Glen SCHROYER, et al., Defendants.

Civil Action No. 9:13-CV-0939 (TJM/DEP)
|
Signed February 26, 2016

**Attorneys and Law Firms**

Chamma K. Brandon, Ossining, NY, pro se.

Kelly M. Monroe, Andrew L. McNamara, Molly C. Casey,
Thuillez, Ford Law Firm, Albany, NY, Bradley J. Stevens,
Lemire, Johnson Law Firm, Malta, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

 **\*1**  This is an action brought by *pro se* plaintiff Chamma K.
Brandon, a prison inmate formerly confined in the Clinton
County Jail ("CCJ"), pursuant to 42 U.S.C. §§ 1983, 1985,
and 1986, against several individuals working at the facility
alleging that they deprived him of his civil rights during his
period of incarceration there. Plaintiff's claims fall into three
groups, complaining of (1) a one-month hiatus in a low-fat,
low-cholesterol ("heart-healthy") diet; (2) the failure to honor
his religious diet by serving him pork products; and (3) the
failure to otherwise accommodate his religious beliefs as a
Muslim. Plaintiff contends that, by their actions, defendants
violated his rights under the First, Eighth, and Fourteenth
Amendments to the United States Constitution, as well as the
Religious Land Use and Institutionalized Persons Act of 2000
("RLUIPA"), 42 U.S.C. § 2000cc.

Now that discovery in the action is complete, all of the
defendants, including Dr. Glen Schroyer, who is separately
represented, have moved for the entry of summary judgment
dismissing plaintiff's claims. For the reasons set forth below, I

recommend that the motions be granted in part but otherwise
denied.

*I. BACKGROUND*

Plaintiff was confined in the CCJ beginning on January 14,
2012, and again following his re-arrest on March 2, 2012,
until December 28, 2012, when he was transferred into the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"). *Dkt. No. 17 at 3,*
12–, 3. Upon his entry into the CCJ for the first time in
January 2012, Brandon was five-feet, eleven-inches in height,
weighed 250 pounds, and was considered clinically obese. [1]
*Dkt. No. 77–6 at 2; Dkt. No. 77–10 at 4.* Plaintiff alleges
that, while he was incarcerated at the CCJ, the defendants
(1) deprived him of constitutionally adequate medical care
by removing him from a heart-healthy diet for one month;
(2) deprived him of his rights under the First Amendment
and RLUIPA to freely exercise his Muslim religion by (a)
repeatedly providing him with meals that contained pork
products, (b) denying him the opportunity to participate in
Ramadan, and (c) denying him access to worship space
and congregate religious services; and (3) retaliated against
him by denying him adequate medical care and depriving
him of his right to freely exercise his religion in response
to grievances and complaints he filed against them during
his incarceration at the CCJ. [2] *See generally Dkt. No. 17.*
Additionally, plaintiff's amended complaint asserts a failure-
to-protect claim against defendants Clancy and Blaise, a
corrections sergeant and a corrections officer, respectively, at
the CCJ. *Id.*

[1]     In his amended complaint, plaintiff alleges that
        he weighed 275 pounds upon his initial entry
        into the CCJ, and 225 pounds upon his transfer
        into the custody of the DOCCS. *Dkt. No. 17 at*
        *11.* In a memorandum submitted in opposition
        to defendants' motions, however, plaintiff claims to
        have lost "about 175 lbs to 130 lbs" while confined
        in the CCJ due to the deprivation of meals. *Dkt. No.*
        *93–2 at 62.*

[2]     A more precise description of the claims asserted
        against the defendants is included below in Part II.
        of this report.

  A. *Plaintiff's Diet*
 **\*2**  When he first arrived at the CCJ, Brandon reported that
he was allergic to shellfish. *Dkt. No. 17 at 4; Dkt. No. 75–6 at*

2. A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen.[3] *See Dkt. No. 17 at 47; Dkt. No. 75–1 at 37.* In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." *Dkt. No. 17 at 48; Dkt. No. 75–1 at 38.*

[3]     The order was later reiterated on July 5, 2012. *Dkt. No. 17 at 50; Dkt. No. 75–1* at 40.

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. *Dkt. No. 17 at 4–5,* 49; *Dkt. No. 75–1 at 39; Dkt. No. 75–6 at 2.* Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, after a review of plaintiff's commissary purchases, which were being monitored by medical staff, revealed the purchase of many items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol.[4] *Dkt. No. 17 at 8–9,* 52; *Dkt. No. 75–1 at 41; Dkt. No. 75–6 at 3.* For example, the record reveals that, during the relevant period, plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. *Dkt. No. 75–1 at 60–62.* Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

[4]     In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. *Dkt. No. 75–6 at 3.* This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. *Dkt. No. 83 at 3–4.* Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

*Interrogatory No. 15:*
Did Dr. Schroyer or anyone else within the Medical–Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?
*Answer to Interrogatory No. 15:*

The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such noncompliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.
*Dkt. No. 83–3 at 25.* While this presents a disputed question of fact, as will be discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate medical indifference claims against defendant Schroyer.

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. *Dkt. No. 17 at 10,* 53, 188; *Dkt. No. 75–1 at 42.* Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. *Dkt. No. 17 at 10.*

**\*3** In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. *Dkt. No. 17 at 12–13; Dkt. No. 83 at 6.* According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. *Dkt. No. 17 at 17–18,* 20–22. Plaintiff alleges that between the time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his religious beliefs. *Dkt. No. 17 at 13,* 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions.[5] *Id.* at 13.

[5]     Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. *Dkt. No. 17 at 13.* Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at *Dkt. No. 83–3 at 2* and *Dkt. No. 93–4 at 68,* and again, half of the document cannot be deciphered.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served

2016 WL 1638242

pork. *Dkt. No. 17 at 13*, 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse [6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for *pork* medical does not do religious diets." *Id.* at 67 (emphasis in original).

[6]   Plaintiff alleges that defendant Kinter authored the response to this sick-call request. *Dkt. No. 17 at 14.* It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. *Dkt. No. 93– 4 at 82–82.* The next two instances occurred on October 9 and 10, 2012. *Id.* at 94–99. On October 17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. *Dkt. No. 17 at 18; Dkt. No. 93–4 at 116–17.* Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." *Dkt. No. 17 at 20.* Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not included within his submissions. *Dkt. No. 17 at 21.* The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. *Dkt. No. 17 at 22; Dkt. No. 93–4 at 16465.*

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. *Dkt. No. 7714 at 2.* Although plaintiff disputes this, *Dkt. No. 17 at 12; Dkt. No. 83 at 6*, his initial booking intake record does not reflect any religious designation. [7] *Dkt. No. 77–6 at 2.* There is no dispute, however, that when plaintiff was rebooked on March 2, 2012, he stated that he was a Muslim, and this is reflected on his booking sheet. [8] *Dkt. No. 17 at 210; Dkt. No. 83–3 at 36.*

[7]   The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

[8]   Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary: Muslim Diet." *Dkt. No. 17 at 210.*

**\*4** Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." *Dkt. No. 77–14 at 2.* Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. *Dkt. No. 77–14 at 3.* In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION," reflecting that plaintiff, as a Muslim, was not to receive pork or pork products. *Dkt. No. 77–3 at 7.* Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's handwriting. *Dkt. No. 17 at 51; Dkt. No. 83–3 at 42.* Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified ... by removing the date written on the notification[.]" [9] *Dkt. No. 93–3 at 11.*

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff was notified of plaintiff's religious dietary restrictions. *See, e.g., Dkt. No. 77–5 at 21* (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet ... and that you are Muslim"); *Dkt. No. 93–4 at 81* (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen ... did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 115 of 174

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate Brandon was not marked in the kitchen as Muslim diet. That was corrected 10/5/12").

9    Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." *Dkt. No. 95–3 at 6.* While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012.[10] *Dkt. No. 17 at 18,* 20, 21, 22; *Dkt. No. 93–4 at 9499,* 116–17, 164–65.

10    Defendants contest whether some of those meals included pork or pork products. *See, e.g., Dkt. No. 77–19 at 9.*

B. *Other Religious Accommodation*

Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19, 2012. *Dkt. No. 17 at 14–15,* 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few

Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15–16.

C. *Assault by a Fellow Inmate*

**\*5** On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. *Dkt. No. 17 at 31.* Defendant Clancy apparently could be heard by plaintiff to say, " '[L]ets [sic] see if he tries that shit on Brandon!' " *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, " '[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.' " *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant Blaise responded by laughing at plaintiff. *Id.*

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| Defendant | Position |
| --- | --- |
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |
| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 116 of 174

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

| | |
|---|---|
| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |
| County of Clinton. [11] | |

[11]  Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. *Dkt. No. 16.*

For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
|---|---|
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
|---|---|
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |
| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

**\*6** On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. *Dkt. No. 75.* On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. *Dkt. No. 77.* The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Defendant Schroyer's Motion*

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the First and Eighth Amendments.

### 1. *Deliberate Medical Indifference*

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain[.]" (*Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 844; *see also Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.; see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of

the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. *Dkt. No. 17 at 25–26,* 62, 63; *Dkt. No. 83 at 5.* According to defendant Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." *Dkt. No. 75–6 at 4.* The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. *Dkt. No. 17 at 36; Dkt. No. 83 at 5.* While plaintiff's high cholesterol may constitute a serious medical need – an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions. *Dkt. No. 75–6 at 4.* Although the parties dispute whether plaintiff was warned ahead of time that his commissary purchases could result in his removal from the diet, *compare Dkt. No. 17 at 27 with Dkt. No. 75–6 at 3,* there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. *Dkt. No. 17 at 25–27.* Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

### 2. *Free Exercise*

**\*9** In addition to claiming deliberate medical indifference, plaintiff contends that defendant Schroyer is responsible for denying him an appropriate religious diet, and specifically, one that conformed to his Muslim faith and did not include pork or pork products. [12] Undeniably, plaintiff was entitled to receive a diet that was consistent with his sincerely held religious beliefs. *See, e.g., Johnson v. Guiffere,* No. 04–CV–0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007)* (Hurd, J., *adopting report and recommendation by* Peebles, M.J.). [13] The record, however, demonstrates that at the CCJ, accommodating diet restrictions in accordance with an inmate's religious beliefs is the responsibility of security staff, rather than medical personnel. *See, e.g., Dkt. No. 75–6 at 2; see also Dkt. No. 75–1 at 44,* 50. To counter this, and in an attempt to implicate defendant Schroyer, plaintiff offers only his speculation based upon the fact that, at one point, in response to a sick-call complaint by plaintiff that he was being served pork, defendant Kinter, a nurse at the facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. *Dkt. No. 83 at 3; Dkt. No. 83–3 at 11.* Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

[12]     Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 120 of 174

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

have not analyzed that claim in the context of defendant Schroyer's motion.

13    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 3. *Retaliation*

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

### 4. *Conspiracy*

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden,* 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

### C. *County Defendants' Motion*

### 1. *RLUIPA* [14]

14    While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g., Dkt. No. 17 at 16,* 36–42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013), I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. *Dkt. No. 17 at 42–44.* It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir. 2014). While plaintiff could ordinarily pursue a claim for injunctive and declaratory relief under the RLUIPA against defendants in their official capacities, *Williams v. Fisher,* No. 11–CV–0379, 2015 WL 1137644, at *17 (N.D.N.Y. Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.), such claims are now moot based upon plaintiff's transfer out of the CCJ. *See Shepherd v. Goord,* 662 F.3d 603, 610 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Accordingly, I recommend that plaintiff's RLUIPA claim asserted against the county defendants be dismissed.

### 2. *Conspiracy*

**\*10** Plaintiff alleges that there was a "meeting of the minds" among some of the defendants to deprive him of his civil rights. *See, e.g., Dkt. No. 17 at 25,* 27–29. Specifically, he contends that defendant Laurin evaluated plaintiff's commissary purchases on or about October 15, 2012, and decided that plaintiff's purchases were inconsistent with his heart-healthy diet. *See Dkt. No. 17 at 24* ("Said conspiracy was initiated on October 15, 2012, as Laurin made a medical assessment stating my commissary buys is a form of non-compliance to my special diet."). Defendant Laurin thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect.... Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously issued diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clansy furthered the

2016 WL 1638242

conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer.[15] *Id.*

[15]   To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g, Dkt. No. 17 at 31,* I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason

aside from plaintiff's commissary purchases. *Dkt. No. 7710 at 3–4.* According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. *Dkt. No. 77–4 at 2–5.* Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." *Dkt. No. 77–11 at 4.* Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

**\*11**   With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom she spoke. *Dkt. No. 17 at 28.* Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 122 of 174

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

plaintiff's rights, defendant Clancy immediately provided him with a new meal. *Dkt. No. 775 at 26.*

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. *Dkt. No. 17 at 29.* According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21–22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." [16] *Little v. City of N.Y.,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y. 2007).* Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

[16]   The doctrine is rooted in the Sherman Antitrust Act, 15 U.S.C. § 1, and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y. 2002)

Although plaintiff's amended complaint mentions, in passing, 42 U.S.C. § 1985, there is no record evidence to support a conspiracy claim against the defendants under section 1985(3). To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate

that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. *United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 835 (1983); *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994). "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi,* 18 F.3d at 193. A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1995) (quotation marks omitted).

**\*12**   In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's section 1985(3) cause of action be dismissed on the merits.

### 3. *Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation*

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services; and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,*

Case 9:19-cv-01203-GTS-TWD   Document 57   Filed 12/22/21   Page 123 of 174

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV– 0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007). [17]

17     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir. 2004) (emphasis omitted)).

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. *Dkt. No. 77–14 at 3.* In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. *Id.* At that point the corrections officer must make an attempt to resolve the grievance informally. *Id.* If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. *Id.* In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint Review Council ("CPCRC"). *Id.* If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he

PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

*13   The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of his incarceration at the CCJ. [18] *Dkt. No. 17 at 78–161; Dkt. No. 77–5 at 2–47; Dkt. No. 93–4 at 76170.* None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivates [sic], but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." *Dkt. No. 93–2 at 40.* The grievances to which plaintiff cites in support of this contention, however, do not relate to being deprived access to religious services, the right to participate in Ramadan, or retaliation. *Dkt. No. 93–4 at 167–171.* Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

18     Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g., Dkt. No. 17 at 20.*

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny,

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

2016 WL 1638242

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 124 of 174

the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. *Dkt. No. 93–2 at 40.* There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." *Dkt. No. 17 at 19.* This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threats of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified individual, cannot serve as a basis for finding an inmate excused from the PLRA exhaustion requirement. *See Singh v. Lynch,* 460 Fed.Appx. 45, 4748 (2d Cir. 2012) ("The test for determining the availability of grievance procedures to a prisoner is objective.... Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable.... As for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh ..., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone,* No. 06–CV–0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was " 'afraid of retaliation' " and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because his substantive claim

is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison,* 2007 WL 2789473, at *6.

### 4. *Personal Involvement*

**\*14** Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g., Dkt. No. 77–19 at 24* ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement inquiry on summary

judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

### a. *Defendant Bedard*

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. *Dkt. No. 77–11 at 4.* In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen had on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

### b. *Defendant Blaise*

**\*15** There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time. [19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See Dkt. No. 93–2 at 54* ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

[19] Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff may be assaulted by the inmate. *Dkt. No. 17 at 31–32; see also Dkt. No. 93–2 at 54–56.* Those allegations will be addressed in Part III.C.5.c. of this report.

### c. *Defendant Clancy*

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record confirming that defendant Clancy responded to at least one of plaintiff's complaints regarding whether his meal contained pork. *Dkt. No. 17 at 1819; Dkt. No. 93–4 at 116–17.* As a CCJ Corrections Sergeant, defendant Clancy is considered a supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

### d. *Defendant Perry*

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." *Dkt. No. 17 at 22–23.* Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. *Dkt. No. 93–4 at 164.* Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

### e. *Defendant Web*

**\*16** Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. *Dkt. No. 17 at 21.* In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21–22. Although plaintiff alleges that he field a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; *Dkt. No. 93–4 at 76–171.* In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey." *Dkt. No. 77–16 at 2.* In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

### f. *Defendant Wingler*

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary restrictions. *Dkt. No. 17 at 7; Dkt. No. 93–2 at 58.* The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. *Dkt. No. 93–4 at 92, 139.* Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason, I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

### 5. *Remaining Claims/Defendants*

#### a. *Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler*

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton,* No. 14–CV–2444, 2015 WL 8911463, at \*5 (D.S.C. Nov. 12, 2015) (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim, I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 127 of 174

b. *Plaintiff's Free Exercise Claim (Regarding his Religious Dietary Restrictions) Asserted Against Defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web*

**\*17**  While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to "a diet consistent with [their] religious scruples." *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [20] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

[20]  The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith,* 494 U.S. 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford v. McGinnis,* 352 F.3d 582, 592 (2d Cir. 2003) (quoting *Emp't Div.,* 494 U.S. at 887); *see also Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

In this case, there is evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. *Dkt. No. 17 at 13,* 18, 20, 21, 22, 66, 67; *Dkt. No. 93–4 at 82–85,* 94–99, 116–17, 164–65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See Norwood v. Strada,* 249 Fed.Appx. 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious meals did not substantially burden the plaintiff's free exercise rights); *Washington v. Afify,* 968 F.Supp.2d 532, 538 (W.D.N.Y. 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)
2016 WL 1638242

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 128 of 174

not give rise to a First Amendment claim." (citing cases)); *Evans v. Albany Cnty. Corr. Facility*, No. 05–CV–1400, 2009 WL 1401645, at \*8 (N.Y.N.D. May 14, 2009) (Suddaby, J.) (finding the plaintiff's allegations that he was served eighteen "wrong meals" out of an approximate 354 meals was constitutionally de minimis); *Odom v. Dixion*, No. 04–CV–0889, 2008 WL 466255, at \*11 (W.D.N.Y. Feb. 15, 2008) (finding the plaintiff's allegation that the defendants failed to provide him with kosher meals on five of the fifteen days he was in keeplock confinement did not give rise to a cognizable constitutional violation). Accordingly, I recommend this claim be dismissed as to defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web.

### c. *Plaintiff's Failure–to–Protect Claim Asserted Against Defendants Blaise and Clancy*

**\*18** The county defendants do not seek dismissal of this claim in their summary judgment papers. For that reason, I recommend that the claim survive this motion but that defendants Blaise and Clancy be permitted an opportunity to file a second motion for summary judgment specific to this remaining claim.

### IV. *SUMMARY AND RECOMMENDATION*

A careful review of the evidence currently before the court demonstrates that no reasonable factfinder could conclude that any of the defendants were deliberately indifferent to plaintiff's medical needs, based upon a decision to remove him from his heart-healthy diet for a period of one month. Addressing plaintiff's religious claims, his assertion that his religious rights were violated when prison officials failed to permit him to celebrate Ramadan and to engage in congregational prayer are precluded based upon his failure to exhaust available administrative remedies before filing this action. Similarly, his retaliation claims are also not properly exhausted. Plaintiff's free exercise claim regarding his religious diet is also subject to dismissal in light of the absence of any evidence from which a reasonable factfinder could conclude that his rights were substantially burdened. Because defendant Schroyer did not seek dismissal of the plaintiff's retaliation claim, I recommend that cause of action survive defendant Schroyer's motion but he be permitted to file a second motion for summary judgment addressing it.

Similarly, the county defendants did not address plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and, accordingly, I recommend that claim survive but that those individuals be permitted to file a motion for summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for summary judgment (*Dkt. No. 75*) be GRANTED to the extent it seeks dismissal of plaintiff's claims against him, with the exception of plaintiff's retaliation claim and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment submitted by defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web, and Wingler (*Dkt. No. 77*) be GRANTED to the extent it seeks dismissal of plaintiff's claims asserted against all defendants, with the exception of plaintiff's failure-to-protect claim asserted against defendants Blaise and Clancy and that the motion be DENIED as to that claim; and it is further

RECOMMENDED that defendant Schroyer be permitted to file a second motion for summary judgment addressing the retaliation claim not addressed in his first motion, and that defendants Blaise and Clancy be permitted to file a second motion for summary judgment addressing the failure-to-protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in Fed. Supp., 2016 WL 1638242

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 129 of 174

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1639904

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Vacated in Part, Remanded by  Brandon v. Kinter,  2nd
Cir.(N.Y.),  September 10, 2019

2016 WL 1639904
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chamma K. BRANDON, Plaintiff,
v.
Dr. Glen SCHROYER, et al., Defendants.

9:13-CV-939 (TJM/DEP)
|
Signed 04/25/2016

**Attorneys and Law Firms**

Chamma K. Brandon, Ossining, NY, pro se.

Kelly M. Monroe, Andrew L. McNamara, Molly C. Casey,
Thuillez, Ford Law Firm, Albany, NY, Bradley J. Stevens,
Lemire, Johnson Law Firm, Malta, NY, for Defendants.

**DECISION & ORDER**

Thomas J. McAvoy, United States District Judge

**\*1**  This action, brought pursuant to 42 U.S.C. §§ 1983,
1985 and 19 86, as well as the Religious Land Use
and Institutionalized Persons Act of 2000 ("RLUIPA"),
42 U.S.C. § 2000cc, alleges that Defendants violated the
Plaintiff's rights by denying him access to food appropriate
to his religion and preventing him participating in religious
ceremonies during his incarceration, and by failing to
protect him from an assault by a fellow inmate. The action
was referred to the Hon. David E. Peebles, United States
Magistrate Judge, for a Report-Recommendation pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation, dated February 26, 2016,
recommends that Defendants' motions for summary judgment
be granted in part and denied in part, and that Defendant
Glen Schroyer be permitted to file a supplemental motion for
summary judgment to address Plaintiff's claims of retaliation.
See dkt. # 99. Defendant Schroyer subsequently filed such a
motion. See dkt. # 100.

Plaintiff filed objections to the Report-Recommendation.
When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a "*de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." See 28 U.S.C. § 636(b)(1). After such a review, the
Court may "accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge.
The judge may also receive further evidence or recommit the
matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt the recommendation of
Magistrate Judge Peebles for the reasons stated in the Report-
Recommendation.

It is therefore

**ORDERED** that the Plaintiff's objections to the Report-
Recommendation of Magistrate Judge Peebles, dkt. # 111, are
hereby OVERRULED. The Report-Recommendation, dkt. #
99, is hereby ADOPTED, and:

1. Defendant Schroyer's motion for summary judgment,
   dkt. # 75, is hereby GRANTED in part and DENIED
   in part. The motion is denied with respect to Plaintiff's
   retaliation claims against Plaintiff and GRANTED in all
   other respects;

2. Defendant Schroyer's second motion for summary
   judgment is hereby accepted as filed. The Clerk of Court
   shall refer the motion to Magistrate Judge Peebles for a
   Report and Recommendation; and

3. The motion of summary judgment of Defendants
   Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web and
   Wingler, dkt. # 77, is hereby GRANTED in part and
   DENIED in part. The motion is DENIED with respect
   to Plaintiff's failure-to-protect claim against Defendants
   Blaise and Clancy and GRANTED in all other respects.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1639904

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 130 of 174

2016 WL 1639904

**End of Document**                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,

v.

Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton
Correctional Facility; Michael B. King, Sgt.,
Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

Attorneys and Law Firms

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of New
York, Krista A. Rock, Esq., Assistant Attorney General, of
Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims that
defendants violated his Eighth Amendment rights as a result
of a physical altercation. Defendants moved for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Dkt. No. 46) and plaintiff opposed the motion.
(Dkt. No. 53). The motions were referred to United States
Magistrate Judge Randolph F. Treece for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in
part. Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims
of medical indifference against defendant Fitzgerald; and
(3) plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended denying
defendants' motion for summary judgment on plaintiff's
excessive force claims against defendants Tompkins, LaClair,
Mason, Malark and Reyell and plaintiff's failure to protect
claims against defendants Ludwig and King.

Defendants filed specific objections to portions of the Report
and Recommendation arguing: (1) that the Magistrate Judge
erred in "overlooking" plaintiff's failure to comply with Local
Rule 7.1(a) (3); (2) that the Magistrate Judge erred when he
failed to apply the *Jeffreys* exception as plaintiff's testimony
was incredible as a matter of law; and (3) plaintiff's excessive
force claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff does
not object to the Report and Recommendation. (Dkt. No. 62).

In view of defendants' objections, pursuant to 28 U.S.C.
§ 636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of the
Report–Recommendation for clear error or manifest injustice.
*See Brown v. Peters,* 1997 WL 599355, *\*2–3* (N.D.N.Y.),
*af'd without op.,* 175 F.3d 1007 (2d Cir.1999); *see also*
*Batista v. Walker,* 1995 WL 453299, at \*1 (S.D.N.Y.1995)
(when a party makes no objection to a portion of the report-
recommendation, the Court reviews that portion for clear
error or manifest injustice). Failure to object to any portion of
a report and recommendation waives further judicial review
of the matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89
(2d Cir.1993).

**DISCUSSION**

**I. Local Rule 7.1(a)(3)**
The submissions of *pro se* litigants are to be liberally
construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579,
583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved

2011 WL 1103045

of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). [1]

[1]     Local Rule 7.1(a)(3) provides:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement*

*of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint

as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties. [2]

[2]    While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

 **\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

 While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.

Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

 Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

 A. I think he asked me how am I feeling, how did this happen?

 Q. And what did you say?

 A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

 Q. What did you say?

 A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

 Q. Which was—

 A. —and that I started this.

 Q. And is that the truth?

 A. No.

 Q. Why did you tell the nurse that?

 A. Because I was being forced to.

 Q. Forced to how?

 A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer
   first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me
   for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge
Treece concluded that plaintiff's "fear of retribution" was a
plausible explanation for the discrepancies in his testimony.
This Court agrees and adopts the Magistrate Judge's
conclusions. *See Langman Fabrics v. Graff Californiawear,
Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v.
Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he
Court notes that ... it would be have difficulty concluding
that [the][p]laintiff's statement of June 5, 2005, and his
statement of June 16, 2005, are wholly irreconcilable, given
his proffered explanation that he made the statement of June
5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which
individuals participated in the attack; that plaintiff's injuries
are consistent with the brief use of force as described by
defendants to subdue plaintiff; and that plaintiff's version
is contradicted by defendants' affidavits. Magistrate Judge
Treece found that plaintiff was able to identify some
individuals involved in the assault which, "stands in stark
contrast to the plaintiff in *Jeffreys* who was unable to identify
any of the officers involved in the alleged assault". Upon
review of the record, as it presently exists, the Court agrees
and finds that plaintiff's testimony is not wholly conclusory
or entirely inconsistent to warrant application of the *Jeffreys*
exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7
(S.D.N.Y.2009) (the court rejected the defendants' argument
that the plaintiff's claims were subject to dismissal for
implausibility as his injuries did not reflect the attack that he
described and his description of the incident changed over
time holding that the plaintiff's testimony, "[did] not reach the
level of inconsistency and lack of substantiation that would
permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of
the record and applicable law and found that the evidence
did not support deviating from the established rule that
issues of credibility are not be resolved on summary

judgment. On review, the Court agrees with the Magistrate's
recommendations and concludes that the *Jeffreys* exception
does not apply. Accordingly, the Court accepts and adopts the
Report and Recommendation on this issue.

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he
failed to dismiss the complaint against Reyell on the grounds
that he was not personally involved in the attack. Defendants
claim that the "RRO erroneously cites plaintiff's declaration
as stating that 'it was defendant Reyell and another officer
who removed the shirt' ". Defendants claim that the
declaration and complaint clearly state that, "Officer Rock
orchestrated the removal of plaintiff's shirt" .[3] Defendants
argue that the assertions in plaintiff's declaration (submitted
in response to the motion for summary judgment) and
complaint are contradicted by plaintiff's deposition testimony.
Defendants claim that plaintiff testified that Reyell tried to
cover up the incident by removing the shirt he was wearing.

[3]     Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration
and deposition transcript and finds defendants' summary of
plaintiff's assertions to be inaccurate. In plaintiff's complaint,
on page 8, plaintiff alleges:

Feeling extremely weak the claimant responded with a
shake of his head. Once this performance was over with
Correctional Officer R. Rock, the individual who held
on to the photograph camera and who is responsible for
capturing the claimant's injuries [sic] photos pointed to the
claimant's bloodly [sic] stain kitchen white colored uniform
[ ] as co-workers....

Correctional Officer D. Mason then roughly removed the
article of clothing and with the help of on[e] other they
discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

Officer Rock, the individual who
held the photograph camera and was
responsible for capturing LaTouche
injuries pointed to LaTouche [sic]
bloody kitchen white colored uniform
to his coworker asking them to remove
the article of clothing before he take

[sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

* * *

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

[T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure

to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1103045

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)

2010 WL 1063875

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,

v.

R. LAMORA, R. Scott, R. MacWilliams,
K. Crossett, E. Facteau, C.O. Demers,
R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

1    **Federal Civil Procedure** 🔑 Civil Rights
Cases in General

Genuine issue of material fact existed as to
whether corrections officer repeatedly hit the
inmate after the inmate was subdued and
thus summary judgment was precluded on the
inmate's excessive force claim. The inmate
alleged in his complaint, testified under oath
at his deposition, and stated in a sworn
affidavit that the corrections officer punched him
unnecessarily in the head several times during
the inmate's cell extraction. Although the cell
extraction was supposed to be videotaped, the
video was never recorded. Despite the fact that
the inmate's injuries were slight and were at least
indirectly brought about by his own action of
refusing handcuffs, there were credibility issues
to be determined. U.S.C.A. Const.Amend. 8.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1** Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983, alleging
deprivation of his civil rights. In his complaint Cicio, who
refused multiple orders from prison officials to exit his cell
in order to effectuate a transfer to another location, complains
that in the course of the ensuing cell extraction, during
which he was removed through the use of force, one of
the corrections officers who participated exerted excessive
force causing him to suffer injuries, while the others involved
failed to intervene, all in violation of the Eighth Amendment's
protection against cruel and unusual punishment. As relief
for the violation, plaintiff seeks the recovery of compensatory
and punitive damages from defendants.

Currently pending before the court is defendants' motion for
summary judgment seeking dismissal of plaintiff's complaint.
In their motion defendants challenge the legal sufficiency of
plaintiff's excessive force and failure to intervene claims and
additionally assert their entitlement to Eleventh Amendment
immunity from suit in their official capacities and good
faith qualified immunity from suit as individuals. Because
a reasonable factfinder could conclude from the record now
before the court that more force than necessary to subdue
and remove Cicio from his cell was applied maliciously
and sadistically by prison officials, I am constrained to
recommend that defendants' motion be denied, except as to
plaintiff's claims against defendant Woods and those against
defendants in their official capacities, which are subject to
dismissal.

I. *BACKGROUND* [1]

[1]    In light of the procedural posture of this case, the
following recitation is from the record now before
the court, with all inferences drawn and ambiguities
resolved in favor of the plaintiff. *Terry v. Ashcroft,*
336 128, 137 (2d Cir.2003). It should be noted that
while most of the pertinent facts are undisputed,
defendants sharply contest plaintiff's allegation
that he was unnecessarily punched by defendant
MacWilliams during the forcible removal from his
cell.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶ 3 and Exh. A (Dkt. No. 35–17). At the times relevant to his claims, plaintiff was designated to the Upstate Correctional Facility ("Upstate"), located in Malone, New York.[2] *Id.*

[2]    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal to surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

**\*2**  On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and

guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶ 4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶

13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWillams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

[3]    Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months

before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d

Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). [4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

4    With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though defending without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

B. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. – – – – , —— S.Ct. ——, —— L.Ed.2d – – – – , 2010 WL 596513, at *3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

*6    [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
Case 9:19-cv-01203-GTS-TWD   Document 57   Filed 12/22/21   Page 142 of 174
2010 WL 1063875

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints. [5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

[5]    Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

### C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants

observed the incident but stood by without intervening on his behalf .[6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

[6]   Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

[7]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*

To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–

99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

E. *Qualified Immunity*

In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

8    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional

Cicio v. Lamora, Not Reported in F.Supp.2d (2010)
Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 145 of 174
2010 WL 1063875

violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at \*14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and

failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

## IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such

2010 WL 1063875

objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063875

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063864

2010 WL 1063864
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. Macwilliams,
K. Crossett, E. Facteau, C.O. Demers,
R.Woods, R. Gill, Defendants.

Civil Action No. 9:08–cv–431 (GLS/DEP).
|
March 22, 2010.

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, C. Harris Dague, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***ORDER***

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge David E. Peebles, duly filed February 24, 2010. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ED, that the Report–Recommendation of Magistrate Judge David E. Peebles filed February 24, 2010 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that defendants' motion for summary judgment (Dkt. No. 35) is GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods is DISMISSED but the defendants' motion otherwise is DENIED, and it is further

ORDERED, that the Clerk of the court serve a copy of this order upon the parties in accordance with this court's local rules.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1063864

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Waters v. Prack, Not Reported in Fed. Supp. (2017)

2017 WL 1187871

2017 WL 1187871
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Keith WATERS, Plaintiff,

v.

Albert PRACK, et al., Defendants.

9:13-CV-1437 (LEK/DEP)
|
Signed 03/30/2017

**Attorneys and Law Firms**

Keith Waters, Wallkill, NY, pro se.

Colleen D. Galligan, New York State Attorney General, Albany, NY, for Defendants.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

*1  This matter comes before the Court following a Report-Recommendation filed on February 24, 2017, by the Honorable David E. Peebles, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 123 ("Report-Recommendation"). Pro se plaintiff Keith Waters and Defendants timely filed Objections. Dkt. Nos. 124 ("Plaintiff's Objections"), 125 ("Defendants' Objections").

**II. LEGAL STANDARD**

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-0857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b). Otherwise, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id.

**III. DISCUSSION**

**A. Defendants' Objections**

Defendants object to Judge Peebles's finding that summary judgment was not appropriate with respect to Waters's First Amendment retaliation claim against defendant A.W. Dirie. Defs.' Objs. at 1. According to Defendants, the evidence is overwhelming that Dirie did not remove Waters from his position in the law library, and that Deputy Superintendent for Programs Marie Hammond, who is not a defendant in this case, was in fact responsible for his removal. Id. Defendants also suggest that because Waters was removed from the position before Dirie received any complaints from Waters, "there [was] no temporal proximity giving rise to a question regarding the reason for the removal." Id. at 2. The question is close, but the Court agrees with Judge Peebles's recommendation that it deny Defendants' motion for summary judgment on this issue.

Defendants point to two pieces of evidence suggesting that Dirie did not remove Waters from the law library position. First, Dirie himself says he was not involved. Id. at 1–2. Second, Waters wrote Dirie a letter on February 28, 2013, complaining that he had been removed from his position at the law library by Hammond. Id. at 2. The only evidence Waters has offered to suggest that Dirie removed him from the position is his own sworn testimony to that effect. Dkt. No. 42 ("Verified Amended Complaint") ¶ 46. [1] Waters's evidence on this point certainly appears weaker than Defendants'. But as Judge Peebles pointed out in a different case, "the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact." Cirio v. Lamora, No. 08-CV-431, 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24, 2010), adopted by 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010). And while it is true that the only piece of evidence Waters offers on this score is his own self-serving testimony, that "can establish a genuine dispute of fact so long as [it] does not contradict the witness's prior testimony." Dye v. Kopiec, No. 16-CV-2952,

Waters v. Prack, Not Reported in Fed. Supp. (2017)

2017 WL 1187871

Case 9:19-cv-01203-GTS-TWD    Document 57    Filed 12/22/21    Page 149 of 174

2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) (collecting cases). The affidavit does differ from the letter in suggesting that Dirie, rather than Hammond, removed Waters from the law library position, but Waters was not testifying when he wrote the letter, so these two pieces of conflicting evidence do not prevent the Court from allowing Waters to establish a genuine dispute of material fact on the basis of his self-serving testimony. [2]

[1]    "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist...." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995).

[2]    As this Court has previously noted, a plaintiff's self-serving affidavit also need not be credited at the summary-judgment stage if the "plaintiff's factual assertion is contradicted by such overwhelming evidence that no reasonable factfinder could credit the plaintiff's account." Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 321 n.22 (N.D.N.Y. 2013) (Kahn, J.). That is not the case here, because the evidence suggesting that Hammond rather than Dirie removed Waters from the law library position is far from "overwhelming." As discussed above, all the Court has on this score is Dirie's own testimony and a letter written by Waters.

*2  Defendants also argue that Dirie could not have retaliated against Waters because the alleged adverse action—Waters's removal from the law library position—took place before Waters complained to Dirie. Defs.' Objs. at 2. As Defendants note, the record makes it clear that Waters was removed from the position on February 17, 2013. Id. Indeed, Waters himself concedes as much in his statement of material facts. Dkt. No. 116-2 ("Waters Statement of Material Facts") ¶ 46 ("Plaintiff remained assigned to the law library clerk position at Greene from the period of February 11, 2013 until February 17, 2013 before he was 'REMOVED FOR GOOD OF DEPARTMENT.' "), and his inmate program assignment history confirms this concession, Dkt. No. 116-3 ("Plaintiff's Bates Material") at 59. Defendants emphasize that Waters complained to Dirie on February 28, 2013, and March 18, 2013. Defs.' Objs. at 2. If these were the only two complaints received by Dirie, Defendants would be correct that the Court could not infer that Dirie retaliated against Waters by removing him from the law library position. See Butler v. City of Batavia, 545 F. Supp. 2d 289, 293 (W.D.N.Y. 2008)

(dismissing a First Amendment retaliation claim because "the adverse conduct started before" the plaintiff made her complaint).

Yet Defendants ignore Waters's assertion that he had complained to Dirie around late January 2013 about "the dorm sanction policy" at the prison. Pl.'s SMF ¶¶ 9, 15; Verified Am. Compl. ¶ 16. Since "a temporal gap of less than two months is sufficient to give rise to an inference of causation," Dushane v. Leeds Hose Co. #1 Inc., 6 F. Supp. 3d 204, 212 (N.D.N.Y. 2014) (Kahn, J.), the gap between Waters's complaints to Dirie in January and his removal from the law library position in February raises the inference that Dirie was motivated by retaliatory animus. And while Dirie says he does not remember Waters's complaining to him orally about the dorm sanction policy, conflicting testimony cannot establish the nonexistence of a genuine dispute of material fact. See Molinaro v. Sears, Roebuck & Co., 478 F. Supp. 818, 822–23 (S.D.N.Y. 1979) (noting that summary judgment "cannot be resolved on the basis of conflicting affidavits"). In sum, the Court is not convinced by Defendants' objections.

**B. Waters's Objections**
Waters objects to Judge Peebles's finding that defendant Eric G. Gutwein would have disciplined Waters for providing unauthorized legal assistance even if Gutwein had lacked retaliatory animus. Pl.'s Objs. at 2. [3] Waters challenges the sufficiency of the evidence Gutwein relied on to discipline him, pointing out that Sergeant Melendez could not specify the type of legal assistance Waters provided to the other inmate or the form of compensation he received. Id. at 3. But as Melendez testified, Waters had received a letter from the inmate in which the inmate suggested that "he would compensate [Waters] for assisting him with a legal matter in the same way he had in the past." Rep.-Rec. at 22. When Melendez spoke to the inmate, he "admitted that he had paid [Waters] in the past for legal assistance." Id. Melendez did not testify that Waters advised the inmate about, say, federal habeas law as opposed to municipal liability under 42 U.S.C. § 1983, but that does not mean Gutwein lacked a solid basis for finding that Waters had violated the rule prohibiting the provision of unauthorized legal assistance. The same goes for the kind of compensation Waters received for his legal work. Judge Peebles was therefore correct to conclude that Gutwein would have imposed discipline even in the absence of any retaliatory motive, especially because this kind of inference is "readily drawn in the context of prison administration where

2017 WL 1187871

we have been cautioned to recognize that 'prison officials have broad administrative and discretionary authority over the institutions they manage.' " Sher v. Coughlin, 739 F.3d 77, 82 (2d Cir. 1984) (quoting Hewitt v. Helms, 459 U.S 460, 467 (1983), abrogated in part on other grounds by Sandin v. Connor, 515 U.S. 472 (1995)); see also Parks v. Blanchette, 144 F. Supp. 3d 282, 331 (D. Conn. 2015) (noting that courts take special care in evaluating First Amendment retaliation claims brought by prisoners "because they can easily be fabricated"). [4]

3      The page numbers for Waters's Objections refer to those generated by this Court's electronic filing system ("ECF").

4      The Court also disagrees with Waters's claim that it was a "quintessential non sequitur" for him to be found guilty of providing unauthorized legal assistance and not guilty of violating a direct order. Pl.'s Objs. at 3. Perhaps Waters was never directly ordered to refrain from providing legal advice. Yet if he was caught doing just that, it would be appropriate to find him guilty for providing unauthorized legal assistance.

**\*3** As part of his challenge to the sufficiency of the evidence relied on to punish him, Waters appears to assert that his right to procedural due process was violated. Pl.'s Objs. at 3–7. Yet as Judge Peebles pointed out, Waters's due process claim fails because "no reasonable factfinder could conclude that plaintiff was deprived of a cognizable liberty or property interest." Rep.-Rec. at 29. Since the Court agrees with that finding, any argument about the sufficiency of the evidence is irrelevant.

## IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 123) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Waters's Motion for Summary Judgment (Dkt. No. 116) is **DENIED**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 110) is **GRANTED in part and DENIED in part** as follows: (1) Waters's due process claims asserted against defendants Gutwein and Prack are **DISMISSED**; (2) Waters's retaliation claim asserted against defendant Gutwein is **DISMISSED**; (3) Waters's retaliation claims asserted against defendant Dirie regarding his failure to undertake a review of the disciplinary hearing determination and his alleged transfer of plaintiff to a different correctional facility are **DISMISSED**; (4) Waters's retaliation claim asserted against defendant Dirie regarding his removal of plaintiff as a law library clerk at Greene Correctional Facility survives Defendants' motion and shall proceed to trial; (5) Waters's retaliation claims asserted against defendant Prack are **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1187871

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7351810
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Donald DYE, Plaintiff,
v.
Jerzy KOPIEC, Defendant.

16 Civ. 2952 (LGS)
|
Signed 12/16/2016

**Attorneys and Law Firms**

David Mark Rabinowitz, Moses & Singer LLP, New York, NY, for Plaintiff.

Darius Adam Marzec, Marzel Law Firm PC, New York, NY, for Defendant.

**<u>ORDER AND OPINION</u>**

LORNA G. SCHOFIELD, District Judge:

 **\*1** Plaintiff Donald Dye brings this action against Defendant Jerzy Kopiec to recover money owed under a €1,000,000 promissory note (the "Note") allegedly executed by the parties. Plaintiff moves for summary judgment. For the reasons stated below, the motion is denied.

**I. BACKGROUND**
The following facts are taken from the parties' submissions and are undisputed unless otherwise indicated.

Plaintiff commenced this action in New York State Court by filing a motion for summary judgment in lieu of a complaint pursuant to N.Y. C.P.L.R. § 3213. Plaintiff included with his motion an affidavit and a copy of the Note. In the affidavit, Plaintiff states that he paid Defendant €1,000,000 for ownership interests in some of Defendant's business ventures but never received the promised ownership interests. Plaintiff further states that, on or about March 31, 2013, he and Defendant agreed to convert the ownership interests into a non-revocable personal debt obligation of Defendant and executed the Note to memorialize this agreement. The Note, which includes a signature page purportedly signed by Plaintiff and Defendant, provides that Defendant is to make semi-annual payments of principal and interest, each in

the amount of €255,000, beginning on September 25, 2013. According to Plaintiff's affidavit, Defendant made a $4,000 payment on the Note on or about April 20, 2013, but has made no further payments.

Defendant removed the case to federal court based on diversity of citizenship [1] and filed an opposition to Plaintiff's motion. In a declaration submitted with his opposition, Defendant states that he never agreed to pay Plaintiff €1,000,000, never signed the Note, never made a $4,000 payment on the Note nor saw the Note prior to this lawsuit.

[1]   According to the Notice of Removal, Plaintiff is a citizen of New York, and Defendant is a citizen of Poland currently domiciled in Florida.

In reply, Plaintiff submitted additional documents that he argues corroborate his allegations. These other documents include purported examples of Defendant's signature; a report by a forensic document examiner concluding, based on a comparison of the purported examples of Defendant's signature and the signature on the Note, that Defendant "probably wrote the questioned signature" on the Note; and various communications Plaintiff and Defendant allegedly exchanged regarding the Note and the underlying debt.

**II. LEGAL STANDARD**
Summary judgment is appropriate where the record before the Court establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. See id. at 255.

**III. DISCUSSION**
 **\*2** Plaintiff's motion for summary judgment is denied because a genuine factual dispute exists regarding the validity of the Note.

Section 3213 states: "When an action is based upon an instrument for the payment of money only or upon any judgment, the plaintiff may serve with the summons a notice of motion for summary judgment and the supporting papers

Case 9:19-cv-01203-GTS-TWD   Document 57   Filed 12/22/21   Page 152 of 174

Dye v. Kopiec, Not Reported in Fed. Supp. (2016)

2016 WL 7351810

in lieu of a complaint." The purpose of § 3213 is to "provide[ ] a speedy and effective means for resolving presumptively meritorious claims." *Banco Popular N. Am. v. Victory Taxi Mgmt., Inc.*, 806 N.E.2d 488, 490 (N.Y. 2004) (internal quotation marks and citation omitted).

To establish a prima facie case under § 3213, a plaintiff must offer proof of "the instrument and a failure to make the payments called for by its terms." *Weissman v. Sinorm Deli, Inc.*, 669 N.E.2d 242, 245 (N.Y. 1996). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to "offer[ ] evidentiary proof sufficient to raise a triable issue of fact." *Banco Popular*, 806 N.E.2d at 490.

Here, Plaintiff established a prima facie case by submitting a copy of the Note and Plaintiff's affidavit stating that Defendant failed to make payments on the Note. *See Weissman*, 699 N.E.2d at 245. In opposition, Defendant raised a genuine dispute regarding the validity of the Note by submitting a declaration that (1) denies Defendant signed the Note or agreed to pay Plaintiff €1,000,000, and (2) bears a signature that appears different from the signature on the Note. *See Kitovas v. Megaris*, 20 N.Y.S.3d 393, 394 (2d Dep't 2015) (finding triable question of fact where Defendant submitted an affidavit denying that he executed the note and a copy of his driver's license, which contained a signature that appeared different from the signature on the note); *Hambrose Reserve Ltd. v. Prete*, No. 88 Civ. 2631, 1989 WL 52345, at *1–2 (S.D.N.Y. May 8, 1989) (finding genuine dispute as to authenticity of the promissory note where defendants submitted an affidavit denying that they signed the note). Because of a genuine dispute as to the material fact of whether the Note is valid, Plaintiff's motion for summary judgment is denied.

Plaintiff's arguments for granting summary judgment in spite of Defendant's denial that he signed the Note are unpersuasive. First, he argues that Defendant's declaration should be rejected. The declaration states: "I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge, information and belief." To qualify as an unsworn declaration made under penalty of perjury under 28 U.S.C. § 1746, an unsworn declaration executed within the United States is to include an affirmation "in substantially the following form": "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." The slight variation between the affirmation in Defendant's declaration and the affirmation prescribed by 28 U.S.C. § 1746 is not sufficient to reject Defendant's

declaration. *See BMS Entm't/Heat Music LLC v. Bridges*, No. 04 Civ. 2584, 2005 WL 2482493, at *2 n.1 (S.D.N.Y. Oct. 7, 2005) (accepting as a declaration under 28 U.S.C. § 1746 an affidavit that was not notarized but "certified" that "each of the statements contained herein is true to the best of my information and belief" and contained a "penalty of perjury" clause).

**\*3** Second, Defendant's declaration cannot be disregarded merely because it is self-serving. Even a self-serving affidavit can establish a genuine dispute of fact so long as the affidavit does not contradict the witness's prior testimony. *See Hayes v. N.Y.C. Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). *See also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460, n.1 (7th Cir. 2014) ("[A] self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts."); *C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 Fed.Appx. 439, 443 (5th Cir. 2011) ("A party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone."). In the short history of this lawsuit, Defendant has consistently denied the validity of the Note and has not given any testimony that contradicts his declaration.

Third, Defendant's declaration is more than a "bald assertion of forgery," which would be insufficient to create an issue of fact contesting the authenticity of a signature. *Banco Popular*, 806 N.E.2d at 490; *see also Pereira v. Cogan*, 267 B.R. 500, 512 (S.D.N.Y. 2001) ("It is incumbent upon a party claiming the nongenuineness of a signature to produce firsthand proof of the forgery."). Defendant's declaration denies the authenticity of the signature on the Note both explicitly through its words and implicitly through its inclusion of a signature that differs from the one on the Note. More fundamentally, the declaration denies that Defendant agreed to pay Plaintiff €1,000,000. Defendant's unequivocal disclaimer appears to be all that a party could reasonably be expected to say in this circumstance. *See Pereira*, 267 B.R. at 512 ("[T]he validity of the defendant's signature should be deemed put at issue when ... there is apparently nothing more the defendant could say.").

Finally, the additional evidence submitted by Plaintiff in reply to Defendant's declaration does not eliminate the factual dispute over the validity of the Note. " '[C]redibility assessments, choices between conflicting versions of the

Dye v. Kopiec, Not Reported in Fed. Supp. (2016)

2016 WL 7351810

events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " *Curry v. City of Syracuse,* 316 F.3d 324, 333 (2d Cir. 2003) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55–56 (2d Cir. 1997)). Because resolving the discrepancies between Plaintiff's and Defendant's evidence necessarily involves weighing the evidence and making credibility determinations, Plaintiff's motion for summary judgment is denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff Donald Dye's motion for summary judgment is DENIED.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2016 WL 7351810

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 991862

2014 WL 991862
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael L. WILSON, Plaintiff,

v.

Nicholas DELUCA, Sergeant, Great Meadows
Correctional Facility, in his individual and
official capacity; Richard Vladyka, Sergeant,
Great Meadow Correctional Facility, in his
individual and official capacity, Defendants.

No. 9:11–cv–00030 (MAD/RFT).
|
Signed March 13, 2014.

**Attorneys and Law Firms**

Michael L. Wilson, Ossining, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Cathy Y. Sheehan, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

 **\*1** Plaintiff commenced this action pursuant to 42 U.S.C.
§ 1983. *See* Dkt. No. 1. Following an initial review and
a ruling on Defendants' motion to dismiss, Plaintiff's only
remaining claim is that Defendants DeLuca and Vladyka
retaliated against him for filing grievances in contravention
of the First Amendment. *See* Dkt. Nos. 7, 32.

On July 29, 2013, Defendants moved for summary judgment.
*See* Dkt. No. 48. In their motion, Defendants argued
that Plaintiff's claim against Defendant DeLuca should
be dismissed because Plaintiff failed to establish personal
jurisdiction over him. *See* Dkt. No. 48–1 at 10–11. Thereafter,
Defendants argued that Plaintiff failed to state a claim against
Defendant Vladyka because he had legitimate, non-retaliatory
reasons for removing Plaintiff from the 2010 Ramadan meal
preparation list, *i.e.,* Plaintiff caused conflict and unrest
among the staff during the 2009 Ramadan meal. *See id.* at
6–8. Finally, Defendants argued that Defendant Vladyka is
entitled to qualified immunity because "it was objectively

reasonable for [him] to believe that he was not violating
plaintiff's constitutional rights when he requested that plaintiff
not be permitted to participate in the 2010 Ramadan meal
preparation because plaintiff threatened [him] during the
previous Ramadan meal and caused problems with the food
service inmates and the line staff." *See id.* at 10–11.

In a February 10, 2014 Report–Recommendation and Order,
Magistrate Judge Treece recommended that the Court
deny Defendants' motion in its entirety. *See* Dkt. No.
57. Specifically, Magistrate Judge Treece first found that
Defendant DeLuca's personal jurisdiction defense should
be deemed waived because Defendants failed to include
lack of personal jurisdiction and/or insufficient service of
process in their initial Rule 12 motion to dismiss. *See id.*
at 5–7. Further, Magistrate Judge Treece found that, in the
alternative, Defendants forfeited this defense by failing to
act promptly in brining them before the Court, and that they
should be estopped from asserting the defense because of their
actions. *See id.* at 6–7. As to Defendant Vladyka, Magistrate
Judge Treece found that Plaintiff sufficiently alleged that he
was engaged in a protected activity and that he was retaliated
against, in part, for that activity. *See id.* at 8–10. Further,
Magistrate Judge Treece found that, despite the proffered
legitimate reason for his actions, Defendant Vladyka failed to
establish that he would have taken the same actions against
Plaintiff even absent the retaliatory motive. *See id.* at 10–
11. For the Court to make such a finding, it would have
to weigh the parties' credibility, which is inappropriate at
this stage. *See id.* at 11. Finally, Magistrate Judge Treece
found that it is unclear whether Defendant Vladyka had a
legitimate non-retaliatory justification for requesting Plaintiff
be removed from the 2010 Ramadan meal preparation list.
*See id.* at 12. As such, he found that qualified immunity is
inappropriate at this stage because a reasonable jury could
conclude that Defendant Vladyka's belief that his actions
did not violate a clearly established federally protected right
was an objectively unreasonable one. *See id.* Neither party
objected to Magistrate Judge Treece's February 10, 2014
Report–Recommendation and Order.

 **\*2** When a party files specific objections to a magistrate
judge's report-recommendation, the district court makes a *"de
novo* determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b)(1). However, when a party
files "[g]eneral or conclusory objections or objections which
merely recite the same arguments [that he presented] to the
magistrate judge," the court reviews those recommendations

Wilson v. Deluca, Not Reported in F.Supp.3d (2014)

2014 WL 991862

for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of

material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*3** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, * 1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

Having carefully reviewed Magistrate Judge Treece's February 10, 2014 ReportRecommendation and Order, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Treece correctly recommended that the Court should deny Defendants' motion for summary judgment.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Treece's February 10, 2014 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 48) is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

2014 WL 991862

**IT IS SO ORDERED.**

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Michael L. Wilson brings this Complaint, pursuant to 42 U.S.C. § 1983, alleging that Defendants retaliated against him for filing grievances in contravention of the First Amendment. *See generally* Dkt. No. 1, Compl. [1] Defendants move for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56(c). Dkt. No. 48. Plaintiff opposes the Motion. Dkt. No. 54. For the reasons that follow, we recommend that Defendants' Motion be **DENIED.**

[1]   Plaintiff's Original Complaint included various other claims against these Defendants and others. *See* Compl. However, following an initial review and, later, a ruling on Defendants' Motion to Dismiss, the Honorable Mae A. D'Agostino, United States District Judge, dismissed the other claims and Defendants, leaving only Plaintiff's retaliation claims against Defendants Vladyka and DeLuca. *See generally* Dkt. Nos. 7, Dec. & Ord., dated May 5, 2011, & 32, Mem.-Dec. & Ord., dated Aug. 27, 2012.

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [ Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

The following summary of facts is taken from the Defendants' Statement of Material Facts Pursuant to Rule 7.1(a)(3). [2]

2014 WL 991862

[2]
    Defendants and this Court issued separate Notices to Plaintiff regarding the importance of properly responding to Defendants' 7.1 Statement. Dkt. Nos. 49–1 & 50. Nonetheless, Plaintiff failed to do so; instead, Plaintiff's 7.1 Statement provides a series of purely conclusory denials, unsupported by citations to the record. *See* Dkt. No. 54, Pl.'s 7.1 Statement; *see also* Dkt. No. 55, Defs.' Reply. Given Plaintiff's lapse, and the fact that doing so does not affect the outcome of this case, we apply Local Rule 7.1(a)(3), and accept as true Defendants' version of the facts as established in their 7.1 Statement. *See Van Loan v. Hartford Acc. & Indem. Co.,* 2006 WL 3782709, at *2–3 (N.D.N.Y. Dec.22, 2006) (reaching a similar conclusion and citing cases to support that holding).

At all times relevant to the claims in his action Plaintiff was an inmate in the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and resided at the Great Meadow Correctional Facility ("GMCF"). Dkt. No. 49, Defs.' Statement of Material Fact Pursuant to Rule 7.1(a)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1. Plaintiff was a cook during the 2009 Ramadan Holiday. *Id.* at ¶ 2. On July 7 and August 8, 2010, Defendant Vladyka authored internal memoranda to Captain Eastman,[3] requesting that Plaintiff be prevented from serving as a cook during the 2010 Ramadan Holiday because he had threatened Defendant Vladyka and caused unrest and conflict among the food service inmates and line staff the previous year. *Id.* at ¶¶ 3 & 4. On August 3, 2010, the Deputy Superintendents of Programs and Security[4] removed Plaintiff from the 2010 Ramadan cook list; Defendant Vladyka did not have the authority to make such a decision personally. *Id.* at ¶¶ 5–7.

[3]
    Captain Eastman is not a named Defendant in this action.

[4]
    Neither of these officials are named Defendants in this action.

### B. Defendant DeLuca

**\*5** Defendants argue that Plaintiff's claim against Sgt. DeLuca should be dismissed because Plaintiff failed to establish personal jurisdiction over him. Defs.' Mem. of Law at pp. 8–9. However, because we find that Defendants waived this defense by failing to raise it in their initial 12(b)(6) Motion to Dismiss, we recommend that Defendants' Motion be **DENIED** as to this ground.

A brief recitation of the procedural history in this case is appropriate. On November 28, 2010, Defendant DeLuca retired from DOCCS. Dkt. No. 48–3, Suzann Edwards Aff., dated July 24, 2013, at ¶ 5. Plaintiff filed the Complaint on January 5, 2011. Compl. On May 5, 2011, Judge D'Agostino granted Plaintiff's Motion to Proceed *In Forma Pauperis,* and authorized service of the Complaint. Dkt. No. 7, Dec. & Order. That same day a Summons for Defendant DeLuca was issued, Dkt. No. 8. On June 3, 2011, Deputy Counsel for DOCCS accepted service of the summons addressed to Defendant DeLuca. Dkt. No. 12. On June 9, 2011, Cathy Y. Sheehan, Assistant District Attorney, filed a Notice of Appearance on behalf of all named Defendants, including Defendant DeLuca. Dkt. No. 18. On June 20, Plaintiff wrote to the Court requesting clarification as to whether or not he had properly served all of the Defendants. Dkt. No. 22, Lt., dated June 15, 2011. In response to Plaintiff's letter, on June 20, this Court issued a Text Order advising Plaintiff that "all of the parties in this action have been served and an appearance has been made for all of the defendants." Text Order, dated June 20, 2011.

On September 30, 2011, Defendants moved on behalf of all of the named Defendants, including DeLuca, for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6); however, they failed to raise personal jurisdiction or failure to provide sufficient service of process as grounds for dismissal. *See generally* Dkt. Nos. 25, Defs.' Motion to Dismiss, and 25–1, Defs.' Mem. of Law. On August 27, 2012, Defendants' Motion to Dismiss was granted in part and denied in part, and Defendants DeLuca and Vladyka were ordered to answer Plaintiff's Complaint. Dkt. No. 32, Mem.Dec. & Ord. at p. 23. On September 9, 2012, Defendants timely filed an Answer, and for the first time, raised lack of personal jurisdiction and insufficient service of process as defenses. Dkt. No. 34, Answer, at ¶ 22. Then on July 29, 2013, Defendants filed the instant Motion, claiming that Plaintiff failed to obtain personal jurisdiction over Defendant DeLuca because he retired from DOCCS five months before Plaintiff served process upon Great Meadow Correctional Facility and that "[s]ervice upon Mr. DeLuca's former place of employment does not comply with any of the service options permitted by law." Defs.' Mem. of Law at p. 8.

2014 WL 991862

However, by failing to include lack of personal jurisdiction and/or insufficient service of process in their initial Rule 12 Motion to Dismiss, Defendants waived these defenses. *See* FED. R. CIV. P. 12(h)(1) (noting that a party waives certain defenses by failing to include it in a pre-answer motion and/or its answer) & 1966 Advisory Committee's Notes (noting that "specified defenses ... are waived by the failure to raise them by a motion under Rule 12 or in the responsive pleading or any amendment thereof to which the party is entitled as a matter of course"); *see also Datskow v. Teledyne, Inc., Cont'l Products Div.,* 899 F.2d 1298, 1303 (2d Cir.1990) (citing *Burton v. Northern Dutchess Hospital,* 106 F.R.D. 477 (S.D.N.Y.1985) & *Vozeh v. Good Samaritan Hospital,* 84 F.R.D. 143 (S.D.N.Y.1979) for the proposition that "[a] delay in challenging personal jurisdiction by motion to dismiss has resulted in waiver, even where, as here, the defense was asserted in a timely answer").

 **\*6** Moreover, even if Defendants have not waived these defenses, they have forfeited the defenses by failing to act promptly in bringing them before the Court. *See Hamilton v. Atlas Turner, Inc.,* 197 F.3d 58 (2d Cir.1999) (distinguishing between a waiver of an affirmative defense pursuant to Rule 12(h)(1) and a forfeiture of the same, the latter of which was found to apply where the defendant delayed over four years in bringing the affirmative defense of personal jurisdiction before the court all the while it participated in the pre-trial phase of the litigation. Here, Defendants raised the issue of personal jurisdiction for the first time in their Answer on September 9, 2012. However, they did not raise the defense in a motion until July 29, 2013. Defs.' Mem. of Law, at pp. 8–9. Nonetheless, during the more than 320 days between the filing of their Answer and their Motion for Summary Judgment, Defendants actively participated in all pre-trial phases of the litigation. *See* Dkt. Nos. 35–47.

Finally, whether or not Defendants waived or forfeited these affirmative defenses, they should be estopped from asserting them. Even if unintentional, Defendants actions —*i.e.,* executing and returning the Acknowledgment of Service, and filing a Notice of Appearance and Motion to Dismiss on Defendant DeLuca's behalf, as well as waiting more than two years to notify Plaintiff of his error—justifiably lulled Plaintiff into a reasonable, albeit false, sense of security regarding Defendant DeLuca's appearance in the case. To allow Defendants to assert these defenses now, at such a late juncture, would be severely prejudicial to Plaintiff. We do not believe that the Court should foster such inequity.

Therefore, we recommend that Defendants' Motion be **DENIED** as to this ground.

### C. Defendant Vladyka

Plaintiff alleges that Defendant Vladyka prevented him from serving as a cook during the 2010 Ramadan Holiday in retaliation for grievances he filed against other DOCCS employees. Compl. Defendants argue that they are entitled to Summary Judgment on the grounds that (1) Plaintiff failed to state a cause of action because Defendant Vladyka had a sufficient non-retaliatory justification for recommending that Plaintiff be prevented from participating in the preparation of the 2010 Ramadan meal, and (2) Defendant Vladyka is entitled to qualified immunity. Dkt. No. 48–1, Defs.' Mem. of Law, at pp. 4–8.

#### 1. Retaliation

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001); *see also Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

 **\*7** The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d at 872–73. A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal

2014 WL 991862

as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (internal quotation marks and citations omitted) (cited in *Davis,* 320 F.3d at 353).

In the instant case, Plaintiff argues that he "filed numerous greivance[s] for various institutional issues against correctional staff at [GMCF] during the time periods between October 2009 and August 2010. Compl. at ¶ 19." Plaintiff further alleges that "Defendant 'Vladyka' on many occasions before removing Plaintiff from his kitchen assignment has made comments about Plaintiff['s] grievances and complaints against correctional staff at [GMCF]." *Id.* at ¶ 20. Plaintiff further claims that Defendant Vladyka removed him from the kitchen Ramadan list in retaliation for having filed grievances and otherwise complaining about events and guards at GMCF. *Id.*

In response to these allegations, Defendants submitted the sworn Affidavit of Defendant Vladyka, wherein he claims, *inter alia,* that: (1) he has been employed at GMCF since 1985, (2) he does not have the authority to remove an inmate from the Ramadan meal preparation list, and (3) he did not request that Plaintiff be removed from the list "in retaliation for his filing of grievances and complaints against staff at [GMCF]." Dkt. No. 48–2, Sgt. Richard Vladyka Aff., dated July 14, 2013, at ¶¶ 1, 6, 11, & 13.

**\*8** Plaintiff has sufficiently alleged that he was engaged in the protected exercise of filing grievances. Significantly, Defendants do not dispute that Plaintiff filed such grievances. Nor do they dispute Plaintiff's allegation that Defendant Vladyka commented on Plaintiff's grievance activity prior to recommending that he be removed from the list of participants eligible to help prepare the 2010 Ramadan meal.

Moreover, the fact that Defendant Vladyka lacked authority to prevent Plaintiff from participating in the preparation of the 2010 Ramadan meal, does not change our conclusion that his recommendation constituted an adverse action. While a prisoner has no constitutional right to a particular work assignment, they are provided constitutional protections if otherwise "routine administrative decisions are made in retaliation for the exercise of constitutionally preotected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987) (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986)). In this regard, it is worth noting that by his own admission, Defendant Vladyka did more than simply recommend that Plaintiff be prohibited from participating in the preparation of the 2010 Ramadan Holiday meal. Indeed, he claims that "[he] did ... everything in [his] power to prevent [Wilson] from being allowed to cook for the Holy Month of Ramadan. It is also factual, that I told [Wilson] face to face, that my intentions were to facilitate that prevention." Vladyka Aff., at Ex. A, Mem., dated Aug. 8, 2010.

Defendant Vladyka asserts that he had a non-retaliatory reason for requesting that Plaintiff be prohibited from participating in the preparation of food for the 2010 Ramadan Holiday. Namely, that while a participant in the preparation of food for the 2009 Ramadan Holiday Plaintiff threatened Defendant Vladyka and caused unrest and conflict among the other inmates and cooks. Defs.' Mem. of Law at p. 5.

Where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct.15,1997)). In the instant case, in support of their allegations that Plaintiff threatened Defendant Vladyka and caused unrest and conflict among other inmates in the kitchen during the preparation of the 2009 Ramadan meal, Defendants offer Sgt. Vladyka's inter-departmental memoranda to Captain Eastman requesting that Plaintiff's privilege be rescinded for the 2010 Ramadan Holiday, as well as his own sworn Affidavit. *See* Defs.' 7.1 Statement at ¶¶ 3– 4; *see also* Vladyka Aff. at ¶¶ 11–13.

In response, Plaintiff points out that no disciplinary action was ever filed regarding his behavior during the 2009 Ramadan Holiday, Dkt. No. 54, Pl.'s Mem. of Law, at p. 2. In further support of his claim, Plaintiff provides his own sworn statement that he did not threaten Defendant Vladyka or cause any unrest or conflict during the preparation of the 2009 Ramadan meal, *see* Dkt. No. 54, Michael L. Wilson Aff.,

2014 WL 991862

dated Aug. 28, 2013, at ¶ 7, and a sworn Declaration from another inmate that participated in the preparation of the 2009 Ramadan meal stating that Plaintiff did not behave "hostile toward staff [,]" *id.* at Ex. G, Paul Thompson Decl., dated Aug. 15, 2013, at ¶ 2.

**\*9** Any conclusion as to which party's version of events is more credible would require us to make the type of credibility assessment that has been explicitly reserved for the finder of fact, be it the trial judge or a jury. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). At present, we are only required to note that Plaintiff has successfully raised an issue of material fact regarding whether Defendant Vladyka had a non-retaliatory justification for recommending that Plaintiff be prohibited from participating in preparing the 2010 Ramadan meal. Accordingly we recommend that Defendants' Motion be **DENIED** as to this ground. *See Graham v. Henderson,* 89 F.3d at 80–81 (denying defendants request for summary judgment of plaintiff's retaliation claim, on the grounds that plaintiff's attempt to initiate a work slowdown provided a nonretaliatory justification for taking adverse action, where plaintiff established a triable issue of fact as to whether he did in fact attempt to cause a work slowdown); *cf. Gayle v. Gonyea,* 313 F.3d 677, 684 (2d Cir.2002) (citing *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) for the proposition that defendants can meet their burden with regard to proving a non-retaliatory justification for a particular punishment by demonstrating that plaintiff committed the most serious of the prohibited conduct they were charged with).

### 2. Qualified Immunity

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally

protected right." *Lee v. Sandberg,* 136 F.3 d 94, 102 (2d Cir.1997) (citations omitted).

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589–90 (2d Cir.1988). Moreover, as noted above, it is unclear whether Defendant Vladyka had a legitimate non-retaliatory justification for requesting Plaintiff be removed from the 2010 Ramadan meal preparation list. Thus, a reasonable jury could conclude that Defendant Vladyka's belief that his actions did not clearly violate an established federally protected right was an objectively unreasonable one.

**\*10** Therefore, we recommend that Defendants' Motion be **DENIED** as to this ground.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 48) be **DENIED;** and it is further

**ORDERED,** that if the above recommendation is accepted, this case be deemed "trial ready"; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs..,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: Feb. 10, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 991862

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MIGUEL DIAZ,

                         Plaintiff,

        -against-                                    9:19-CV-1438 (LEK/TWD)

ERIC J. SMITH, *et al.*,

                         Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Miguel Diaz, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this pro se action pursuant to 42 U.S.C. § 1983, asserting constitutional claims arising from his incarceration at Upstate Correctional Facility ("Upstate"). Dkt. No. 1 ("Complaint"). This Court reviewed the complaint in accordance with 28 U.S.C. § 1915 and found Plaintiff's (1) Eighth Amendment excessive force claims against Correction Officer Adam Gallagher, Correction Officer Robert Lamica, Superintendent Donald Uhler, Sergeant Trevor Dunning, Lieutenant Gary Gettmann, Correction Officer Domonic, Correction Officer Eric Smith, Correction Officer Joshua Tulip, Correction Officer James Trombley, Correction Officer Bryan Leclair, and Nurse Geraldine Wilson; (2) Eighth Amendment sexual abuse claim against Smith; and (3) Eighth Amendment medical indifference claim against Wilson survived initial review and required a response. Dkt. No. 6.

In addition to answering Plaintiff's Complaint, several Defendants moved for partial summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. Dkt. No. 46 ("Motion for Partial Summary Judgment"); 46-1 ("Defendants' Memorandum of Law"); 46-2 ("Defendants' Statement of Material Facts" or "Defendants' SMF"). Specifically,

Defendants seek dismissal of Plaintiff's Eighth Amendment deliberate indifference claim against Defendant Wilson and Eighth Amendment excessive force and failure-to-intervene claims against Gallagher, Lamica, Uhler, Dunning, Gettmann, and Dominic as they pertain to an incident on February 22, 2019. Defs.' Mem. of Law at 3. [1]

Plaintiff responded, asserting that Defendants' arguments are meritless, and cross-moved for summary judgment on the merits of his claims. Dkt. No. 51 ("Plaintiff's Opposition").

For the reasons that follow, the Court denies Defendants' Motion for Partial Summary Judgment and Plaintiff's cross-motion for summary judgment.

## II.   BACKGROUND

Plaintiff was incarcerated at Upstate from about January 14, 2019 through February 26, 2019. Defs.' SMF ¶ 5. On February 26, 2019, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"). Id. ¶ 6.

On February 11, 2019, Plaintiff filed inmate grievance No. UST-64656-19. Id. at ¶ 12. This grievance generally accused Defendant Smith of sexual harassment and discussed Plaintiff's concerns that the facility was not enforcing a protective order. Dkt. No. 46-3 at 11–13. The factual allegations contained in this grievance are not directly relevant to this action. However, Plaintiff contends that these factual allegations are the basis for Smith's later retaliation. See Compl.

On March 11, 2019, while housed at Clinton, Plaintiff filed inmate grievance No. CL-7565361-19, dated March 1, 2019. Defs.' SMF ¶ 16. This grievance reported that supervisors at Upstate had ignored his complaints that Smith sexually harassed Plaintiff on February 2, 2019. Dkt. No. 46-4 at 10. Plaintiff further alleged Smith spit in his food in retaliation for Plaintiff's

---

[1] Citations to filings on the docket refer to the pagination CM/ECF automatically generates.

filing complaints regarding the harassment. Id. Relevant to the current motion, Plaintiff asserted that, on February 22, 2019, he asked Dunning for new food and help with Smith. Id. Rather than help, however, Dunning ordered a cell extraction. Id. at 10. According to Plaintiff, several officers—including Gallagher, Lamica, Uhler, Dunning, Gettmann, and Domini—used excessive force during the cell extraction or failed to intervene to stop Plaintiff from being beaten. Id. at 10–11. Plaintiff was then taken for a nurse check with Wilson, but she stood five feet away from him and did nothing to help or care for his injuries and failed to discover a severe cut on Plaintiff's eyelid. Id. at 11.[2]

On May 29, 2019, the Upstate Superintendent denied grievance No. UST-64656-19, finding that Plaintiff's allegations were unsubstantiated. Defs.' SMF ¶ 17. At this time, Plaintiff was housed at Great Meadow Correctional Facility. Id. ¶ 18. On June 14, 2019, the Clinton Superintendent denied grievance No. CL-7565361-19, stating, in pertinent part, that "[a]n investigation has revealed that that [sic] the allegations concerning Upstate CF have been addressed in UST-64656-19." Id. ¶ 22.

Plaintiff appealed grievance No. UST-64656-19 by signing an Appeal Statement on June 18, 2019. Id. ¶ 19. Plaintiff did not appeal the Clinton Superintendent's decision with respect to grievance No. CL-7565361-19. Id. ¶ 23. However, in his appeal statement to grievance No. UST-64656-19, Plaintiff referenced reports in his medical file related to injuries he purportedly suffered during the February 22, 2019 incident. Dkt. No. 46-3 at 15.

The Central Office Review Committee ("CORC") had not issued a response to grievance No. UST-64656-19 before Plaintiff filed his complaint in this action. Defs.' SMF ¶¶ 20–21.

---

[2] This grievance includes allegations about an additional incident of force that occurred later that same day and involved an alleged sexual assault. Id. at 11–12. Defendants are not moving for summary judgment with respect to Plaintiff's claims regarding the second incident on February 22, 2019.

Defendants now move for partial summary judgment to dismiss the claims in this action regarding the incident of excessive force mentioned above in grievance No. CL-7565361-19. See Mot. for Partial Summ. J. Generally, Defendants argue the undisputed evidence establishes Plaintiff failed to appeal grievance No. CL-7565361-19 to CORC and therefore failed to properly exhaust his administrative remedies. Defs.' Mem. of Law at 9. Moreover, Defendants contend that, assuming the Court construes grievance No. UST-64656-19 as encompassing the claims in this action, Plaintiff still failed to exhaust his administrative remedies, because he filed this action prior to receiving CORC's decision on his appeal. Id. at 13.

Plaintiff responded, asserting that he appealed to CORC and that Defendants arguments are, therefore, meritless. Pl.'s Opp'n at 3. Plaintiff further filed a "Notice of Motion" purporting to move for summary judgment on the merits of his claim. Id. at 1. In his papers, Plaintiff included several medical records and photographs of his injuries attempting to establish he was injured on February 22, 2019 and still suffers to this day. Dkt. No. 51-1.

III.    LEGAL STANDARD

A.  Standard of Review

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Salahuddin v. Gourd, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential

4

to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has established that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." Id. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . .

interpret them to raise the strongest arguments that they suggest." <u>Burgos v. Hopkins</u>, 14 F.3d 787, 790 (2d Cir. 1994).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. <u>Hayes v. New York City Dep't of Corr.</u>, 84 F.3d 614, 619 (2d Cir. 1996); <u>Rule v. Brine, Inc.</u>, 85 F.3d 1002, 1011 (2d Cir. 1996) (credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on a motion for summary judgment).

## IV.    DISCUSSION

### A. Plaintiff's Failure to Comply with Local Rule 7.1[3]

In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[4] While courts are required to give due deference to a plaintiff's pro se status, that status "does not relieve [a pro se] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." <u>Jorgensen v. Epic/Sony Records</u>, 351 F.3d 46, 50 (2d Cir. 2003).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are

---

[3]  The Local Rules were amended effective January 1, 2021. In the currently operative version of the Local Rules, L.R. 56.1 deals with summary judgment motions. However, because these motions were filed in 2020, the Court refers to the Local Rules as they existed at that time.

[4]  Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.Y.N.D. L.R. 7.1(a)(3).

supported by evidence in the record, and (2) provided that the nonmovant, if proceeding pro se, has been specifically advised of the possible consequences of failing to respond to the motion.[5] See Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996).

Accordingly, the facts set forth in Defendants' Statement of Material Facts that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's complaint and verified opposition submissions will be accepted as true. See McAllister v. Call, No. 10-CV-610, 2014 WL 5475293, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); Douglas v. Perrara, No. 11-CV-1353, 2013 WL 5437617, at *3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) . . . supplemented by Plaintiff's verified complaint . . . as true."). As to any facts not contained in Defendants' Statement of Material Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. Terry, 336 F.3d at 137.

Moreover, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's pro se status, the Court has reviewed the entire record.

---

[5] Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. See Mot. for Partial Summ. J. at 4.

With respect to Plaintiff's own cross-motion for summary judgment, however, the Court cannot overlook Plaintiff's failure to comply with the Local Rules. Here, Plaintiff did not submit a Statement of Material Facts, Memorandum of Law or any supporting affidavits. Importantly, the Local Rules provide that "[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts *shall* result in a denial of the motion." L.R. 7.1(3) (emphasis added). Without the aid of a statement of material facts, the Court is unable to consider the motion. Furthermore, though Plaintiff has presented evidence that tends to support his allegation that he was *injured* in the alleged assaults, he has not offered any evidence besides his own unsupported assertions that he was assaulted without justification. Accordingly, the Court denies Plaintiff's cross-motion for summary judgment.

## B. Exhaustion

As noted above, Defendants make two arguments with respect to exhaustion. First, they assert Plaintiff's failure to appeal grievance CL-7565361-19 is fatal to his claims. Moreover, anticipating the argument that grievance No. UST-64656-19 could be construed as encompassing the claims in this action, Defendants argue he failed to exhaust that grievance, because he filed suit in this action before receiving a final disposition from CORC.

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined and do so properly. Jones v. Bock, 549 U.S. 199, 218 (2007) (citing Woodford v. Ngo, 548 U.S. 81, 88 (2006)). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 211. In New York state prisons, DOCCS has a well-established three-step Inmate Grievance Procedure ("IGP"). N.Y. Comp. Codes R. & Regs. tit. 7 ("NYCRR"), § 701.5 (2013).

Generally, the IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. § 701.5(a). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. § 701.5(d)(3)(ii).

9

Complaints of harassment are handled by an expedited procedure which provides that such a grievance, once it is given a number and recorded by the IGP clerk, is forwarded directly to the superintendent of the facility, after which the inmate may appeal any negative determination to CORC. §§ 701.8(h), (i).

Generally, a plaintiff must properly appeal through all the relevant levels of the IGP before seeking relief in a federal court under § 1983. See Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

Finally, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." Ross v. Blake, 136 S. Ct. 1850, 1858 (2016). More specifically, § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); see also Ross, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (internal quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." Ross, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The Ross Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. Id. at 1859–60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Finally, an administrative

remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

As an affirmative defense, the defendant bears the burden of showing the plaintiff failed to satisfy the exhaustion requirements. See Jones, 549 U.S. at 216; Johnson v. Testman, 380 F.3d 691, 695 (2d Cir. 2004).

As noted above, on March 11, 2019, while housed at Clinton, Plaintiff filed inmate grievance No. CL-7565361-19, dated March 1, 2019. Defs.' SMF ¶ 16. This grievance included the relevant facts regarding the alleged February 22, 2019 assault that is the subject of this motion. Dkt. No. 46-4 at 10–11. Clinton's Superintendent denied this grievance on June 14, 2019. Defs.' SMF ¶ 22. The record evidence establishes that Plaintiff did not appeal the Superintendent's decision related to grievance No. CL-7565361-19. Id. ¶ 23.

Under normal circumstances, Plaintiff's failure to appeal grievance No. CL-7565361-19 would be fatal to his claim. See Ruggiero, 467 F.3d at 176. However, the Superintendent's denial of grievance No. CL-7565361-19 contained a material misstatement regarding the investigation into the events on February 22, 2019. To that end, the Clinton Superintendent stated, in pertinent part, that "[a]n investigation has revealed that that [sic.] the allegations concerning Upstate CF have been addressed in UST-64656-19." Defs.' SMF ¶ 22.

Here, the Court concludes that the Superintendent's misstatement is an example of the type of misinformation that would have interfered with Plaintiff's pursuit of relief. See Ross, 136 S. Ct. at 1860 (noting that "interference with an inmate's pursuit of relief renders the administrative process unavailable."). Viewing the evidence in light most favorable to Plaintiff, the Superintendent's affirmative representation that the investigation of the February 22, 2019,

incident was being handled by a separate grievance[6] lead Plaintiff to abandon grievance No. CL-7565361-19 and instead appeal grievance UST-64656-19. Indeed, Plaintiff's appeal statement regarding grievance UST-64656-19—filed *after* receiving the Superintendent's denial of grievance No. CL-7565361-19—included allegations related to the February 22, 2019 incident. Dkt. No. 46-3 at 15. Accordingly, the Superintendent's misrepresentation thwarted him "from taking advantage of the grievance process," rendering his remedies unavailable. See Ross, 136 S. Ct. at 1860; see also Perez v. Arnone, No. 12-CV-1591, 2018 WL 3596747, at *8 (D. Conn. July 26, 2018) (concluding administrative remedies were unavailable because a prison official provided misinformation to the plaintiff about the grievance process).

Additionally, Defendants' contention that Plaintiff was able to successfully navigate the IGP as to other matters, see Defs.' Mem. of Law at 15, does not necessarily weaken Plaintiff's unavailability argument. Rather, his history of filing grievances could also suggest that, absent interference, he was capable of complying with the IGP. See Burrell v. Zurek, No. 17-CV-0906, 2019 WL 4051596, at *3 (N.D.N.Y. Aug. 28, 2019).

Defendants further argue, in the alternative, that, if the Court finds Plaintiff adequately exhausted his administrative remedies through his pursuit of grievance UST-64656-19, his claim should still be dismissed because he filed this action before receiving a response from CORC. However, during the pendency of this motion the Second Circuit issued a decision that squarely rejects Defendants' arguments. To that end, the Court held that "an inmate exhausts administrative remedies when he follows the procedure in its entirety but the CORC fails to

---

[6] Defendants' submissions establish the Superintendent's statement was false. (Dkt. No. 46-3 ¶¶ 30–31.) To that end, Sherri Debyah, the IGP Supervisor at Upstate, indicated that the investigation regarding grievance UST-64656-19 *did not* consider any of the events that took place on February 22, 2019. Id. at ¶ 31. Thus, it appears, from Defendants' own submissions, that *no internal investigation* took place to consider the serious allegations included in grievance No. CL-7565361-19 as they related to Upstate.

respond within the 30 days it is allocated under the regulations." Hayes v. Dahlke, 976 F.3d 259, 270 (2d Cir. 2020). Here, it is undisputed that CORC failed to issue a decision within 30 days after receiving Plaintiff's appeal; and Plaintiff commenced this action only after the relevant timeframe. Defendants acknowledge that Hayes controls the relevant issues and rightfully abandoned this argument with respect to exhaustion. Dkt. No. 59.

Thus, the Court concludes Defendants have failed to meet their burden to establish they are entitled to summary judgement with respect to Plaintiff's claims related to the first incident on February 22, 2019, on exhaustion grounds. Accordingly, the Court denies Defendants' motion.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 46), is **DENIED**; and it is further

**ORDERED**, that Plaintiff's cross-motion for summary judgment (Dkt. No. 51), is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 26, 2021
                   Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge